Justin D. Niznik, Esq. (*admitted pro hac vice*)
**Bowman and Brooke LLP**
1064 Greenwood Blvd., Ste. 212
Lake Mary, FL 32746
Tel. (407) 585-7600
Fax (407) 585-7610
justin.niznik@bowmanandbrooke.com

MARIO D. VALENCIA
Nevada Bar No. 6154
40 S. Stephanie St., Ste. 201
Henderson, Nevada 89012
Tel. (702) 384-7494
Fax (702) 384-7545
valencia.mario@gmail.com

Attorneys for Defendant
W.M. BARR & COMPANY, INC.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ANGELA UNDERWOOD, as Personal Representative for the ESTATE OF TYLER UNDERWOOD,<br><br>Plaintiff,<br><br>v.<br><br>O'REILLY AUTO PARTS, INC., *et al.*,<br><br>Defendants. | Case No. 2:21-cv-01766-GMN-NJK<br><br>**DEFENDANT W.M. BARR & COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendant W.M. Barr & Company, Inc. ("W.M. Barr"), moves this for summary judgment in its favor and against the Plaintiff, Angela Underwood, as Personal Representative of the Estate of Tyler Underwood, Deceased ("Plaintiff") on the grounds that:

(1) The Federal Hazardous Substances Act, 15 U.S.C. §1261 *et seq*. ("FHSA") preempts Plaintiff's state law based failure to warn claims;

(2) Plaintiff cannot meet her burden of establishing that the W.M. Barr products that Plaintiff's Decedent, Tyler Underwood ("Decedent") allegedly used or otherwise was exposed to as a child, if any, to wit: Klean Strip® Odorless Mineral Spirits and Klean Strip® Lacquer Thinner

(collectively "Barr Products") contained the substance Plaintiff claims rendered them defective and unreasonably dangerous (*i.e.*, benzene);

(3) Plaintiff also cannot meet her burden of establishing that the Barr Products were a substantial factor in causing the Decedent to contract Acute Myelogenous Leukemia ("AML");

(4) The sole cause of Decedent's illness and eventual death is not any defect in the Barr Products or deficiency in their on-product warnings and instructions, but, instead, Plaintiff's unforeseeable use of them in a manner that flagrantly violated those warnings and instructions; and

(5) Because neither Plaintiff, nor the Decedent were in contractual privity with W.M. Barr and because, in any event, breach of implied warranty claims are subsumed in claims for strict liability, Plaintiff cannot pursue, let alone prevail on claims for breach or express or implied warranty.

Accordingly, W.M. Barr is entitled to judgment, as a matter of law. In support of its Motion, W.M. Barr relies on the following statement of undisputed facts, arguments, and authorities.

## STATEMENT OF UNDISPUTED FACTS

### Decedent's Alleged Exposures To Barr Products

1. This wrongful death action arises out of the Decedent's purported use of and/or exposure to benzene-containing products manufactured, sold, and/or distributed by various Defendants, his subsequent contraction of AML, and his eventual death as a result of that disease.

2. At various times, Plaintiff owned and operated ANG Custom Painting, a commercial and residential painting contractor in Reno, Nevada. *See* Deposition of Angela Underwood, dated October 11, 2022 ("A. Underwood Depo"), at pp. 256, 257, and 259, *see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Composite Exhibit A**.

3. Decedent was born in 1996.

4. Between 2004 and 2008, Plaintiff periodically enlisted the Decedent to help her clean paint brushes that she and other ANG employees used in the course of the day's work.[1] *Id.* at pp. 262, 265, & 293-94; Deposition of Tyler Underwood ("T. Underwood Depo"), dated January 5, 2022, at pp. 284 & 285, *see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Composite Exhibit B**.

5. To perform some of that work, Plaintiff supplied the Decedent with—and instructed him in the use of— Klean Strip® Odorless Mineral Spirits, which she claims to have purchased from one of several painting supply and/or big box retailers in the Sparks/Reno/Sun Valley area. A. Underwood Depo at pp. 272 & 273.[2]

6. Specifically, with respect to brushes that had been used to apply oil-based paints, Plaintiff recalls pouring Klean Strip® Odorless Mineral Spirits into a bucket and directing the Decedent to run his hands and the mineral spirits through the bristles of the brushes until they were cleared of all paint residue. *Id.* at pp. 269-71.

7. In warmer temperatures, Plaintiff and the Decedent cleaned the brushes outdoors, but, in the colder months, they performed the task indoors with the garage door opened just a crack, the

---

[1] Plaintiff shut down her business in 2009; thus, she did not enlist Decedent's help to clean paint brushes between 2009 and 2012. A. Underwood Depo at 280, 281.

[2] There is **no documentary evidence** (*e.g.,* business records, invoices, purchase orders and/or receipts, etc.) to corroborate Ms. Underwood's self-serving deposition testimony regarding her purchase and/or the Decedent's use of the Barr Products, nor is there any **testimonial corroboration**. *Id.* at pp. 278, 279, & 280. In fact, the Decedent and his sister, Lisa, have no recollection of the name brands of any of the products the Decedent may have used or been exposed to as a child or where they were purchased. T. Underwood Depo at pp. 295, 296, & 311. *See also* Deposition of Lisa Underwood, dated October 12, 2022 ("L. Underwood Depo") at pp. 178-79 & 182-84, *see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Composite Exhibit C**.

"man door" at the rear of the garage open, and, on occasion, the use of a small fan, as their sole source of ventilation. *Id.* at pp. 282 - 285.[3]

8. Plaintiff did not supply the Decedent with any form of respiratory or eye protection, nor did she insist that he wear gloves to prevent or minimize the risk of his exposure to the fumes of the mineral spirits and/or its contact with his skin. *Id.* at pp. 270 & 288; T. Underwood Depo at pp. 300, 301, & 302.

9. The only precautionary instructions Plaintiff transmitted to the Decedent was that he should be careful not to ingest the mineral spirits, take care to avoid getting any of it in his eyes, and be sure to wash his hands and arms thoroughly when he had completed his work. A. Underwood Depo at pp. 269, 270, & 281.

10. On rare occasions, Plaintiff also allowed the Decedent to assist her in cleaning her "spray rig," which, depending on whether she had used the rig to apply latex paint, oil-based paint, or lacquer would involve the use of water, mineral spirits, lacquer thinner, or some combination of the three. *Id.* at pp. 274 & 275.[4]

11. The Decedent assisted Plaintiff in cleaning paint brushes 2 to 4 days a week for somewhere between 15 minutes and an hour at a time, though that varied depending on Decedent's schedule and level of interest in helping. *Id.* at pp. 271, 275, & 277. *See also* T. Underwood Depo at pp. 289 & 290.

---

[3]Notably, brushes used to apply water-based paints, were cleaned with soap and water (*i.e.*, without the use of chemicals). *Id.* at 266. Plaintiff used water-based paint on every project and only used oil-based paint for doors, jams, and casings. *Id.* at pp. 267 & 268.

[4]Plaintiff has no recollection of the Decedent ever cleaning out her rig with lacquer thinner. *Id.* at p. 275. However, on occasion, the Decedent was present when Plaintiff and other ANG employees ran clean lacquer through the system and into a bucket to clean it, before he helped fill the system with mineral spirits to ready it for the next day's work. *Id.* at pp. 275-76.

12. Plaintiff never had the Decedent read any of the warnings or instructions on the labels of the Barr Products, nor did she read them out loud to him. A. Underwood Depo at p. 281.

13. Decedent does not remember any of the labels of mineral spirits he used when he was a child nor did anyone ever tell him to read the labels or read the labels to him. T. Underwood Depo at p. 161.[5]

14. Plaintiff's experts have tested several of the products the Decedent allegedly worked with or otherwise exposed to and claim those tests confirmed that those products contained varying concentrations of benzene. *See* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit D**. *See also* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit E**.

15. However, Plaintiff's experts have not tested the Barr Products that Plaintiff exposed the Decedent to during his childhood (*i.e.,* at various times between 2004 and 2008) to either confirm or rule out whether they contained benzene and, if so, in what concentration(s).

16. Consequently, the only record evidence that exists on that subject affirmatively and conclusively demonstrates that batch ingredients used to manufacture the Barr Products were routinely and consistently tested and **benzene was not detected**. *See* Deposition of Dennis Shireman, dated August 22, 2023 ("Shireman Depo") at pp. 152-54, *see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Composite Exhibit F**.

17. In fact, Mr. Shireman, W.M. Barr's corporate representative, who has been a chemist at W.M. Barr since 1989, testified that, at times, he personally used the mass spectrometer on a gas chromatograph to look below the normal detection limits and has never been able to detect benzene. *Id.* at pp. 57 & 158.

---

[5]For a couple months in 2015, Decedent worked as a painter for Mr. Alex Carrera but he did not know what brand of mineral spirits and lacquer thinner, if any, were used. T. Underwood at pp. 157,158. If fact, Decedent could not recall a specific time when he used mineral spirits or whether he used lacquer thinner while working for Mr. Carrera. *Id.* at pp. 175-76.

**The Barr Products**

**Klean Strip® Odorless Mineral Spirits**

18. Klean Strip® Odorless Mineral Spirits is a multi-purpose product, distilled from petroleum that is used to thin oil-based paints, stains, and varnishes and to clean fresh paint from brushes and splatters.

19. As evidenced by the front panel of its on-product label contains, *inter alia*, the following warnings and instructions:

- **"DANGER! HARMFUL OR FATAL IF SWALLOWED. EYE IRRITANT.**
- **"COMBUSTIBLE."**
- **"IMPORTANT:** Carefully read all directions, notes and cautions prior to use. Only use this product as directed on the label."
- "Protect eyes with chemical splash goggles and avoid prolonged skin contact."

20. The back label, in turn, instructs and warns users as follows:

- **"DANGER! HARMFUL OR FATAL IF SWALLOWED. EYE IRRITANT. COMBUSTIBLE."**
- "Contains Petroleum Distillates. Keep away from heat, sparks, open flames, and other ignition sources."
- **"USE ONLY WITH ADEQUATE VENTILATION TO PREVENT BUILDUP OF VAPORS."**
- "Whenever possible, use outdoors in an open air area. If using indoors open all windows and doors and maintain a cross ventilation of moving fresh air across the work area."
- "IF THE WORK AREA IS NOT WELL VENTILATED, DO NOT USE THIS PRODUCT."
- **"KEEP OUT OF REACH OF CHILDREN"**

*see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit G**.

21. The foregoing labels fully comply with FHSA. *See* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit H**, Report of Steve Arndt, Ph.D., CHFP, dated May 19, 2023 at pp. 38 & 39.

**Klean Strip® Lacquer Thinner**

22. Klean Strip® Lacquer Thinner is also a multi-purpose, petroleum-derived product that customarily is used to clean paint sprayers and tools. It also improves flow and leveling of lacquers, and helps resist blushing.

23. Its front label informs and warns purchasers as follows:

- "**DANGER!** [skull and crossed bones icon] **POISON. EXTREMELY FLAMMABLE. VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY. MAY BE FATAL OR CAUSE BLINDNESS IF SWALLOWED. EYE IRRITANT. VAPOR HARMFUL**. Read other cautions on back panel."

24. The back label, much like that on the mineral spirits, further instructs and warns as follows:

- "**IMPORTANT**: Carefully read all directions, notes and cautions prior to use. Only use this product as directed on the label.
- "Protect eyes with chemical splash goggles."
- "**DANGER! EXTREMELY FLAMMABLE. KEEP AWAY FROM HEAT, SPARKS, FLAME AND ALL OTHER SOURCES OF IGNITION. VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY**."
- "**USE ONLY WITH ADEQUATE VENTILATION TO PREVENT BUILDUP OF VAPORS**."
- **IF THE WORK AREA IS NOT WELL VENTILATED, DO NOT USE THIS PRODUCT**.
- "Contains Acetone, Ethyl Acetate, Methanol, Petroleum Distillates and Toluene."

- "Cannot be made nonpoisonous."
- "Reports have associated repeated and prolonged overexposure to solvents with neurological and other physiological damage."
- "Intentional misuse of this product by deliberately concentrating and inhaling vapors can be harmful or fatal."
- "**WARNING**: Using this product will expose you to chemicals which are known to the State of California to cause cancer and reproductive harm."[6]
- "**KEEP OUT OF REACH OF CHILDREN**"

*see* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit I**.

25. The foregoing labels fully comply with FHSA. Appendix at Exhibit H, p. 38.

## STATEMENT OF PROCEEDINGS

On September 15, 2021, Plaintiff filed suit against W.M. Barr and others—in Clark County, Nevada—for damages associated with the Decedent's alleged exposure to benzene, his diagnosis of AML, and his subsequent death on January 16, 2022. The case was later removed and Plaintiff has since twice amended her Complaint. In what is now her Second Amended Complaint ("SAC") (Dkt. No. 302), Plaintiff alleges that, while residing in Arizona and Nevada, the Decedent was exposed to benzene-containing products "manufactured, marketed, supplied, distributed, and/or sold" by various Defendants, including W.M. Barr. ." *Id.* at pp. 1 & 7, ¶¶ 1 & 20. Plaintiff further alleges that: (1) as a result of those exposures, the Decedent contracted and ultimately died from AML (*Id.* at p. 7, ¶¶ 22 and 23); and (2) W.M. Barr and various other Defendants should be held liable for his death on state law based theories of negligence, gross negligence, strict liability, and breach of express and implied warranties, all based on their purported failure to warn or failure to adequately warn users of the

[6] In 1991, California determined that toluene had developmental toxicity, thus requiring the Proposition 65 warning https://oehha.ca.gov/proposition-65/chemicals/toluene. To be clear, however, at all times relevant to this action, NTP, IARC Monographs and OSHA did not deem any of the ingredients in the Barr products to be carcinogenic.

health risks associated with benzene. *Id.* at pp. 9, 70 - 86, and 92 – 99, ¶¶ 25, 82, 83, 84, 85, & 91 - 115. W.M. Barr, in turn, generally and specifically denied all allegations in the SAC and asserted 37 affirmative defenses (Dkt. No. 310).

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Initially, the movant bears the burden of demonstrating that there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. If it is a fact concerning which the movant has the burden of proof at trial, "the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Csech v. McKee,* No. 3:19-CV-00288-MMD-CLB, 2021 WL 4930340 at *2 (D. Nev. Oct. 1, 2021) (citing *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)). However, when the burden of proof on an issue at trial is the non-movant's, as is more often the case, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

Once the moving party has met its burden, the non-movant must come forth with evidence that there is a genuine disputed factual issue that may change the outcome of the lawsuit in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). To discharge that burden, a non-movant "must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists." *Csech*, 2021 WL 4930340 at *3 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 11 (1986)). Thus, speculation is insufficient, as are "conclusory allegations unsupported by factual data." *Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981). *See also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–

82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."); *Soremekun*, 509 F.3d at 985. If the non-movant fails to meet that burden, summary judgment must be granted.

## ARGUMENT

### I. As a matter of law, FHSA preempts Plaintiff's state common law-based causes of action relating to the content and/or adequacy of the on-product instructions and warnings.

Congress expressly enacted FHSA in 1960 to "provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use." H.R. REP. No. 86-1861, at 2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2833, 2833. *See also Moss v. Parks Corp.*, 985 F.2d 736, 739 (4th Cir.), *cert. denied*, 509 U.S. 906 (1993). The Act and its enacting regulations, in turn, define a "hazardous substance" as "[a]ny substance or mixture of substances which ... is flammable or combustible". 15 U.S.C. §1261(f)(1)(A)-(B).[7] A substance is deemed to be "flammable" if its flashpoint (*i.e.,* the lowest temperature at which it emits ignitable vapors) is between 20 and 100 degrees Fahrenheit. 16 C.F.R. §1500.3(c)(6)(ii). Moreover, products that can cause death and blindness if ingested also are considered to be "hazardous" and subject to the FSHA's labeling requirements. 16 C.F.R. §1500.14 (a)(4).

If a product is deemed to be a "hazardous substance" under the FHSA, both FHSA and 16 CFR §1500.3(b)(14)(i) mandate that it contain certain statutorily prescribed language on its label so as not to be categorized as a "misbranded hazardous substance." That information includes the following:

(A) The name and place of business of the manufacturer, packer, distributor, or seller;

---

[7]The FHSA authorized the Consumer Product Safety Commission ("CPSC") to issue regulations implementing the FHSA. 15 U.S.C. §1262(b). *See* 16 C.F.R. §1500, *et seq*. The provisions of the FHSA and the CPSC regulations provide a detailed scheme for the handling and labeling of hazardous substances. *Torres-Rios v. LPS Laboratories, Inc.*, 152 F.3d 11, 13 (1st Cir. 1998).

(B) The common or usual name or the chemical name (if there be no common or usual name) of the hazardous substance or of each component which contributes substantially to its hazard, unless the Commission by regulation permits or requires the use of a recognized generic name;

(C) The signal word ''DANGER'' on substances which are extremely flammable, corrosive, or highly toxic,

(D) The signal word ''WARNING'' or ''CAUTION'' on all other hazardous substances;

(E) An affirmative statement of the principal hazard or hazards, such as ''Flammable,'' ''Combustible,'' ''Vapor Harmful,'' ''Causes Burns,'' ''Absorbed Through Skin,'' or similar wording descriptive of the hazard;

(F) Precautionary measures describing the action to be followed or avoided, except when modified by regulation of the Commission pursuant to section 3 of the act;

(G) Instruction, when necessary or appropriate, for first-aid treatment;

(H) The word Poison for any hazardous substance which is defined as ''highly toxic'' by section 2 (h) of the act (restated in paragraph (b)(6) of this section);

(I) Instructions for handling and storage of packages which require special care in handling or storage; and

(J) The statement (1) ''Keep out of the reach of children'' or its practical equivalent, or, (2) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard."

*Id.* Moreover, with respect to any product that contains benzene, toluene, xylene, or petroleum distillates, 16 CFR §1500.14(b)(3) imposes the following additional warning requirements on its manufacturer:

(i) Because inhalation of the vapors of products containing 5 percent or more by weight of benzene may cause blood dyscrasias, such products shall be labeled with the signal word “danger,” the statement of hazard “Vapor harmful,” the word “poison,” and the skull and crossbones symbol. If the product contains 10 percent or more by weight of benzene, it shall bear the additional statement of hazard “Harmful or fatal if swallowed” and the additional statement “Call physician immediately.

(ii) Because products containing 10 percent or more by weight of toluene, xylene, or any of the other substances listed in paragraph(a)(3) of this section may be aspirated into the lungs, with resulting chemical pneumonitis, pneumonia, and pulmonary edema, such products shall be labeled with the signal word “danger,” the statement or hazard “Harmful or fatal if swallowed,” and the statement “Call physician immediately.”

(iii) Because inhalation of the vapor of products containing 10 percent or more by weight of toluene or xylene may cause systemic injury, such products shall bear the statement of hazard “Vapor harmful” in addition to the statements prescribed in paragraph(b)(3)(ii) of this section.”

16 CFR §1500.14(b)(3).

Significantly, in 1966, Congress amended the FHSA to address "the impracticality of having the states produce potentially 50 different labels for a particular hazardous substance." *Moss*, 985 F.2d at 739. It did so through the adoption of the following provision:

> [I]f a hazardous substance or its packaging is subject to a cautionary labeling requirement under [15 U.S.C. §§1261(p) or 1262(b)] designed to protect against a risk of illness or injury associated with the substance, no State ... may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under [the FHSA].

15 U.S.C. §§1261 n. (b)(1)(B). Stated otherwise, the FHSA preempts any state common law-based causes of action which seek to impose an additional, different, or more elaborate labeling requirement

on a product subject to the FHSA. *See, e.g., Mwesigwa v. DAP, Inc.,* 637 F.3d 884, 887 (8th Cir. 2011); *Comeaux v. National Tea Co.*, 81 F.3d 42, 43 (5th Cir. 1996); *Moss*, 985 F.2d at 739-740. *See also Watts-Gillead v. Smith*, No. 350663/2008, 2016 N.Y. Slip Op. 31376 (N.Y. Sup. Ct. 2016) (stating the general rule).

A number of courts have held that the FHSA preempts state common law claims predicated on the alleged inadequacy of warning and other labeling of hazardous consumer products directly analogous to the instant case. *See, e.g., Mwesigwa*, 637 F.3d at 889 (label on can of construction adhesive "complies with the FHSA because the principal hazard to be avoided is flammability, and the way to avoid that hazard is to remove all potential ignition sources"); *Moss*, 985 F.2d at 742 (label on can of paint stripper provided all warnings required by FHSA and CPSC); *Kirstein v. W. M. Barr & Co., Inc.*, 983 F. Supp. 753, 763-64 (N.D. Ill. 1997) (warnings on can of lacquer Stripper that it is extremely flammable and that its vapors may cause flash fire or ignite explosively satisfied FHSA requirements), *aff'd*, 159 F.3d 1065, 1067 (7th Cir. 1998). *See also Walker v. Sunnyside Corp*, No. 08-CV-2339 (FB) (CLP), 2013 WL 2298967 (E.D.N.Y. May 24, 2013) (manufacturer of denatured alcohol entitled to summary judgment based on FHSA preemption); *Namundi v. Rocky's Ace Hardware, LLC*, 81 Mass. App. Ct. 665, 671-672, 966 N.E.2d 846, 852-853 (2012) (words “EXTREMELY FLAMMABLE” and “VAPOR HARMFUL” on principal display panel of paint stripper provided required statements of product's principal hazards).

The Barr Products indisputably are a “hazardous substance” governed by the FHSA, in that they are consumer products sold in interstate commerce, which: (1) are comprised of "substance[s] or [a] mixture of substances which ... [are] flammable or combustible." It is equally undisputed that, at the time they allegedly were purchased by Plaintiff and at all times the Decedent may have used or otherwise been exposed to them, the labels on the Barr Products satisfied all applicable FHSA and CPSC on-product labeling requirements. Appendix at Exhibit H. Specifically, they include the words “FLAMMABLE”, “DANGER” and “POISON”, as well as the “skull and crossbones” symbol. 16

C.F.R. § 1500.14 (b)(4); Appendix at Exhibits G and I. Moreover, the Klean Strip® Odorless Mineral Spirits label alerts users that its contents are "HARMFUL OR FATAL IF SWALLOWED," while the Klean Strip® Lacquer Thinner label alerts users as follows: "VAPOR HARMFUL", "MAY BE FATAL OR CAUSE BLINDNESS IF SWALLOWED." *Id.* Finally, the Klean Strip® Lacquer Thinner label plainly: (1) warns users that "this product will expose you to chemicals which are known to the State of California to cause cancer and reproductive harm; and," and (2) describes the precautionary measures to take in the event of exposure, as well as what to be avoided in connection with the use of the product. *Id.*

Thus, absent circumstances not present here,[8] the FHSA preempts Plaintiff's failure to warn claims in their entirety, as a matter of law.[9] *Moss*, 985 F.2d at 740; *Mwesigwa*, 637 F.3d at 888-889; *Torres-Rios*, 152 F.3d at 14-15; *Comeanx*, 81 F.3d at 43-44; *Kirstein*, 983 F. Supp. at 764 (holding that the FHSA preempted plaintiffs' state law "failure to warn" claim for injuries plaintiffs suffered in a flash fire while using defendant's Klean Strip lacquer thinner to remove mastic underlayment). *See also Suarez v. W.M. Barr & Co.*, 842 F.3d 513 (7th Cir. 2016) (applying Illinois law) (district court properly concluded that FHSA preempted plaintiffs' state common law based failure to warn claims against Barr for damages arising out of a fire that erupted in connection with their use of Goof Off, but did not preempt non-failure to warn strict liability and negligence claims).

## II. Plaintiff cannot meet her burden of demonstrating that she or the Decedent would have heeded a different warning had one been provided, since she indisputably either failed to read or ignored the ones that were given.

To prevail on failure-to-warn based strict liability claim in Nevada, a plaintiff bears the **<u>burden of production and persuasion</u>** on the same elements that apply in all strict liability claims,

---

[8] The only exception would be if Plaintiff was alleging that the subject label is misbranded under the FHSA, which she is not.

[9] Notably, the issue is whether the label satisfies the requirements of the FHSA, not whether a label defines every phrase and addresses every potential hazard. *Canty v. Ever-Last Supply Co.*, 296 N.J. Super. 68, 685 A.2d 1365, 1375 (N.J. Super. Ct. Law Div. 1996).

namely that "(1) the product had a defect which rendered it unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer, and (3) **<u>the defect caused the plaintiff's injury</u>**." *Rivera v. Philip Morris, Inc.*, 125 Nev. 185, 191, 209 P.3d 271, 275 (2009) (quoting *Fyssakis v. Knight Equip. Corp.*, 108 Nev. 212, 214, 826 P.2d 570, 571 (1992)) (emphasis added)). The difference is that, in failure-to-warn cases, the "unreasonably dangerous and defective" inquiry turns on a manufacturer's alleged failure to warn or failure to adequately warn. *See, e.g., Yamaha Motor Co. v. Arnoult*, 114 Nev. 233, 238-39, 955 P.2d 661, 665 (1998). As a general rule, a plaintiff's ability to meet their burden of proving causation depends on their ability to prove that an on-product warning or a different warning would either have altered the way they used the product or prompted them to take precautions that would have avoided the injury. *See, e.g.*, *Rivera*, 125 Nev. at 191, 209 P.3d at 275 (citing *Riley v. American Honda Motor Co.*, 856 P.2d 196, 198 (Mont. 1993) with approval). *See also Sims v. General Tel. & Electronics*, 107 Nev. 516, 523, 815 P.2d 151, 156 (1991), *overruled on other grounds by Tucker v. Action Equip. & Scaffold Co.*, 113 Nev. 1349, 1356 n. 4, 951 P.2d 1027, 1031 n. 4 (1997), *overruled on other grounds by Richards v. Republic Silver State Disposal*, 122 Nev. 1213, 148 P.3d 684 (2006).

Plaintiff cannot meet her burden with respect to causation here for at least two reasons. **<u>First</u>**, by her own admission, Plaintiff either did not read or failed to heed the plain, conspicuous, and unambiguous on-product warnings that W.M. Barr indisputably did provide, beginning—most fundamentally—with its unqualified admonition that she "**KEEP** [the Barr Products] **"OUT OF REACH OF CHILDREN."** *See* Appendix at Exhibits G and I. *See also* Appendix at Exhibit A, Angela Underwood Depo at pp. 237, 238, and 239. Instead, Plaintiff quite intentionally not only **<u>put one or both of the Barr Products in "reach" of the Decedent</u>**, but instructed him to immerse his arms and hands in them—with his face only inches from the 5 gallon buckets she filled with them—for 15 minutes to an hour a day. *Id.* at pp. 269, 270, and 271. *See also* Appendix at Exhibit B, T. Underwood Depo at pp. 289, 301, and 302. In the case of the Klean Strip® Lacquer Thinner, Plaintiff

did so in the face of and with utter disregard for a "**WARNING**" that "Using [the] product [would] expose [the user—in this instance, her minor child, Tyler] to **chemicals which are known to the State of California to cause cancer** and reproductive harm." *See* Appendix at Exhibit I (underlined emphasis added).

Plaintiff also ignored a number of other warnings and instructions plastered on the front and back of the Barr Products, including directives that she: (1) "Avoid contact with eyes and contact with skin. Avoid breathing of vapors or mist and contact with skin, eyes, and clothing;" (2) "Protect [her and the Decedent's] eyes with chemical splash goggles and avoid prolonged skin contact[;]" (3) "Carefully read all directions, notes and cautions prior to [their] use. Only use [them] as directed on the label;" (4) "**USE** [THEM] **ONLY WITH ADEQUATE VENTILATION**;" (5) "use [them] outdoors in an open air area [whenever possible];" (6) open all windows and doors and maintain a cross ventilation of moving fresh air across the work area [if using them indoors];" and (7) not use them "**IF THE WORK AREA IS NOT WELL VENTILATED**." *See* Appendix at Exhibits G and I. *See also* Appendix at Exhibit A, A. Underwood Depo at pp. 270, 284, 285 and 288.[10] All this notwithstanding the fact that the on-product labeling specifically and expressly informed Plaintiff that "[r]eports ha[d] associated repeated and prolonged overexposure to solvents with neurological and other physiological damage." *See* Appendix at Exhibit I.

**Second**, in light of the foregoing, no reasonable jury could conclude that additional or different on-product warnings or instructions would have: (1) altered the way Plaintiff used and/or instructed the Decedent to use the Barr Products; or (2) prompted Plaintiff to take precautions that

---

[10]Specifically, Plaintiff admitted that, *inter alia*, she did not provide the Decedent with safety goggles, gloves, or any form of respiratory protection. *Id.* at 270 and 288. *See also* Appendix at Exhibit B, T. Underwood Depo at 300 and 301. Moreover, Plaintiff did not take steps to ensure that the family garage in which she and the Decedent used one or both Barr Products in the winter months was far from well-ventilated, nor did she maintain "a cross ventilation of moving fresh air across the work area." Instead, she simply opened the garage door a "crack" and a small entry door on the opposite end of the garage. *See* Appendix at Exhibit A, A. Underwood Depo at 284 and 285.

would have avoided any potential injury to herself or the Decedent. At the end of the day, the **inescapable fact** is: Had Plaintiff, a knowledgeable, professional painting contractor, simply heeded one simple warning: "**KEEP OUT OF REACH OF CHILDREN**," the Decedent never would have used or otherwise been exposed to the Barr Products and W.M. Barr would never have been named in this lawsuit.[11] The fact that she ignored "**KEEP OUT OF REACH OF CHILDREN**" is fatal to her failure to warn claims even if they were not preempted by FHSA, which they are, mandates the entry of summary judgment in favor of W.M. Barr.[12]

## III. W.M. Barr is also entitled to summary judgment on Plaintiff's strict liability and negligence claims, because the record is devoid of evidence that the Barr Products were defective and unreasonably dangerous.

Few principles are more fundamental to product liability jurisprudence than: (1) a plaintiff's burden to establish that the product at issue is defective and unreasonably dangerous; (2) a defendant's entitlement to summary judgment when a plaintiff fails to meet that burden. *See, e.g., Neal-Lomax v. Las Vegas Metropolitan Police Dept.*, 574 F. Supp. 2d 1193, 1997 (D. Nev. 2008) (citing *Fyssakis*, 108 Nev. at 214, 826 P.2d at 571). *See also Azad v. Goodyear Tire & Rubber Co.*, No. 2:11-CV-00290-KJD-GWF, 2013 WL 593913 (D. Nev. Feb. 14, 2013); *M R Inv. Co. v. Anzalotti*, 105 Nev. 224, 226-27, 773 P.2d 729, 730-31 (1989).

---

[11]It is telling that Plaintiff admits it is inappropriate to allow a minor to use these products unsupervised yet because she failed to ensure the warnings and instructions were followed Decedent was *de facto* unsupervised while using these products. *See* Appendix at Exhibit A, A. Underwood at 231, 232, 233.

[12]Where, as here, a plaintiff's failure-to-warn based negligence and strict liability claims are duplicative, the granting of summary judgment on the strict liability claim mandates the entry of summary judgment on the negligence claims. *See, e.g., Ontiveros v. Coloplast Corp.*, No. 2:20-CV-463 JCM (VCF), 2022 WL 3084429 (D. Nev. Aug. 3, 2022); *Forest v. E.I. DuPont de Nemours & Co.*, 791 F. Supp. 1460, 1464 (D. Nev. 1992) (concluding that negligence and strict liability claims should be considered together "for purposes of considering Defendant's possible liability for failure to provide an adequate warning"); *Forest v. Vitek, Inc.*, 884 F. Supp. 378, 380 (D. Nev. 1993) (noting that "there is no practical difference between an action in negligence for breach of one's duty to warn and an action in strict liability for a product defect due to inadequate warning or labeling").

In the instant case, Plaintiff alleges that the Barr Products were defective in two ways: (1) the absence and/or inadequacy of on-product warnings; and (2) the presence of an ingredient (*i.e.*, benzene) that, at certain exposure levels, over prolonged periods of time, has been associated with various health hazards, including AML. *See, e.g.,* Plaintiff's SAC [Dkt No. 302] at p. 75, ¶ 83 and p. 84, ¶ 85. W.M. Barr already has established its entitlement to judgment as a matter of law as to the failure-to-warn claims. See Arguments I and II, *supra*. However, W.M. Barr also is entitled to summary judgment as to Plaintiff's alternate basis for strict liability (*i.e.*, defect design), because there is not a scintilla of evidence that proves that the Barr Products Plaintiff purchased and the Decedent allegedly used or was otherwise exposed to contained benzene.

Plaintiff did not preserve any of the Barr Products that she claims to have purchased and that the Decedent purportedly used during his childhood. Accordingly, unlike products manufactured and supplied by other Defendants in this action which were preserved and tested,[13] **Plaintiff's experts have not tested the Barr Products that the Decedent actually was exposed to** and, therefore, cannot opine, with a reasonable degree of scientific certainty, that those products contained benzene. They also have not tested any exemplar containers of Klean Strip® Odorless Mineral Spirits and/or Klean Strip® Odorless Lacquer Thinner in an effort to determine if they contain discernable levels of benzene. Thus, there is no admissible record evidence upon which a reasonable jury could conclude that the substance Plaintiff claims rendered the Barr Products defective (*i.e.*, benzene) was actually present in those products at the time they left W.M. Barr's control.

In fact, the only record evidence that does exist on the subject affirmatively establishes that: (1) W.M. Barr had a business practice of testing every incoming batch of bulk ingredients used to

---

[13]*See* Appendix to W.M. Barr's Motion for Summary Final Judgment at **Exhibit J**, Plaintiff's Second Supplemental Expert Disclosures, dated May 27, 2023, (wherein Plaintiff documents the fact that her experts tested samples of TruFuel 50:1 and O'Reilly Power Steering Fluid retrieved from the Decedent's automotive repair shop and purportedly found that the TruFuel 50:1 sample contained 777 ppm benzene by mass, while the sample of O'Reilly Power Steering Fluid contained 1 ppm benzene).

manufacture the Barr Products upon their arrival at the manufacturing site; (2) that testing including the use of a gas chromatograph with mass spec calibrated to detect the presence of benzene down to 200-300 ppm; (3) at other times, W.M. Barr personnel manually modified that sensitivity setting below that baseline for further evaluative purposes; (4) W.M. Barr has never detected the presence of benzene in any of bulk materials it uses and, during the period of the Decedent's alleged exposures, was using to manufacture Klean Strip® Odorless Mineral Spirits and/or Klean Strip® Odorless Lacquer Thinner; and (5) if W.M. Barr had detected the presence of benzene, it would not have accepted the shipment. *See* Appendix at Exhibit F, Shireman Depo at pp. 72, 107, 123, 152-55, 157, 158, 170, and 197.

In light of the foregoing, as to W.M. Barr, Plaintiff has not met and cannot meet her burden of establishing the existence of a defect in the Barr Products and, therefore, W.M. Barr is entitled to summary judgment.

**IV. Plaintiff cannot meet her burden of establishing causation, as a matter of law, because she lacks proof that the Barr Products: (1) contained benzene; and (2) were a substantial factor in causing the Decedent's illness and death.**

It is axiomatic that "a plaintiff bears the burden to prove causation in strict products liability cases." *Bunker v. Ford Motor Co.*, No. 11-CV-1286-PMP-NJK, 2013 WL 4505798, *6 (D. Nev. Aug. 22, 2013) (citing *Rivera*, 125 Nev. at 191, 209 P.3d at 274-77). To satisfy that burden, "the plaintiff must establish a nexus 'between the design defect of the product and the injury—that is, the plaintiff must show that **<u>the design defect</u>** in the product was a **<u>substantial factor</u>** in causing his injury'." *Bunker*, 2013 WL 4505798 at * 9 (quoting *Price v. Blaine Kern Artista, Inc.*, 111 Nev. 515, 520, 893 P.2d 367, 370 (1995) (emphasis added)). Where the Barr Products are concerned, Plaintiff has not met that burden for two reasons. **<u>First</u>**, as explained in Argument III, *supra.*, **<u>Plaintiff has</u> <u>no evidence</u> <u>that the Barr Products</u>** that the Decedent allegedly used or otherwise was exposed to in his childhood, if any, **<u>were defective</u>** (*i.e.*, that they contained the ingredient Plaintiff claims rendered

them defective and unreasonably dangerous: benzene). Indeed, the uncontroverted record evidence establishes just the opposite (*i.e.,* that they did not).

**Second**, even if there was evidence of trace amounts of benzene in the Barr Products, Plaintiff has not proffered admissible evidence that would allow a reasonable jury to conclude that Decedent's *de minimus* exposures to those products were a substantial factor in causing the Decedent to develop AML.

Under Nevada law, where allegedly toxic substances are concerned, it is not enough to simply establish **general causation** (*i.e.,* that, according to credible medical and scientific literature, there is an established causal connection between the toxic substance at issue and the development of the disease process at issue in the general population). Instead, a plaintiff also must establish exposure (or **specific**) **causation** (*i.e.*, proffer evidence that their exposure to a particular defendant's product(s) was a **substantial factor** in causing their injury), especially where, as here, the plaintiff alleges exposures to products manufactured, distributed, and/or sold by several different defendants. *See, e.g., Holcomb v. Ga. Pac., LLC*, 128 Nev. 614, 621-22, 289 P.3d 188, 192 (2012) (emphasizing that, "[r]egardless of the cause of action, causation—encompassing both **medical causation** and sufficient exposure [*i.e.*, **exposure causation**]—is a necessary element in proving [a plaintiff's] case"). *See also Wyeth v. Rowatt*, 126 Nev. 446, 464-65, 244 P.3d 765, 778 (2010); *County of Clark v. Upchurch*, 114 Nev. 749, 758-59, 961 P.2d 754, 760–61 (1998).

In order to meet that burden and defeat a motion for summary judgment on causation, a plaintiff must proffer evidence concerning the "frequency, regularity, and proximity" of their or their decedent's alleged exposure upon which a reasonable "jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." *Holcomb*, 289 P.3d at 196 (citing *Gregg v. V–J Auto Parts, Inc.*, 943 A.2d 216, 227 (Pa. 2007) with approval). Thus, to bring the issue of exposure to a jury, a **plaintiff is required to show more than**: (1) "speculation or possibility that the product caused the injury;" (2) *de minimus* exposure to a

defendant's product; and/or (3) testimony that "any and every exposure" was a causative factor in the development of plaintiff's injuries or the decedent's death. *Holcomb*, 128 Nev. at 627, 289 P.3d at 196 (citations omitted).

Plaintiff has not met that burden here with respect to W.M. Barr and the Barr Products. For starters, neither Plaintiff, nor her experts have tested either of the Barr Products that the Decedent allegedly used or was otherwise exposed to. Consequently, they cannot testify, with a reasonable degree of scientific certainty, that those products actually contained benzene, let alone the concentration of that ingredient. Without that information, they also cannot opine as to the exposure dosages, if any, that may have accompanied the Decedent's use of those products. As if those considerations, standing alone, were not sufficiently fatal to Plaintiff's ability to meet her burden of establishing causation, **which they are**, Plaintiff also is unable to accurately quantify the frequency and/or duration of the Decedent's alleged use of the Barr Products. It could have been as little as 15 minutes a day, 2 days a week over a 3 or 4 year period, but in no event was more than to 1 to 1½ hours a day, 4 days a week for that same or a lesser period. *See* Appendix at Exhibit A, A. Underwood Depo at 262, 263, 265, and 271; *See* Appendix at Exhibit B, T. Underwood Depo at 289 and 290. In either event, however, those exposures were *de minimus* at best and, therefore, insufficient to rise to the level of a substantial factor in causing the Decedent's illness.[14]

Finally and most significantly, Plaintiff cannot point to any credible medical or scientific literature establishing that a person who uses mineral spirits and/or lacquer thinner **with no discernable benzene content** to clean paint brushes 15 minutes to 1 hour a day, 2 to 4 days a week, for 3 to 4 years is at any greater risk of developing any disease, let alone the AML that caused the

---

[14] The *de minimus* nature of the Decedent's alleged exposure to the Barr Products is reinforced by the undisputed fact that: (1) at least part, if not most, of the time he was assisting Plaintiff, the Decedent would have been cleaning water-based paint off brushes using only soap and water; and (2)the Decedent was a child in school and doing other extracurricular activities having nothing to do with mineral spirits or lacquer thinner for the vast majority of time between 2004 and 2008

Decedent's death, as compared to members of the general population—and for good reason: **Because no such peer-reviewed studies exist**. Accordingly, any suggestion that the Barr Products were a causative, let alone a **substantial factor** in causing the Decedent's illness and/or eventual death is based on sheer speculation and/or nothing more than the *ipse dixit* of Plaintiff's experts, which is inadmissible. *See, e.g., Wilson v. U.S.*, No. 2:18-CV-1241 JCM (NJK), 2023 WL 2728863 (D. Nev. Mar. 31, 2023) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) and emphasizing that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). Instead, the total lack of proof of causation entitles to W.M. Barr to judgment in its favor, as a matter of law.

**V. Plaintiff's undisputed misuse of the Barr Products is fatal to her product liability claims, as a matter of law.**

In addition to the foregoing, W.M. Barr is entitled to summary judgment on Plaintiff's strict liability claim because it was her **unforeseeable misuse** of the Barr Products—and not any defect in the products themselves—that caused the Decedent to be exposed to those products at all.

It is settled law in Nevada that, "under strict liability[,] a manufacturer is entitled to assume that his product will not be subjected to abnormal and unintended use" and is insulated from liability where it is misused. *Crown Controls Corp. v. Corella*, 98 Nev. 35, 37, 639 P.2d 555, 557 (1982). *See also Heath v. Tristar Prods.*, No. 2:17-cv-2869-GMN-BNW, 2022 WL 4134124 (D. Nev. Sep. 11, 2022) (holding that there was ample record evidence to support a defense of misuse, where the plaintiff, who allegedly was injured when the defendant's pressure cooker "exploded" on being opened, failed to adduce evidence that she read, let alone followed allow of the defendant's warnings and instructions and could not recall if, as instructed, she properly released the pressure before opening the device), *aff'd in relevant part, vacated and remanded in part*, No. 22-16543, 2023 WL 7034500 (9th Cir. Oct. 26, 2023); *Roberts v. Albertson's LLC*, No. 2:08-CV-00236-PMP-LRL, 2010 WL 2555082 (D. Nev. June 22, 2010) (granting summary judgment in favor of the manufacturer of a

blood pressure testing device and against a plaintiff who claimed that its malfunction caused him to suffer a severe stroke, based, in part, on plaintiff's failure to proffer evidence that his improper use of a large cuff with the device and not any alleged defect in the device itself, caused the stroke).

Here, the undisputed evidence is that, at least where the Barr Products are concerned, Plaintiff flagrantly violated the most fundamental of all of the on-product instructions and instructions: "**KEEP OUT OF REACH OF CHILDREN**." It is equally irrefutable that had she not done so, the Decedent never would have been exposed to those products and any harm they could potentially have caused. In addition, Plaintiff also directly violated the instruction to "Avoid contact with eyes and contact with skin. Avoid breathing of vapors or mist and contact with skin, eyes, and clothing;" Instead, Plaintiff not only did not keep them out of the Decedent's reach, she filled buckets with them and stood idly by while her minor child spent 15 minutes to 1 hour a day, 2, 3, or 4 days a week up to his elbows in them with no gloves on and his unprotected face inches from the bucket. *See* Appendix at Exhibit A, A. Underwood Depo at pp. 269 and 270; *See* Appendix at Exhibit B, T. Underwood Depo (Vol. III, 1/5/22) at pp. 289, 301, and 302. In doing so, Plaintiff engaged in an egregious misuse of the Barr Products, which, given her role as parent and her professional background and training as a commercial and residential paint contractor, was unforeseeable as a matter of law. Accordingly, W.M. Barr is entitled to summary judgment on Plaintiff's strict liability and negligence claims.

**VI. Plaintiff's claim for breach of implied warranty is subsumed in her strict liability claim or, alternatively, fails because of a lack of privity and, therefore, W.M. Barr is entitled to summary judgment on count IV of Plaintiff's Second Amended Complaint.**

Plaintiff's breach of implied warranty claim fails, as a matter of law for at least two reasons. **First**, one of the principal reasons courts in Nevada and elsewhere adopted the doctrine of strict liability in tort was to obviate the many obstacles that plaintiffs injured by allegedly defective products frequently encountered in attempting to utilize contract remedies to impose liability on remote manufacturers and sellers. *See, e.g.*, *Calloway v. City of Reno*, 116 Nev. 250, 268, 993 P.2d 1259, 1271

(2000), *overruled on other grounds by Olson v. Richard*, 120 Nev. 240, 243-44, 89 P.3d 31, 33 (2004) (wherein the Nevada Supreme Court identified three policy rationales supporting the doctrine of strict liability, including "concerns about a plaintiffs ability to prove a remote manufacturer's or seller's negligence"). *See also Schueler v. Ad Art, Inc.*, 136 Nev. 447, 450, 472 P.3d 686, 689 (Nev. App. Ct. 2020). Principal among those obstacles was the doctrine of privity. *Id.* at 690 (emphasizing "Section 402A provides that if a product is defective and that defect causes harm to person or property, liability will be imposed upon the manufacturer or distributors, notwithstanding the manufacturer's or distributors' lack of fault **<u>and whether or not they were in privity with the plaintiff</u>**" (emphasis added)). Thus, where, as here, **<u>privity does not exist</u>**, claims for breach of implied warranty are subsumed in a claim for strict liability. Thus, W.M. Barr is entitled to a judgment in its favor consistent with that rule, as to Plaintiff's breach of implied warranty claim.

**<u>Second</u>**, even if this Court were to conclude that there are some circumstances in which a claim for breach of implied warranty can co-exist with a claim for strict liability, this case indisputably would not be one circumstances. Because it is settled law that "privity of contract is a prerequisite for recovery under theories of implied warranty in Nevada." *Claridge v. I-Flow Corp.*, No.: 2:18-cv-01654-GMN-BNW, 2019 WL 4139433, * 3 (D. Nev. Aug. 30, 2019). *See also Finnerty v. Howmedica Osteonics Corp.*, No. 2:14-cv-00114-GMN-GWF, 2016 WL 4744130, at *7 (D. Nev. Sept. 12, 2016). Consequently, the lack of privity is fatal to an implied warranty claim. *Claridge*, 2019 WL 4139433, *3. The undisputed record evidence here makes it clear that neither the Plaintiff, nor the Decedent were in contractual privity with W.M. Barr in connection with the purchase and use of the Barr Products (*i.e.*, they did not purchase the Barr Products from W.M. Barr). Instead, the Decedent did not purchase them at all and Plaintiff purchased them, **<u>if at all</u>**, from various big box and painting supply retailers (e.g., Home Depot, and Kelly-Moore). *See* Appendix at Exhibit A, A. Underwood Depo at pp. 272 & 273. Accordingly, W.M. Barr is entitled to judgment, as a matter of law, on her claims for breach of implied warranty. *See, e.g., Claridge*, 2019 WL 4139433, * 3 (dismissing claims

for breach of implied warranty brought by plaintiff who allegedly suffered severe shoulder injuries after being treated with defendants' pain pumps, based on his lack of horizontal or vertical privity with the manufacturer).

**Third**, there is no evidence that either of the W.M. Barr products were unmerchantable (*i.e.*, that they failed to perform in their intended manner, which, where the Barr Products are concerned, is to thin oil-based paints, stains, and varnishes and to clean fresh paint from brushes and splatters). *See, e.g., Underwood v. O-Reilly Auto Parts, Inc.*, No. 2:21-cv-01766-GMN-NJK, 2023 WL 3205213, * 7-8 (D. Nev. May 1, 2023) To the contrary, the fact that Plaintiff, a highly-sophisticated, commercial and residential painting contractor—and her employees—repeatedly purchased and used both products is compelling evidence that they performed exceptionally well for the purposes for which they were intended, when used in a manner that conforms with the plain, unambiguous, and conspicuous warnings and instructions on their labels belies her unsupported, conclusory allegation that one or both of those products were not "merchantable" and/or "were unfit for the ordinary purpose or uses for which [they] were intended." SAC at p. 95, ¶ 5. Accordingly, W.M. Barr is entitled to judgment on Plaintiff's breach of implied warranty claims, as a matter of law.

**VII. W.M. Barr is entitled to summary judgment as to Plaintiff's breach of express warranty claim because there is no evidence that it breached any affirmations of fact relating to the Barr Products or that any such breach was causally related to the Decedent's illness.**

Nevada courts, including this Court, have made it clear that to prevail on a claim of breach of express warranty, a plaintiff must plead and prove that: (1) the defendant made an "affirmation or promise" prior to the plaintiff's purchase of the product; (2) the affirmation became a basis for the bargain; (3) the product failed to conform to the affirmation or promise; and (4) that failure caused plaintiff to suffer harm. *See, e.g., Underwood*, 2023 WL 3205213 at * 7 (citations omitted). *See also Greystone Nevada, LLC v. Anthem Highlands Community Ass'n*, No. 2:11-cv-01424, 2012 WL 2782603, at * 6 (D. Nev. July 9, 2012). Pleading and proving the precise representation(s) is especially important given that, without it, a court cannot determine, *inter alia*, whether the alleged affirmations

or promises were a "statement of fact or opinion" and/or the causative role, if any, that the alleged breach of those promises or affirmations played in plaintiff's injuries. *Greystone Nevada, LLC*, 2012 WL 2782603, at *6.

Plaintiff's SAC, in the instant case, contains no allegations with respect to the specific affirmations and/or promises that W.M. Barr made and which purportedly became a basis for the bargain relating to Klean Strip® Lacquer Thinner. Accordingly, W.M. Barr is entitled to judgment as to Plaintiff's claim that it breached any such promise or affirmation, as a matter of law. Moreover, is entitled to the same relief with respect to Plaintiff's express warranty claims directed at Klean Strip® Odorless Mineral Spirits—albeit for different reasons. Where that product is concerned, Plaintiff's express warranty claim is predicated on W.M. Barr's purported representation the product is "Low odor—Good for indoor use." Plaintiff's problem is twofold: (1) there is no evidence that it is not "Low Order" or not "Good for indoor use." It plainly is both. More fundamentally, the record is devoid of evidence that the product's "low odor" or "indoor use" (*i.e.*, a purported breach of one or both of those alleged affirmations) were causally related to the Decedent's injuries. They were not. Accordingly, W.M. Barr cannot be held liable for breach of express warranty as a matter of law.

**VIII. W.M. Barr is entitled to summary judgment on Plaintiff's "gross negligence" claim, because no reasonable jury could conclude that it "failed to exercise even the slightest degree of care" in the production of the Barr Products.**

This Court and others have made it clear that to prevail on a claim for gross negligence a plaintiff must establish that the defendant failed 'to exercise even the slightest degree of care' in his conduct." *Gaming v. Trustwave Holdings, Inc.*, No. 2:15-cv-02464, 2016 WL 5799300, at *6 (D. Nev. Sept. 30, 2016) (quoting *Hart v. Kline*, 61 Nev. 96, 116 P.2d 672, 673-74 (1941)). *See also Underwood*, 2023 WL 3205213 at * 4-5; *Smith v. Wolf Performance Ammunition*, No. 2:13-cv-2223, 2015 WL 2359063, at *3 (D. Nev. May 18, 2015) ("Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a prudent man'"); *Martin v. Collier*, No. 2:11-cv-0320, 2011 WL 1628028, at *2 (D. Nev. Apr. 28, 2011); *Bearden v. City of*

*Boulder City*, 89 Nev. 106, 109, 507 P.2d 1034, 1035 (1973) (explaining that gross negligence "is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care").

As is evident from the foregoing Statement of Undisputed Facts, arguments, and authorities, there is not a scintilla of evidence in the record that would allow a reasonable to conclude that W.M. Barr failed to exercise the slightest degree of care or engaged in conduct of an “aggravated character” with respect to the Barr Products, especially where benzene is concerned. To the contrary, the uncontroverted record evidence establishes that: (1) W.M. Barr carefully inspected every batch of raw materials/ingredients that arrived at its manufacturing plants; (2) it has never detected the presence of benzene in any of bulk materials it uses and, during the period of the Decedent’s alleged exposures, was using to manufacture the Barr Products; and (3) if it had detected the presence of benzene, it would not have accepted the shipment. Shireman Depo at pp. 72, 107, 123, 152-55, 157, 158, 170, and 197. Such conduct is hardly the stuff of which gross negligence claims are made in Nevada. Accordingly, W.M. Barr is entitled to summary judgment as to Count II of Plaintiff’s SAC.

**CONCLUSION**

Based on the foregoing arguments and authorities, the Defendant, W.M. Barr & Company, Inc., respectfully requests that this Court enter summary final judgment in its favor and against Plaintiff as to all claims against W.M. Barr in Plaintiff’s Second Amended Complaint and that it grant W.M. Barr any and all such further relief to which it is entitled.

/ / /

DATED: November 6, 2023. Respectfully Submitted,

**BOWMAN AND BROOKE LLP**

______________________________
JUSTIN D. NIZNIK, ESQ.
Pro Hac Vice
Florida Bar No. 0774901
Justin.niznik@bowmanandbrooke.com
1064 Greenwood Blvd., Ste 212
Lake Mary, FL 32746
Tel: (407) 585-7600; Fax: (407) 585-7610

MARIO D. VALENCIA, ESQ.
Nevada Bar No. 6154
mailto:valencia.mario@gmail.com
40 S. Stephanie St., Ste 201
Henderson, NV 89012
Telephone: (702) 384-7494

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2023, I electronically filed the foregoing document entitled **DEFENDANT, W.M. BARR & COMPANY, INC.'s MOTION FOR SUMMARY JUDGMENT** using the District of Nevada's CM/ECF system. Participants int his case who are registered CM/ECF users will be served by the CM/ECF system.

______________________________
JUSTIN D. NIZNIK