# Exhibit P

# Dr. Rory Shallis Expert Report (April 21, 2023)

**Rory M. Shallis, M.D.**
*Yale Cancer Center*
*Assistant Professor of Internal Medicine, Hematology*

*333 Cedar Street*
*PO Box 208028*
*New Haven, CT 06520-8028*

*Phone 203.737.7103*
*Fax 203.737.3401*
*Email rory.shallis@yale.edu*

April 21st, 2023

Andrew J. Dupont, Esq.
Locks Law Firm
The Curtis Center
601 Walnut Street, Suite 720 East
170 S. Independence Mall West
Philadelphia, PA 19106

Re: Tyler Daniel Fred Underwood
DOB: August 20th, 1996
SSN: XXX-XX-9369

**I. Statement of truth**

1. My name is RORY M. SHALLIS. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am competent to make this affidavit. I have personal knowledge of the facts set forth in this declaration and if called as a witness could and would testify to these facts under oath.

**II. Expert qualifications**

1. I am a practicing clinical hematologist-oncologist currently employed as an Assistant Professor of Medicine in the Division of Hematology of the Department of Internal Medicine at the Yale University School of Medicine as well as a Full Member of the Developmental Therapeutic Research Program, member of the Yale Cancer Outcomes, Public Policy and Effectiveness Research Center.
2. I earned a Bachelor of Arts degree in Cell Biology and Neuroscience as well as Psychology from Rutgers College in May of 2010.
3. I then earned a Medical Doctor (M.D.) degree from Rutgers University-Robert Wood Johnson Medical School in June of 2014.
4. I completed an Internal Medicine residency at Brown University-Rhode Island Hospital in June of 2017.
5. Following my residency, I completed a fellowship in Hematology-Oncology at Yale-New Haven Hospital/Yale Cancer Center in June of 2020.

6. I have been certified by the American Board of Internal Medicine in Internal Medicine since 2017, have been certified by the American Board of Internal Medicine in Hematology since 2021, and remain board-eligible by the American Board of Internal Medicine for Medical Oncology.
7. I have published more than 75 primary research articles, reviews, editorials and chapters in peer-reviewed medical and scientific journals related to the biology and treatment of myelodysplastic syndrome (MDS), acute myeloid leukemia (AML) and other myeloid malignancies.
8. I have served as an investigator on and designed clinical trials dedicated to the study of patients with myeloid malignancies including trial concepts specifically for patients with AML and/or MDS.
9. I regularly engage in epidemiological and outcomes research as a member of the Yale Cancer Outcomes, Public Policy and Effectiveness Research Center and have collaborated with experts at the Yale School of Public Health to accomplish epidemiological research as it relates to leukemogenic exposures and the risk of MDS and AML development.
10. I review many manuscripts pertaining to AML, MDS and other myeloid malignancies in peer-review for several high-impact medical journals.
11. I currently serve as the Chair for the Yale Leukemia and Myeloid Malignancies Practice Standardization Committee and represent the Yale Cancer Center/Smilow Cancer Hospital on the National Comprehensive Cancer Center Myelodysplastic Syndromes Panel and National Comprehensive Cancer Center Acute Myeloid Leukemia Panel, which are alliances of 30 leading cancer centers that develop the comprehensive set of evidence-based and consensus guidelines for the diagnosis and management of MDS and AML.
12. Lastly, I currently serve on the Older Acute Myeloid Leukemia Working Group for the National Cancer Institute for the Myeloid Precision Medicine Initiative, the ECOG-ACRIN Cancer Research Group Leukemia Committee and also serve as the SWOG Cancer Research Network intergroup clinical representative.

## III. Methodology

1. As a clinical hematologist-oncologist, I regularly diagnose and treat dozens of patients with newly-diagnosed myeloid malignancies every year, many of whom have AML or MDS, which are my areas of expertise. It is critical for a provider treating a patient with AML or MDS to reliably determine whether or not a specific etiology is more likely than not responsible for the initiation or promotion of leukemogenesis that eventually led to the overt myeloid neoplasm like AML with which a patient like Mr. Underwood was diagnosed. An important aspect of my position involves understanding environmental causes of AML/MDS and evaluating each patient for acquired risk factors that either possibly or very likely were associated with the development of their AML/MDS. For many patients, a specific occupational or environmental cause is not identified. However, a subset of patients has a history of environmental and/or occupational exposures, which almost certainly played a causative role in the initiation of AML/MDS. It is my professional opinion that Mr. Underwood belongs to this latter, unfortunate subset of patients.

2. It is important to note that the establishment of a causal association between an exposure like benzene and the development of AML/MDS is founded upon several principles and must account for the nuance with regard to disease classification in epidemiologic studies. First, one must recognize that the disease classification of myeloid malignancies including AML and MDS has evolved over time (Shallis RM, et al. *Blood Rev.* 2019;36:70-87 and Zeidan AM, Shallis RM, et al. *Blood Rev.* 2019;34:1-15). The first classification system of myeloid malignancy, the French-American-British (FAB) Co-operative Group Leukemia Classification, was established in 1975 and included MDS (Zeidan AM, Shallis RM, et al. *Blood Rev.* 2019;34:1-15, Bennett JM, et al. *Br J Haemtol.* 1976;33:451-8 and Jaffe ES, et al. WHO classification of tumours of haematopoietic and lymphoid tissues. Lyon, France: IARC; 2001). The FAB categorization of MDS included bone marrow blast counts up to 30%. In 2001, the World Health Organization (WHO) created the current classification system, which reassigned patients whose bone marrow contained 20-30% blasts to the AML category (Jaffe ES, et al. WHO classification of tumours of haematopoietic and lymphoid tissues. Lyon, France: IARC; 2001). This arbitrary event is critical to recognize as any studies which parse out MDS causation separately from AML causation have been necessarily obfuscated by the changing systems. Key opinion leaders in the field have continually advocated for rectifying these definitional restrictions (Estey E, et al. *Blood.* 2022;139[3]:323-332) and only recently has a lower blast threshold (10-19%) been established to define a new "overlap" category known as "MDS/AML" in a newer disease classification system known as the International Consensus Classification (Arber DA, et al. *Blood* 2022;140[11]:1200-1228). Certain molecular subsets of disease serve as key examples in support of this evolving understanding. For instance, the most recent revised WHO 2022 classification states that *TP53*-mutated MDS with $\geq$10% marrow (or $\geq$5% peripheral blood) blasts "…may be regarded as AML-equivalent"(Khoury JD, et al. *Leukemia*. 2022;36:1703-1719). Furthermore, the new International Consensus Classification further delineates *TP53*-mutated myeloid neoplasms by blast threshold, establishing those with 10-19% blasts and *TP53* VAF $\geq$10% as MDS/AML with mutated *TP53* (Arber DA, et al. *Blood.* 2022;140[11]:1200-1228). Furthermore, the low incidence of AML and MDS (4.3 and 4.0 per 100,000 persons, respectively [(Shallis RM, et al. *Blood Rev.* 2019;36:70-87 and Zeidan AM, Shallis RM, et al. *Blood Rev.* 2019;34:1-15]) requires large cohort studies to yield appropriate statistical power to substantiate environmental association or causation.

3. Although many patients have no identifiable or invokable etiology for the development of MDS/AML, several risk factors have been identified (albeit some not consistently or with high-quality methods) such as older chronological age and male sex (Shallis RM, et al. *Blood Rev*. 2019;36:70-87 and Shallis RM, et al. *Blood Rev.* 2019;34:1-15), which may actually be indirect measures or surrogates of other risk factors, obesity (Li S, et al. *Sci Rep.* 2017;7:17998, Poynter JN, et al. *Cancer Epidemiol.* 2016;40:134-40, Strom SS, et al. *Cancer.* 2012;118:4589-96 and Ma X, et al. *Am J Epidemiol.* 2009;169:1492-9), tobacco smoking (Ma X, et al. *Am J Epidemiol.* 2009;169:1492-9), and the most clear risk factors being prior receipt of chemotherapy or radiotherapy, which are most often employed to treat prior solid tumors as well as

accidental ionizing radiation exposure. Although all of these possibilities must be considered as contributors to an eventual diagnosis of AML, a critical appraisal of the literature supporting these associations must be conducted with particular attention to confounders for which there was insufficient accounting.

4. In addition to the above, history-taking must also include a rigorous and in-depth account of the patient's occupational history, which often elucidates a patient's unequivocal and repeated exposure to leukemogens or chemicals/agents for which either clinical/epidemiological research or sound mechanistic literature supports the relationship between exposure to the chemical/agent in question and an increased risk of AML/MDS. This occupational history-taking is not only critical to whether a causative exposure is implicated as not only can this inform the safety of and need to refrain from a particular practice, hobby or even employment, but this can also influence management decisions (e.g. whether therapy-related myeloid neoplasm is likely and for which the standard of care may be CPX-351 or liposomal daunorubicin/cytarabine, an approved agent for the treatment of many of these patients) or if the pre-test probability of the most stubborn disease biology is high enough to warrant frontline less-intensive therapy for the patient with convincing leukemogen exposure and limited safety in awaiting the results of cytogenetic and molecular testing. Furthermore, I have reviewed the quantitative benzene exposure estimates for Mr. Underwood assessed by the Plaintiffs' industrial hygiene expert, Dr. Robert Laumbach and by the Plaintiffs' forensic chemist expert Dr. Michael A. Sommer II.

5. Specific causation must account for all of these risk factors for AML/MDS, but must also apply specific causation methodology that is reproducible, accounts for confounders and the available weight of evidence that can be gleaned from the literature. I principally apply what are known as the Bradford Hill criteria, which were proposed by Sir Austin Bradford Hill in 1965 as a fundamental framework for causal inference and are arguably still the most widely-applied methods for such today (Hill AB. *Proc Royal Soc Med*. 1965;58[5]:295-300). Sir Bradford Hill established the following aspects of association to be considered before concluding a *causal* association:

    a. *Plausibility*: This aspect mostly centers around the *biological* plausibility of an exposure invoked as a cause in inducing the DNA, chromosomal, epigenetic or other cellular aberrancy to bring about the event/disease of interest. Most of the data supporting this criterion is pre-clinical or based in *in vitro* or *ex vivo* studies.

    b. *Biological gradient*: A clear dose-response relationship would lend weight to a *causal* association (e.g. with greater exposure do we see a greater incidence of the outcome of interest?); however, there are many caveats to this criterion including inadequacies or inconsistencies in quantitative exposure measurements, differences in the biological consequences of low vs. high exposure among others.

    c. *Temporality*: The occurrence of the event must be rectified with the timing of the invoked causal exposure.

d. *Strength*: Emphasis should be placed on the strength or magnitude of the effect linked to a cause. Sir Braford-Hill cautions us not to dismiss a *causal* association should the strength of association be minor, as the proportion of individuals within the general population exposed to an invoked leukemogen may be small and, likewise, the risk of developing an otherwise uncommon disease like AML/MDS may be inherently low.

e. *Consistency*: The cause-and-effect relationship should be noted across different studied populations with regards to individual-specific characteristics, location/region and temporal considerations. This aspect is typically satisfied when the weight of *well-designed* epidemiological studies (accounting for confounders like subject-specific differences or the decision to group or dissociate AML and MDS as the outcome of interest, for instance). Inconsistent results, however, do not prove a negative, but might rather simply make obvious imperfect epidemiological methods.

f. *Analogy:* This is possibly the most inconsequential aspects which if satisfied can support a *causal* association and simply posits that the cause-and-effect hypothesis relating to the particular cause and particular effect in question can be strengthened if a cause-and-effect relationship for a *similar* cause and *similar* effect can be demonstrated.

g. *Specificity*: This aspect relates to the confidence that the outcome of interest is specifically associated with the cause invoked and not another confounder or if multiple agents *including* the one invoked act together (e.g. in synergism) to bring about the result/effect.

h. *Coherence*: The available pre-clinical evidence must be contrary to the findings observed in the clinical or epidemiological literature.

i. *Experiment:* The cause-and-effect relationship can be further supported if the effect/outcome be lessened or even abrogated if a preventative measure is taken against the invoked cause/exposure. This requires a large, prospective study with an interventional design and appropriate accounting for other relevant covariates.

6. However, Sir Bradford Hill acknowledges that a) not all of these criteria need to be satisfied to determine a *causal* association and b) none of these aspects can be required as a *sine qua non* or, in brief, without satisfying a particular aspect above a *causal* association can be unequivocally refuted.

## IV. Factual review of Mr. Underwood's case

### A. Occupational and exposure history

1. I have exhaustively reviewed the medical records and deposition of Mr. Underwood, who reports exposure to products known to contain the leukemogen benzene beginning as early as eight years old.

a. Mr. Underwood reports at deposition that his father maintained an interest in restoring and collecting old automobiles, amassing a collection of approximately 30 vehicles. Mr. Underwood's father wanted to share this hobby with his son in an effort to prepare him to be self-sufficient in

repairing when the time came. When Mr. Underwood was 8 years old he began to learn automotive work including up until his father passed away in October, 2010 when Mr. Underwood was 14 years old. Mr. Jarrad Fisher, his friend and eventual employer at Full Throttle Speed Shop (discussed below) reports at deposition witnessing pumping gasoline, into both cans and vehicles, since the age of 8 years as “he was the pump guy” and “always wanted to pump the gas,” specifically using Bi-Rite Market’s gas station and 7-Eleven. Mr. Fisher reports that this also continued into his later years relating to his hobbies involving power sports and ATVs and that gasoline spillage or overfill was “pretty common.” Mr. Fisher also reports that he never witnessed Mr. Underwood wear gloves or “protective gear.”

b. After the passing of his father, Mr. Underwood continued to enjoy and perform automotive work as a hobby but was also employed in the same capacity. Mr. Underwood worked at Bob’s Forklift and Repair (also later known to be Davenport Auto) during his high school years with his step-father, Mr. Robert Davenport, from 2010-2014 almost every day during the summer months to a total of approximately 40 hours per week during that time. Mr. Davenport at deposition corroborates this estimate. Mr. Underwood would then work during the school year after school about 3-4 afternoons/evenings per week and often weekends. Mr. Davenport reports at deposition that Mr. Underwood “would have worked seven” days a week if he had let him and this did occur on several occasions. During his time at Bob’s Forklift and Repair Mr. Underwood would work on bulldozers, skid steers, backhoes and personal vehicles. Mr. Davenport at deposition states that he would task Mr. Underwood with the “grunt work,” including hydraulic work (rebuilding cylinders and valves), engine work, and disc and drum brake work, that would itself consist of disassembling, cleaning and reassembling parts and that on average he would work 4-5 hours at a time.

    i. During this time, Mr. Underwood was also helping friends during the summer months with automotive work, for instance doing brake replacements.

c. Mr. Underwood then worked at his old neighbor Howard “Sonny” Bowles’ house in Reno, Nevada on a van gifted to him by his late father and performed significant automotive repair to the point of operability.

d. Mr. Underwood then returned to Sedona to work with his step-father again as well as well as do work his sister Lisa Underwood’s cleaning company, Your Majestic Maid (worked with his sister from 2010, a few weeks per month, initially 5 hours per week while in high school and then up to about 20-30 hours per week, until his diagnosis of AML), often blowing leaves, whacking weeds and other maintenance tasks. Ms. Lisa Underwood reports at deposition that Mr. Underwood was specifically asked to do exteriors and that Mr. Underwood was doing “hundreds” of jobs per year at her direction. During this time, Ms. Lisa Underwood reports at deposition purchasing mineral spirits and lacquer thinner for Mr. Underwood to clean equipment.

e. From approximately 2014-2015, Mr. Underwood then went to Las Vegas, Nevada to work with his brother-in-law, Jarrad Fisher at Full Throttle Speed Shop nearly every day for several months. Mr. Fisher states at deposition that he worked five days a week and "normal" hours during this time.

f. In 2015, Mr. Underwood briefly worked for a painting company called Alexander Custom Coatings for three to four months. During this time, Mr. Underwood recalls pouring mineral spirits and lacquer thinner in a bucket to clean his brushes (and sometimes the rollers) with a wire brush at the end of the work-day. Mr. Underwood recalls that these agents would contact his skin.

g. In 2015, Mr. Underwood briefly (for a few months) worked for his aunt's heating, ventilation and air conditioning company called Mt. Rose Heating & Air Conditioning, Inc. in Reno, Nevada, typically hanging commercial duct work.

h. Mr. Underwood then returned to Sedona to work with his step-father and sister once again.

i. In approximately 2015-2016, Mr. Underwood then returned to Las Vegas, Nevada to work for his aunt, Karen Giovani, and her recreational vehicle rental company and help maintain the trucks, tractors that were also on her property as well as other vehicles bought at auction; also doing side requests for his previous neighbor Sonny.

j. Mr. Underwood then returned to Sedona to work with his step-father.

k. In 2016-2017, Mr. Underwood worked in Sedona for Quicker Cleaner Car Wash as their maintenance technician mostly for their hydraulic equipment.

l. In 2018, Mr. Underwood worked for several months at Rainbow Adventures, LLC as an automotive mechanic for their vehicles, namely Humvees.

m. In 2019, Mr. Underwood went into business for himself after renting out a commercial building and opened his own automotive repair shop in Camp Verde, Arizona, called AP Injection.

2. During the years of experience/work pre-employment and during his employment as an automotive mechanic, Mr. Underwood used and was regularly exposed to several agents:

a. Mr. Underwood's father showed him to use CRC Brakleen aerosol and gasoline to clean parts, which he would do with the aforementioned automotive work. Mr. Underwood would obtain the gasoline from either the 7-11 or Buy-Rite in Sun Valley, Nevada and would apply it to a rag and wipe down the surface that required cleaning. During this time, Mr. Underwood also reports that he would also use CRC carburetor cleaner as well as PB B'laster aerosol to "saturate" a part that required removal, but was too corroded to allow removal; typically used as a lubricant to help loosen bolts. Mr.

b. During the years of work as an automotive mechanic from 2010 onward, Mr. Underwood used break cleaners to clean "almost every part you can think of," specifically recalling using:

i. O'Reilly's brake cleaner (used this one the most). Mr. Davenport at deposition reports this during work at Davenport Auto from 2011-2014 to have been a non-chlorinated formulation and was "always" an aerosolized formulation. Mr. Fisher states at deposition

that this was a brake cleaner that was used by Mr. Underwood from approximately 2014-2015 at Full Throttle Speed Shop.

ii. CRC Brakleen. Mr. Davenport at deposition reports this during work at Davenport Auto from 2011-2014 to have been a non-chlorinated formulation and was "always" an aerosolized formulation. Mr. Fisher states at deposition that this was a brake cleaner that was used by Mr. Underwood from approximately 2014-2015 at Full Throttle Speed Shop.

iii. Autozone brake cleaner. Mr. Davenport at deposition reports this during work at Davenport Auto from 2011-2014 to have been a non-chlorinated formulation and was "always" an aerosolized formulation. Mr. Fisher states at deposition that this was a brake cleaner that was used by Mr. Underwood from approximately 2014-2015 at Full Throttle Speed Shop.

Mr. Underwood would typically use a can per job, but would sometimes use more than one can, specifically if the job was more extensive, such as trying to clean an oil pain from a large diesel vehicle. Mr. Davenport at deposition reports that during 2011-2014 a minimum of 2 cases (each case containing 12 cans) of brake cleaner would be used per week, an average of 2-3 cases per week, and during higher volume weeks this could be more; Mr. Davenport states that approximately 60% of this brake cleaner volume was used by Mr. Underwood. Mr. Fisher states at deposition that from approximately 2014-2015 at Full Throttle Speed Shop, Mr. Underwood "…He was the one cleaning everything," "…was left to do all the essential dirty work," and would use approximately 1-2 cans per day per job. Mr. Fisher also states at deposition that while the two were living together Mr. Underwood would wash "all the transmission parts and such with brake cleaner at home" and that this required "at least" two cans per week. Mr. Fisher states that Mr. Underwood never "purposefully" inhaled brake cleaner. Mr. Underwood recalls the aerosolized material would often splatter and splash upon application, often contacting his skin, and have an odor that at least on one occasion was associated with dizziness.

c. Mr. Underwood specifically reports using CRC carburetor cleaner and recalls the aerosolized material would often splatter and splash upon application, often contacting his skin, and have a distinct odor. Mr. Davenport at deposition corroborates this use from 2011-2014 specifically stating that it would be used to "…rebuild a carb or take an old vehicle and try to get it running." Mr. Fisher states at deposition that from approximately 2014-2015 at Full Throttle Speed Shop that CRC carburetor cleaner was the "go to" carburetor cleaner and approximately one can was used per 48 hours.

d. Mr. Underwood likely used AutoZone-branded carburetor cleaner as per the deposition testimony of Mr. Fisher who states he is "sure" it was used and that this would be used if CRC carburetor cleaner was not available.

e. Mr. Underwood specifically reports using PB B'laster penetrating catalyst. His step-father Mr. Davenport introduced him to PB B'laster penetrating catalyst, which he would use to loosen bolts and other parts that were corroded or otherwise stubborn. Mr. Davenport at deposition also corroborates that he introduced Mr. Underwood to the product, corroborates the indications and means of application that was "very liberally on everything," and this product worked well and he "absolutely" satisfied with the product. This would be mostly used for suspension work (knuckles, struts, brake rotors), corroded or rusted bolts that were typically found on outdoor equipment, namely their hydraulic cylinders (and the pins in them) and tracks. Mr. Underwood would also use it for work related to the rear differential, U-joints, drive lines and hubs as well as rear bolts and axle nuts. Mr. Underwood would saturate the intended area with PB B'laster penetrating catalyst and often apply it more than once to allow removal, applying this via aerosol 1-2.5 feet from his face. Mr. Davenport at deposition reports that PB B'laster penetrating catalyst "tastes nasty" and "smells nasty," also visually witnessing Mr. Underwood repeatedly indirectly inhaling (specifically denying witnessing any "deliberate" inhalation) the vapors produced from the application and use of PB B'laster penetrating catalyst and states that "…you can't help it" and "…you can't get away from it." Mr. Fisher states at deposition that this was also used "quite a bit" by Mr. Underwood from approximately 2014-2015 while employed at Full Throttle Speed Shop, specifically using 1-2 cans per day for the first month and then 1-2 cans per week afterward.

f. Mr. Underwood specifically reports using a parts washing machine that was gifted by Howard "Sonny" Bowles in approximately 2017. Mr. Davenport at deposition reports that this was a Safety-Kleen parts washer. After taking it to his shop, Mr. Underwood would use it to clean parts with diesel fuel, as shown to him by Howard "Sonny" Bowles, any time a part needed cleaning. Mr. Underwood reports at deposition that Rainbow Adventures also had a parts washing machine.

g. During his time as an automatic mechanic, Mr. Underwood also reports using transmission fluid, namely that from ATF, O'Reilly's and Valvoline.

h. During his time as an automatic mechanic, Mr. Underwood also reports using power steering fluid and brake fluid, namely that from O'Reilly's.

i. Mr. Underwood reports never wearing a respirator or mask and only intermittently and early on wearing nitrile or rubber gloves in an attempt to keep from getting dirty but the nature of his work repeatedly led to these gloves breaking so he eventually abandoned this practice. Mr. Fisher corroborates this and reports at deposition only witnessing Mr. Underwood wear safety glasses, but never gloves, a mask or respirator. Mr. Davenport reports never witnessing Mr. Underwood wearing a mask.

3. Mr. Underwood also enjoyed riding dirt bikes and all-terrain vehicles (ATVs)/"quads" and reports frequently using CRC carburetor cleaner to clean parts of these vehicles, sometimes several times per week, using about a half-can per at a time.
4. Mr. Underwood, while working with his sister would regularly use TruFuel 50:1 pre-mixed 2-cycle engine fuel, bought from O'Reilly's, to operative the tools necessary to his job, reporting frequent (up to 85% of use) dermal contact of the fuel and inhalation while filling up tanks requiring the product. Mr. Underwood's mother, Angela Louise Crawford Underwood, corroborates the use of TruFuel during Mr. Underwood's high school years at work and at home and while he was working with Ms. Lisa Underwood, who also at deposition corroborates the use of TruFuel during his time working with her business. Mr. Underwood reports never mixing his own fuel for this. Ms. Angela Underwood reports at deposition witnessing Mr. Underwood spilling TruFuel, including onto his hands, and that this would have to be cleaned up with a rag. Mr. Underwood reports intermittently wearing a mask due to the COVID-19 pandemic, and wearing gloves on some jobs where the site was dirty, but otherwise did not wear a mask and gloves, although he did wear goggles for weed whacking. Ms. Lisa Underwood at deposition corroborates that lack of mask use during these tasks, but did wear safety glasses.
5. In addition to work with his father beginning at a young age and the formal employment above, Mr. Underwood also helped his mother with her painting company called A&G Custom painting when he was 8 years old starting in 2004 as per his deposition testimony; his mother Mr. Angela Underwood at deposition corroborates that this began in 2004. Ms. Lisa Underwood reports at deposition that she, Mr. Underwood and their mother went on approximately 100 painting jobs during 2015-2019 and that mineral spirits and lacquer thinner would be used for significant portion of them ("more than 10") during clean up. During this time, Mr. Underwood would:
   a. Clean paint brushes with Klean-Strip (approximately 80% of the time with the remainder "once in a while" being from Sunnyside as per the testimony of Ms. Angela Underwood) mineral spirits and Klean-Strip lacquer thinner that were poured in a five-gallon bucket where the brushes that had been used for oil-based painting (which was the majority as per the deposition testimony of Ms. Angela Underwood) were placed; the process afterward as per the testimony of Ms. Angela Underwood would be: "…you squish it, you run it through your hands a few times, get it clean" and then "…slowly drizzle clean mineral spirits into your hand and your brush, and you squeeze it until it runs clean into that dirty bucket. And then you set that brush aside and you let it dry." This process would sometimes have to be augmented and the brush would need to be scrubbed with a wire brush. Mr. Underwood did this about 3-4 days a week, about 1-2 hours at a time, after she came home from work around 4:00-7:00PM, corroborated by the deposition testimony of Mr. Underwood and Ms. Angela Underwood. The cleaning process would take anywhere from 15-60 minutes. Mr. Fisher also reports at deposition that he witnessed Mr. Underwood using mineral spirits during this time ("probably" during his "pre-teen" into his "teen" years), specifically using it

to clean paint brushes. Ms. Angela Underwood reports at deposition that Mr. Underwood did not wear a respirator during or gloves for this work and that "…you couldn't wear gloves…because they would get soggy" with this type of material and process.

b. Clean his mother's spraying rig with mineral spirits so that it would be cleaned and ready for the next use. Mr. Fisher also reports at deposition that he witnessed Mr. Underwood using mineral spirits during this time ("probably" during his "pre-teen" into his "teen" years), specifically using it to clean paint rigs. This process would take approximately 30 minutes per job.

c. Mix five-gallon buckets of paint back and forth and did this for about five years until he moved to Sedona, Arizona in approximately 2009-2010.

**B. Medical history**

1. Mr. Underwood underwent a wisdom tooth extraction on December 8th, 2020 and not long after noted new-onset fever and night sweats over the course of a week that were unresponsive to acetaminophen and so he decided to present to the Flagstaff Medical Center Emergency Department in Arizona on December 19th, 2020. A complete blood count (CBC) on December 19th, 2020 revealed a total white blood cell count (WBC) of 0.9 cells/µL, hemoglobin (Hgb) of 6.7 g/dL with mean corpuscular volume of 88 and a platelet count of 18,000 cells/µL. Maxillofacial CT revealed a small fluid collection over the right mandible at the site of the known wisdom tooth extraction with extension to the submandibular space concerning for abscess.
2. Three days later on December 22nd, 2020, Mr. Underwood had a CBC drawn that revealed a WBC of 0.8 cells/µL, Hgb 6.9 g/dL with MCV 91 fL and platelet count of 24,000 cells/µL. A peripheral blood smear at this time revealed markedly decreased leukocytes and decreased platelets as well as mild, nonspecific anisopoikilocytosis of erythrocytes. He underwent a bedside incision and drainage of the site of suspected abscess by oral-maxillary-facial surgery on December 19th, 2020 and was started on broad spectrum intravenous anti-bacterial therapy with cefepime and vancomycin. Dr. Todd Erickson of Hematology/Oncology was consulted and given the concern for acute leukemia, Mr. Underwood was transferred to Banner Gateway Medical Center in Gilbert, Arizona.
3. Mr. Underwood underwent a marrow evaluation on December 22nd, 2020 that revealed a hypercellular marrow (85%) with a majority of the cellularity comprised of blasts. A 200-cell count on a good quality aspirate revealed 85% blasts with decreased granulocytic, erythroid and megakaryocytic maturation as well as increased iron on iron staining without increase in ring sideroblasts. Fluorescence *in situ* hybridization revealed deletion 5q in 97% of cells and loss of one copy of ABL1 in 97% of cells. Karyotyping revealed a complex karyotype, specifically 24-46,X,-Y,del(1)(p13p31),add(4)(p12),add(5)(q22),+mar[cp12]/ 46,idem,del(13)(q12q21)[3]/ 46,XY[5]. Myeloid next generation sequencing (50+ gene panel) performed by Sonora Quest Laboratories revealed a Tier IA frameshift insertion mutation in *CEBPA* p.(H24Afs*84) c.68_69insC at a variant allele frequency of 37.14% and nonsense mutation of unknown significance in

*PHF6* p.(R274*) c.820C>T at a variant allele frequency of 85.95%; the latter is most suggestive of a single nucleotide polymorphism and no concern for contribution to AML.

4. Given the diagnosis of AML, Mr. Underwood was treated with classical 7+3 induction with day 1 on December 25th, 2020. A "day 14" marrow evaluation on January 6th, 2021 revealed a hypocellular marrow (30%) with serous atrophy with cellularity predominantly comprised of histiocytes, lymphocytes and blasts, with the latter comprising about 20% of cellularity by CD34 immunohistochemical staining; normal maturing hematopoietic elements were markedly decreased, reticulin strain revealed no significant fibrosis (MF-0 of 3). A good quality aspirate revealed 76% blasts, which were also 85% of cells by flow cytometric analysis. Overall the findings were consistent with persistent AML.
5. Mr. Underwood's course during first induction was complicated by candidemia as well as MRI showing findings possibly consistent with leptomeningeal enhancement. Mr. Underwood was evaluated by Ophthalmology and was found to have bilateral, multilevel retinal hemorrhage that was attributed to leukemic retinopathy without evidence of disseminated intraocular infection. A lumbar puncture on January 11th, 2021 was not consistent with leukemic involvement. Furthermore, Mr. Underwood had a punch biopsy on January 12th, 2021 that revealed a ruptured follicle with yeast forms without leukemia cutis or hyphae identified possibly consistent with Candida or Pityrosporum ovale folliculitis.
6. Mr. Underwood underwent a repeat marrow evaluation at day 26 of 7+3 induction on January 18th, 2021 that revealed a hypocellular marrow (50%) without increase in blasts or fibrosis. A 500-cell count on a good quality aspirate revealed 2% blasts corroborated by flow cytometric analysis that revealed 3% blasts. Overall the findings were consistent with no morphological or immunophenotypic evidence of a myeloid neoplasm. Fluorescence *in situ* hybridization detected no aberrations and next generation sequencing detected no mutations.
7. Mr. Underwood then proceeded with the consolidation phase of AML management and was treated with high-dose cytarabine. A marrow evaluation on February 23rd, 2021 after first cycle of high-dose cytarabine consolidation revealed a hypocellular marrow (40%) with mild erythroid hyperplasia, marked myeloid hypoplasia and no morphological or immunophenotypical evidence of a myeloid neoplasm.
8. Mr. Underwood was then transitioned to decitabine + venetoclax (with the latter dose-reduced to 70 mg daily given the drug-drug interaction with concurrent posaconazole anti-fungal prophylaxis) on March 15th, 2021.
9. Mr. Underwood had a marrow evaluation on April 5th, 2021 that revealed a hypocellular marrow (20%) with a 500-cell count on a good quality aspirate revealing 0% blasts, but a small abnormal blast population was identified by flow cytometric analysis (comprising 0.01% of white cells with aberrant expression of CD7 among others).
10. Mr. Underwood then underwent an allogeneic hematopoietic stem cell transplant on April 22nd, 2021 using his sister as a matched related donor (peripheral blood stem cell source) with thiotepa + fludarabine

+ melphalan conditioning with post-transplant cyclophosphamide. Mr. Underwood received graft versus host disease (GVHD) prophylaxis with sirolimus + tacrolimus.

11. Mr. Underwood's post-transplant course was complicated by concern for acute gastrointestinal GVHD with stool output >500ml. A colonoscopy on May 18th, 2021 with biopsies revealed some areas of apoptosis in the large colon that were felt to possibly represent GVHD and was treated with a corticosteroid taper. Mr. Underwood was then found to have evidence of clostridium difficile colitis and was treated with oral vancomycin.
12. Mr. Underwood underwent a marrow evaluation day +33 post-transplant on May 25th, 2021 that revealed no evidence of relapsed disease without immunophenotypic evidence of measurable residual disease by flow cytometric analysis.
13. Mr. Underwood underwent an EGD on June 24th, 2021 performed because of abdominal pain, nausea and vomiting invoking the possibility of GVHD, but this revealed no abnormal findings including on several random biopsies without evidence of H. pylori, CMV or adenovirus infection.
14. Unfortunately, Mr. Underwood then underwent a marrow evaluation on day +82 post-transplant on July 21st, 2021 that revealed a markedly hypocellular marrow (15%) with marked myeloid hypoplasia, mild erythroid hypoplasia without an increase in blasts or fibrosis, but a small abnormal population of CD34-positive myeloid blasts were identified at 1.6% of total white cells (again expressing CD7 among others), concerning for relapsing AML.
15. Mr. Underwood was then treated with high-dose cytarabine + venetoclax and a marrow evaluation day 27 of therapy on August 25th, 2021 revealed a markedly hypocellular marrow (1-5%) with minimal fibrosis and a 400-cell count on a hemodilute aspirate revealed 5% blasts. Flow cytometric analysis revealed that 0.12% of white cells were CD34-positive myeloid blasts expressing CD7 consistent with persistent, measurable residual disease.
16. Mr. Underwood was then transitioned to CLAG (cladribine + cytarabine + G-CSF) + donor lymphocyte infusion on September 16th, 2021. A marrow evaluation day 26 of this therapy on October 12th, 2021 revealed a hypocellular marrow (15%) with minimal fibrosis and a 500-cell count on a good quality aspirate revealed 2% blasts. Flow cytometric analysis revealed 0.04% CD34-positive myeloblasts expressing CD7 consistent with persistent measurable residual disease. A repeat marrow evaluation on November 22nd, 2021 revealed a hypocellular marrow ranging from 15-30% cellular and clusters of immature mononuclear cells were noted with minimal fibrosis. A 500-cell count revealed 5% blasts and flow cytometric analysis revealed 7% CD34-positive blasts that aberrantly expressed CD4, CD5 and CD7 among others, all consistent with persistent AML.
17. Mr. Underwood was admitted on December 18th, 2021 after presenting with neutropenic fever. He was found to have persistently positive RSV B on respiratory viral panel testing. CT chest on December 18th, 2021 revealed the interval development of patchy bibasilar reticulonodular ground glass alveolar infiltrates with discrete nodular densities and multiple solid lung nodules >8 mm concerning for

pneumonia. Mr. Underwood was treated with broad spectrum, intravenous anti-bacterials and his fever was ultimately felt to be related to his underlying AML.

18. Mr. Underwood was then transitioned to decitabine + venetoclax + nivolumab and a marrow evaluation on day 29 of therapy on December 29th, 2021 revealed a hypocellular marrow (20%) with clusters of blasts noted, up to 90% of cellularity by CD7 immunohistochemical staining and 50% co-expressing CD117. A 155-cell count revealed 78% blasts and flow cytometric analysis revealed 48% blasts. Fluorescence *in situ* hybridization and chromosome analysis off of a bone marrow specimen from December 27th, 2021 revealed deletion 5q + loss of one copy of ABL1 and complex karyotype with 46,X,-Y,del(1)(p31p13),add(4)(p12),add(5)(q22),+mar[cp14]/ 45,sl,t(1;22)(q32;q13)[2]/ 45,sdl,add(5)(p15),inv(7)(p11.1q21)[3]/ 45 46,sl,del(14)(q13q24)[cp2], respectively.
19. Mr. Underwood had a CT chest on January 4th, 2022 in the context of active, persistent/refractory AML that revealed worsening bilateral opacities that caused his clinical condition to worsen despite aggressive measures.
20. After discussion with multiple providers, Mr. Underwood ultimately transitioned to hospice care on January 8th, 2022 and passed away eight days later on January 16th, 2022.

## V. Analyzing the causal association between Mr. Underwood's myeloid malignancy and his work-related exposure

1. Mr. Underwood reports in his deposition that over an approximately 15-year course beginning as a child at the age of 8 years and on a daily basis later during his many years of formal employment, he was regularly exposed to gasoline, CRC carburetor cleaner, CRC Brakleen, PB B'laster penetrating catalyst, O'Reilly's brake cleaner, Autozone brake cleaner, Safety-Kleen parts washer, Klean Strip lacquer thinner, Klean Strip mineral spirits, and Sunnyside mineral spirits, specifically dermal contact as well as inhalational exposure.
2. In evaluating the composition of these agents and invoked leukemogens:
    a. Mr. Underwood reports long-standing and repeated exposure to gasoline beginning at the age of 8 years. Commercial automotive gasoline contains is known to contain measurable benzene, which is a simple and aromatic hydrocarbon (Vlaanderen J, et al. *Am J Ind Med*. 2012;55:779–85). Exposure to benzene has long been recognized as a leukemogen, specifically increasing the risk of AML/MDS (Shallis RM et al. *Blood Rev.* 2020. Doi: 10.1016) and this recognition has prompted regulatory bodies to gradually reduce the percentage of benzene allowable in gasoline. For reference, the benzene was estimated to comprise 4-6% of gasoline by volume in the 1970s (Parkinson GS. *Ann Occup Hyg*. 1971;14:145–53 and Armstrong TW, et al. *Am Ind Hyg Assoc J*. 1996;57:333–43). This benzene content decreased to approximately 2-3% during the 1980s (Walker B. *Arch Environ Health.* 1995;50:252–4 and Lagorio S, et al. *Scand J Work Environ Health.* 1994;20:331–8), but has since been estimated to be < 1%, which is lower than the average and

maximum levels mandated by the Environmental Protection Agency (Chin JY, et al. *Chemosphere*. 2012;86:951–8 and Gasoline Mobile Source Air Toxics. United States Environmental Protection Agency [EPA]. https://www.epa.gov/gasoline-standards/gasoline-mobile-sourceair-toxics; 2016). In addition to the repeated dermal contact with gasoline likely encountered by Mr. Underwood, who reports cleaning parts as early as the age of 8 years, attention must also be paid to the fact that benzene is detected in the ambient air surrounding gasoline stations, a finding attributable to gasoline's volatility, but also at levels higher than "normal," non-gasoline station environments in epidemiologic studies (Correa SM, et al. *Atmos Poll Res*. 2012;3:163-169, Karakitsios SP, et al. *Atoms Env.* 2007;41:1889-1902 and Demirel G, et al. *Sci Total Environ.* 2014;473-474:537-48).

b. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to CRC carburetor cleaner, which as per MSDS review was constituted by toluene (approximately 10-70%) and, for some period of time, xylene, both of which had appreciable benzene content due to impurity (0.1-1.0% and 0.1%, respectively).

c. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to CRC Brakleen, which was constituted by petroleum distillates/Stoddard which had appreciable benzene content due to impurity of about 0.1%. Furthermore, the non-chlorinated formulation of this substance was constituted by xylene, hexane, heptane and acetone, which had appreciable benzene content due to impurity (0.1%, 1-6%, up to 4.0%, 0.1-1.0% and 30 ppm, respectively).

d. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to PB B'laster penetrating catalyst, which as per my review of the MSDS for the product published as recently as August 21st, 1995 was still known to be constituted with 1.05% ethylbenzene and 1.000% 1,2,4-trimethylbenzene; furthermore, PB B'laster penetrating catalyst was constituted by 7% xylene, which had appreciable benzene content due to impurity (approximately 0.1%)(PB Penetrating Catalyst; Material Safety Data Sheet; Chemical Solvents, Inc.: Cleveland, OH, USA, 8/21/1995).

e. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to O'Reilly's Brake Parts Cleaner, which contained "6.6 mg/kg benzene," as per an analysis of a sample collected from Mr. Underwood's shop at AP Injection and submitted to Dixie Services Incorporated on July 29th, 2022 described in a report (number 165993-C) signed by Laboratory Manager Ryan H. Moyer and made available to me.

f. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to Autozone brake cleaner, which upon my review of the MSDS from both January 17th and October 22nd of 2003 contained toluene and heptane (estimated proportion not provided), which had appreciable benzene content due to impurity (0.1-1.0% each).

g. Mr. Underwood is noted to have suffered repeated dermal and inhalational exposure to TruFuel 50:1 pre-mixed 2-cycle engine fuel, which upon my review of the MSDS from October 14th, 2013

contained 50-60% naphtha petroleum, 5-10% toluene, 5-10% xylene and 1-5% ethylbenzene; as per the MSDS from April 2nd, 2015 it contained 50-75% naphtha petroleum, 6-10% toluene, 5-10% xylene and 1-1.8% ethylbenzene, 0.3-1.0% naphtha (petroleum), and 0.1-0.3 distillates (petroleum), among others.

h. Mr. Underwood reports at deposition to have suffered repeated dermal and inhalation exposure to Safety-Kleen parts washer. Safety-Kleen parts cleaner/washing solvents were known to be constituted by 99.9% "solvents" (MSDS from March 25th, 1975). Review of subsequent MSDS data reveals that Safety-Kleen parts cleaner/washing solvents were known to be constituted by 99.9% "mineral spirits" (MSDS from September 12th, 1986 among others) or 31.3% ortho-di-chlorobenzene (MSDS from March 11th, 1987 among others). Mineral spirits are found to be benzene-contaminated to as high as 1% (or 10,000 ppm)(Kopstein M. *J Occup Environ Hyg*. 2006;3[1]:1-8 and Kopstein M. *J Occup Environ Hyg*. 2011;8[5]:300-309). Furthermore, Safety-Kleen parts cleaner/washing solvents were contaminated through introduction of benzene with one analysis determining up to 58 ppm (0.0058%) benzene concentration at temperatures of both solvent and atmosphere that were below with an accounting for temperature differences (Fedoruk, et al. *Appl Occ Env Hygiene*. 2003;18:764-771).

i. Mr. Underwood, supported by the deposition testimony of his mother Angela Underwood, is noted to have suffered repeated dermal and inhalation exposure to Klean-Strip mineral spirits, which as per my review of the MSDS data demonstrate that the product in 2005 (based on the MSDS from June 20th, 2005), a year after Mr. Underwood's exposure began, and through 2008, was constituted by 95-100% Stoddard solvent (mineral spirits, aliphatic petroleum distillates, white spirits), and then based on MSDS data from 2014-2015 was constituted by hydrotreated light distillate (petroleum, mineral spirits).

j. Mr. Underwood, supported by the deposition testimony of his mother Angela Underwood, is noted to have suffered repeated dermal and inhalation exposure to Sunnyside mineral spirits, which as per my review of the MSDS data demonstrate that the product in 2005 (based on the MSDS from May 20th, 2005), a year after Mr. Underwood's exposure began, had a "petroleum odor" and was constituted by mineral spirits in unknown quantity, but four years prior based on the MSDS from May 15th, 2001 was constituted by mineral spirits, heavy hydrotreated naphtha, heavy hydrodesulfurized naphtha, trimethylbenzenes, and 1,2,4-trimethylbenzenes among others.

k. Mr. Underwood, supported by the deposition testimony of his mother Angela Underwood, is noted to have suffered repeated dermal and inhalation exposure to Klean-Strip lacquer thinner, which based on the MSDS data from August 20th, 2007 (three years after exposure to Mr. Underwood began) was constituted by 5-20% toluene, which itself was constituted by "benzene,

methyl-.” The product was constituted by 5.0-60.0% toluene, , which itself was constituted by “benzene, methyl-“ in 2009 based on the MSDS data.

l. Furthermore, studies specifically evaluating benzene exposure to automotive mechanics while employing high quality quantitative measurements and analytical methodology have found that the measured airborne concentrations of benzene can exceed 1 ppm during gasoline-related tasks (Williams PR and Mani A. *J Toxicol Environ Health B Crit Rev.* 2015;18[7-8]:371-99), which if performed in a protracted fashion depending on the exact work required by an automotive mechanic/technician for the day could likely exceed the 1 ppm 8-hour time-weighted average permissive exposure limit established by the Occupational Safety and Health Administration (OSHA) in 1987 and has since remained the standard (Occupational Safety and Health Administration. Occupational Safety and Health standards: occupational health and environmental control [Standard No. 1910.95]; 1970 and ] Galbraith D, et al. *Crit Rev Toxicol.* 2010;40[Suppl. 2]:1–46).

3. Strong data support biologic plausibility for the leukemogenic potential, or its *causal* association with the development of AML/MDS, of benzene and the substances it constitutes.

   a. First, a hematopoietic stem/progenitor cell, or in brief the marrow-residing “parent” cells whose progeny through several stages of maturation become the mature elements of the peripheral blood, must acquire an early DNA or epigenetic lesion to eventually become a “leukemia-initiating cell” that can escape the normal biological determinants of maturation and proliferation and lead to AML/MDS.

   b. To this point, *In vitro* data demonstrate that the reactive metabolites of benzene, 1,2,4-benzenetriol and hydroquinone, are genotoxic and induce chromosomal abnormalities like loss of chromosome 7 (monosomy 7) or selective deletions of the long arm of chromosome 5 (del[5q]) in human bone marrow CD34+ cells at concentrations as low as 0.2-2.5 µM for as little as 20-72 hours (Smith et al. *Carcinogenesis.* 2000;21:1485-90 and Stillman et al. *Exp Hematol.* 2000;28:169-76). Other *ex vivo* or cell line data have shown that exposure to up to 10 µM of hydroquinone can similarly induce the development of del(7q) and trisomy 8, other chromosomal aberrations frequently associated with AML/MDS (Ji Z, et al. Leukemia. 2010;24:986-91). In fact, the specific chromosomal aberrations monosomy 7, del(7q) and del(5q) are some of the very few that in detected in context of peripheral blood cytopenias inherently *define* a diagnosis of MDS as per the classification of diseases set forth by the World Health Organization (Swerdlow SH, Campo E, Harris NL, Jaffe ES, Pileri SA, Stein H, et al [eds]. WHO classification of tumours of haematopoietic and lymphoid tissues. Lyon, France: IARC; 2017).

   c. CYP2E1, the primary enzyme responsible for benzene metabolism by in humans, is shown to saturate with as little as 1 ppm of benzene exposure (Rappaport SM, et al. *Cancer Res*.

2002;62:1330–7, Rappaport SM, et al. *Chem Biol Interact.* 2005;153-154:103–9, Seaton MJ, et al. *Carcinogenesis*. 1994;15:1799–806 and Nedelcheva V, et al. *Arch Toxicol*. 1999;73:33–40).

d. Gasoline-exposed workers have observed a higher rate of peripheral blood leukocyte single-strand DNA breaks when compared with control subjects (Nilsson RI, et al. *Am J Ind Med*. 1996;30:317–24).

e. However, the induction of benzene-related chromosomal abnormalities is not a pre-requisite for the development of AML/MDS. In addition to inducing leukemogenic chromosomal damage, *ex vivo* studies have demonstrated that exposure to benzoquinone and hydroquinone at concentrations up to 40 μM induces hypermethylation of the promoter region of genes critical to DNA mismatch repair and cycle cell regulation, all events that disrupt normal genomic stability (Ren et al. *PLoS One.* 2019;14[8]:e0220500). Furthermore, these hypermethylation changes are the typical and pathogenic epigenetic changes observed in the diseased marrow cells of individuals with AML/MDS (Ren et al. *PLoS One.* 2019;14[8]:e0220500).

f. It should, however, that although many specific chromosomal aberrations are detected by fluorescence *in situ* hybridization testing or full karyotyping/chromosomal analysis via G-banding analysis, these techniques are imperfect and not entirely sensitive. An informative analysis of 30 primary sampled from patients with AML/MDS demonstrated that genome-wide oligonucleotide array comparative genomic hybridization or “microarray analysis” can in up to approximately 40% of cases reveal chromosomal aberrations not detected by conventional methods, owing to the relatively low resolution of the latter techniques and lack of sensitivity to detect chromosomal abnormalities less than 6-10 megabases (Bajaj R, et al. *Mol Cytogenet.* 2011;4:3). Should this technique had been employed in the case of Mr. Underwood, it is quite likely that a chromosomal aberration classically associated with MDS/AML and described above, particularly given the complex karyotype identified in Mr. Underwood’s leukemia, would have been detected.

4. Benzene has been recognized as a carcinogen and a leukemogen for decades and based on many occupational studies high-quality benzene exposure assessment methods the International Agency for Research on Cancer (IARC) concluded in 1987 that this evidence was sufficient to conclude that benzene causes AML and subsequently classified benzene as a “known human carcinogen,” or Group 1 carcinogen, their strongest classification (IARC. *IARC Monogr Eval Carcinog Risks Hum Suppl.* 1987;Supplement 7:40–1). This same evidence and continually-emerging occupational studies with high-quality exposure assessment methods have allowed IARC to reaffirm benzene’s Group 1 carcinogen and leukemogen status multiple times in updated IARC consensus reports (Loomis D, et al. *Lancet Oncol*. 2017;18:1574–5).

5. The weight of scientific evidence fails to establish the exact threshold level of exposure, on a population-wide basis, that is necessary for benzene to cause AML/MDS or dose-response relationship between a benzene and AML/MDS. The detection of statistically-significant increases in risk of AML when compared with arbitrary exposure traunches should not be considered demonstration of an exposure “threshold”

below which benzene exposure is safe. Such flawed conclusions would be rooted in data based on small sample sizes and likely benzene exposure underestimates, especially for older studies. The current lack of understanding of a conclusive dose-response relationship between benzene and AML/MDS is also likely due to the robust degree of heterogeneity in cumulative benzene exposure assessments employed in the epidemiologic literature. As previously-mentioned, the majority of dose-response curves for carcinogens are likely to be non-linear; the effect of cumulative benzene exposure is likely to be similar. To this point, benzene-related serum albumin adducts are shown to be generated with air benzene concentrations of *less than* 1 ppm (with high-quality quantitative exposure assessment methods e.g. personally-worn, calibrated organic vapor monitors) in case-control studies of benzene-exposed factory workers and a non-linear/supralinear increase in the rate of benzene-related protein adducts was observed at <1 ppm (Rappaport SM, et al. *Cancer Res*. 2002;62:1330–7 and Rappaport SM, et al. *Chem Biol Interact.* 2005;153-154:103–9). An exact dose-response relationship for benzene and AML/MDS likely also remains elusive because, as described above, in any individual case of cancer, other factors likely interact in a multi-step process including genetic susceptibility that might inevitably play a causal role in the development of that cancer. Thus, what may be a safe “threshold” of benzene exposure for one person could be a lethal dose for another. This individual variation in AML/MDS susceptibility dictates that any statement positing a particular quantitative exposure as “trivial,” “non-contributory,” “insignificant,” “inconsequential,” “irrelevant,” or “minor” is not only overconfident but erroneous. It is entirely possible that *no* safe threshold of occupational benzene exposure exists (Lutz, *Mut. Res*. 2001;481 and Shallis et al. *Blood Rev*. 2020;100760).

a. It should be noted that the Bradford Hill criteria must be continually re-evaluated with new or emerging data to suggest improved understanding pertaining to biological pathways and most pertinently to this case the understanding of dose-response relationships since the inception of the Bradford Hill criteria. Specifically, we now know that most dose-response relationships are in fact no linear as originally used in Sir Bradford Hills’s example to illustrate his “biological gradient” aspect. “J-shaped,” “U-shaped,” or “inverted U-shaped” curves/dose-effects can be observed and the concept of “hormesis,” or a discordance between effect size and exposure dose, has been recognized (Calabrese EJ. *Crit Rev Toxicol*. 2013;43[7]:580-606 and Calabrese EJ, Blain RB. *Regul Toxicol Pharmacol.* 2011;61[1]:73-81). In many scenarios *no* consistent dose-response relationship can be determined, as is the case with benzene and AML/MDS, but this limitation in understanding should not weaken the argument for *causal* association as Sir Bradford Hill himself specifically opines (Hill AB. *Proc Royal Soc Med*. 1965;58[5]:295-300).

6. Studies have in fact demonstrated automotive mechanics to have chronic exposure to benzene. Popp and colleagues measured the mean air benzene concentration at the workplaces of automotive mechanics in Germany (during a time when the benzene content of gasoline is estimated to have been 1.7-3.0%) to be 2.6 $mg/m^3$ and maximum 13 $mg/m^3$. Furthermore, when evaluating the peripheral blood of 26 benzene-

exposed automotive mechanics and after accounting for tobacco smoking, a known confounder for benzene exposure, the researchers still found a mean benzene blood level of 0.7 µg/L (range: 0.2-1 3) in 8 non-smoking automotive mechanics, visibly higher than the doubled mean benzene blood levels observed in counterparts with smoking history (1.5 µg/L [range: 0.8-1.9] and higher than what would be expected with non-benzene-exposed individuals (Popp W, et al. *Int Arch Occup Environ Health*. 1994;66:1-6).

7. The previous presumption that the acquisition of DNA damage, either from benzene or another leukemogen, *cannot* be causally associated with the development of AML/MDS or other myeloid malignancies years if not decades later is an antiquated and ultimately erroneous contention. Increasing data demonstrate that the genotoxic effects incurred by a leukemogen like benzene may not manifest a terminal phenotype like AML/MDS for many years and in many cases *decades.*
    a. One of the most powerful examples of this phenomenon is the observation that atomic bomb survivors (who were unequivocally exposed to both gamma and particle radiation, which are also unequivocally known to induce genetic and chromosomal abnormalities and consequent AML/MDS) are still observed to have an increased risk of myeloid neoplasm and leukemia up to <u>forty-five</u> years after their exposure when compared with the general population; the most recent evaluations of this population have demonstrated that the increased risk of myeloid leukemia has *still* not remitted to the background level (Iwanaga M, et al. *J Clin Oncol.* 2011;29[4]:428-34, Sakata R, et al. *Maturitas*. 2012;72:99–103 and Tsushima H, et al. *Int J Hematol*. 2012;95:232–238). In brief, these data demonstrate that *no* confirmed period of time after an exposure to a leukemogen like gamma/partial radiation or benzene after which the development of AML/MDS can be asserted to have *not* arisen from the original insult.
    b. A much more recent and powerful demonstration of the ability of leukemogenic lesion to remain "quiet" for years before manifesting as AML/MDS was presented as the premier "Late-Breaking Abstract" at the most recent American Society of Hematology meeting in 2020 during which researchers at the Wellcome Sanger Institute and University of Cambridge in the United Kingdom, using whole-genome sequencing of single-cell derived hematopoietic colonies combined with sequencing of *longitudinal* blood samples of patients with another myeloid malignancy, specifically a myeloproliferative neoplasm. In reconstruct phylogenetic trees of hematopoiesis and tracing blood cell lineages back to embryogenesis, they were able to time the acquisition of the disease driver mutation (*JAK2*-V617F, noting that <u>all</u> of these driver mutations of myeloid disease were either acquired *in utero* or in childhood and demonstrated a mean latency between myeloid disease driver mutation and eventual clinical presentation of 34 years (ranging from 20 to as long as <u>54</u> years) (Williams N, et al. *Blood* 2020; 136 [Supplement_2]: LBA–1). These data essentially confirm what AML/MDS specialists have suspected for many years.
    c. These critical observations regarding latency and the ability of leukemic stem cells to remain quiescent for years if not decades before cycling and proliferating diseased progeny is a chief

consideration in appraising the few "negative" or "null" epidemiologic studies relating to automotive mechanics and the risk of subsequent AML/MDS, which simply may be limited by insufficient follow-up.

8. Consistent with the above data demonstrating a consistent level of benzene to which Mr. Underwood was exposed almost daily for many years and the genotoxicity data demonstrating clear biologic plausibility, several epidemiological studies have demonstrated that automotive mechanics/technicians and gasoline station attendants do unfortunately have a detectable increased risk of leukemia, addressing Sir Bradford Hill's "strength" and "consistency" aspects.
    a. Hunting and colleagues in their retrospective cohort study of 335 automotive mechanics employed between 1977-1989, using surrogate-based (qualitative) exposure estimates by position titles, job series codes, and dates for job changes found an increased risk of leukemia/aleukemia-related death among 297 workers with the highest estimated benzene exposure (essentially only including those workers with regular exposure to fuels and solvents like Mr. Underwood and *excluding* workers who were only employed in an "office" setting or were in the "general garage environment") when compared with the expected death rates of those within the surrounding general population (standardized mortality ratio=9.26 [1.12-33.43])(Hunting KL, et al. *Occup Environ Med*. 1995;52:673–8). Another case-control study found an excess leukemia risk among mechanics (odds ratio [OR]=4.79, 95% confidence interval [CI]:1.42-16.18). Although the type of "mechanic" was unspecified, it is likely the automotive mechanics represented the bulk of the case population as opposed to aircraft, electrical, diesel, small engine, etc. mechanics; however, it is also likely that all of these mechanics would have utilized the same types of solvents, including benzene-containing solvents, used by Mr. Underwood during his time as an automotive mechanic and his automotive work antedating and after his actual employment (Brownson RC and Reif JS. *Int. J Epidemiol*. 1988;17:27-32). Using death certificate information from 1975-1985, Schwartz performed an analysis of New Hampshire automotive mechanics and found an excess proportionate mortality ratio (PMR) for leukemia (PMR=178)(Schwartz E. *Am J Ind. Med*. 1987;12:91-99).
        i. Several "negative" or "null" studies are in the literature, but have their limitations.
            1. ES Hansen published a historical cohort study of in which the Danish automotive mechanics employed during the 1970s were followed for up to 10 years and evaluated for cause-specific mortality. This study may not reliably comment on the risk of AML/MDS for automotive mechanics because:
                a. no AML/MDS/leukemia-specific mortality evaluation was reported and
                b. 10 years may not be sufficient to capture individuals who would have developed AML/MDS beyond 10 years in line with the evidence regarding

latency presented above (Hansen ES. *Scand J Work Environ Health*. 1989;15:43-46)

b. Studies investigating humans with chronic exposure to commercial gasoline, similar to Mr. Underwood, have similarly reported an increased risk of AML/MDS. A Swedish registry-based study identifying approximately 9,000 gas station attendants (employed during a time when gasoline was estimated to be constituted with 3-5% benzene) found 10 who eventually developed AML and, when comparing this to the incidence of AML expected among the entire Swedish population, found an excess risk of AML for these individuals chronically-exposed to gasoline (observed-to-expected ratio=3.6, 95% CI: 1.7-6.6)(Jakobsson, et al. *Arch Environ Health*. 1993;48:255–9). A larger and later study of 572 adults diagnosed with AML in the context of Cancer and Leukemia Group B (CALGB) studies, after excluding those with prior chemotherapy or radiation (known leukemogens) and excluding those with AML arising *out* of MDS, found that of the 61 subjects who were previously employed as gas station attendants, those employed for at least one year as a gas station attendant had an increased risk of AML when compared with age, sex, race and region-matched controls and accounting for other confounders in a multivariable analysis (OR=1.8, 95% CI:1.1–2.9)(Terry PD, et al. *Leuk Res*. 2005;29:1117–30). E Schwartz, in addition to detecting an excess proportionate mortality ratio for leukemia among New Hampshire automotive mechanics above, also detected an excess proportionate mortality ratio for leukemia among New Hampshire gas station attendant (PMR=328, 95% CI: 113-951)(Schwartz E. *Am J Ind. Med*. 1987;12:91-99).

9. Large, prospective and well-designed studies with high-quality quantitative benzene exposure measurements have demonstrated an increased risk of AML/MDS in other workers with chronic, low-dose exposure to benzene (in an effort to satisfy Bradford Hill's "analogy" aspect)

a. The most notable such study is that performed by the US National Cancer Institute (NCI) and the Chinese Center for Disease Control and Prevention (previously the Chinese Academy of Preventive Medicine) of over 110,000 factory workers employed during 1972-1987 and followed from 1972-1999 (Linet et al. *J Natl Cancer Inst.* 2019;111465-74). The NCI researchers recently conducted a case-control analysis of 44 myeloid leukemia cases within this population with an updated exposure assessment and validation component. This study suggested an increased risk of myeloid leukemia with increasing cumulative benzene exposure ($p_{trend}$=0.08) and a statistically significant increased risk for cumulative exposure 40 to < 100 ppm-years (RR=2.52, 95% CI: 1.02-6.08) compared to those without exposure (Linet et al. *J Natl Cancer Inst.* 2019;111465-74). This clinical evidence comprises a small part of that which supported the International Agency for Research on Cancer's formal conclusion that benzene is a Group 1 agent or that being associated with sufficient evidence for it being a "known" human carcinogen (IARC Monogr Eval Carcinog Risks Hum Suppl 1987;Supplement 7:40–1). This same body of evidence prompted the Agency for

Toxic Substances and Disease Registry (ATSDR) to conclude that "there is sufficient evidence for causation for benzene and all leukemia types" (U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry. "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases" 2017). These esteemed agencies' recognition of the causal association between benzene exposure and myeloid leukemias have served as the guiding evidence for service connection claims for veterans exposed to benzene-contaminated water at Camp Lejeune and who developed myeloid leukemias. These specific veterans between 1975-1985 were exposed to an estimated median monthly concentration of 7.6 µg/L [range: 1.6-12.2] of benzene from the Hadnot Point water well/system, which because of the recognized contamination was closed in February of 1985 (U.S. Department of Health and Human Services, Public Health Service, Agency for Toxic Substances and Disease Registry. "ATSDR Assessment of the Evidence for the Drinking Water Contaminants at Camp Lejeune and Specific Cancers and Other Diseases" 2017).

b. Similarly, workers exposed to crude oil, which has a benzene content ranging from 0.2-1.7% (Kirkeleit J, et al. *Ann Occup Hyg.* 2006;50:123–9 and Verma DK, et al. *AIHAJ*. 2000;61:255–63), suffer from chronic, low-dose benzene exposure and have been demonstrated to have an increased risk of AML/MDS based on large, prospective studies out of Australia, Canada, the United Kingdom and Norway. A pooled, nested case-control analysis including 60 cases of AML and 29 cases of MDS demonstrated a statistically-significant increase in MDS among the highest tertile of measurement-based cumulative exposure (>2.93 vs <0.348 ppm-years, OR=4.33, 95% CI: 1.31-14.3) and a significant trend for MDS risk with greater cumulative exposure (ptrend =0.01). Even at a comparatively low cumulative exposure of 0.348-2.93 ppm-years was associated with a statistically-significant increased risk of developing MDS when compared to the normal population (Schnatter AR, et al. *J Natl Cancer Inst*. 2012;104:1724–37). Another case-control study of a large cohort of Norwegian offshore petroleum workers detected an increased risk of AML among when compared with normal control subjects identified within the Norwegian Registry of Employers and Employees (relative risk [RR]=2.89, 95% CI: 1.25-6.67)( ] Kirkeleit J, et al. *Cancer Causes Control*. 2008;19:13–23).

c. One of the more informative analyses that can be performed in confirming a meaningful strength of association and supporting *causal* association is identifying *attributable-risk* estimates. The most powerful study of individuals with occupational exposure to gasoline and organic solvents, most relevant to Mr. Underwood, and reporting benzene-attributable risk estimates is a case-control study performed by Sara S. Strom and colleagues. The researchers evaluated 638 Texas residents with AML and used a job exposure matrix to assign exposure intensity level based on job title (the population was comprised of 25% automotive mechanics, 13% oil field workers, 13% chemical plant operators/workers and 10% gas station operators) and reported an increased risk

of AML with "low" occupation-related solvent exposure (OR=2.76, 95% CI: 1.46-5.21) and an even higher risk of AML with "high" occupation-related solvent exposure (OR=4.18, 95% CI: 2.28-7.64), but also offered a population-attributable risk of 41% and 14% for men and women, respectively, with exposure to "moderate/high levels of solvents"(Strom SS, et al. *Cancer*. 2012;118:4589-4596).

10. In determining a *causal* association between Mr. Underwood's chronic exposure to benzene, I also consider other confounders to address Sir Bradford Hill's "specificity" aspect.
    a. In reviewing Mr. Underwood's family history, there is no history of hematologic let alone myeloid malignancies. Specifically I reviewed the known medical history provided at deposition by Mr. Underwood, Ms. Angela Underwood (Mr. Underwood's mother) and Ms. Lisa Underwood (Mr. Underwood's sister):
        i. Mr. Underwood's mother, Angela Louise Crawford Underwood, a painting contractor for her painting company called A&G Custom Painting. Other than a single basal cell carcinoma that was removed, at deposition she reports no known history of malignancy or other hematologic problems.
        ii. Mr. Underwood's father, who passed away in October of 2010 from a massive cerebral vascular accident when Mr. Underwood was 14 years of age. He reportedly had no known history of malignancy or other hematologic problems.
        iii. Mr. Underwood's six older full siblings who reportedly have no known history of malignancy or other hematologic problems, including:
            1. Kyra Underwood, his fraternal twin sister born August 20th, 1996, and Mr. Underwood at deposition reports having no knowledge of any family members having hematologic disease.
            2. Lisa Underwood, born September 24th, 1982, and at deposition reports having no hematologic disease or malignancy history.
            3. Ami, born May 28th, 1979., and Mr. Underwood at deposition reports having no knowledge of any family members having hematologic disease.
            4. Mara, born April 4th, 1989, and Mr. Underwood at deposition reports having no knowledge of any family members having hematologic disease.
            5. Emily, born July 24th, 1985, and Mr. Underwood at deposition reports having no knowledge of any family members having hematologic disease.
            6. Shari, born August 17th, 1977, and Mr. Underwood at deposition reports having no knowledge of any family members having hematologic disease.
        iv. Mr. Underwood's several aunts and uncles who reportedly have no known history of malignancy or other hematologic problems, including:

1. Karen Underwood Bingham, Mr. Underwoods paternal aunt who is alive and to the best of Mr. Underwood's knowledge is "completely healthy."
2. Al Underwood, Mr. Underwoods paternal aunt who is alive with history of coronary disease complicated by myocardial infarction.
3. Rhonda (Mr. Underwood cannot recall her last name), Mr. Underwood's maternal aunt who is alive and to the best of Mr. Underwood's knowledge is "completely healthy."
4. Michael Crawford, Mr. Underwood's maternal uncle, who is alive at time of deposition of Ms. Angela Underwood who reports that he had a history of melanoma.

v. Mr. Underwood's grandparents who reportedly have no known history of malignancy or other hematologic problems, including:

1. Albert Underwood, Mr. Underwood's paternal grandfather, who is a retired truck driver with a history of "retaining fluid around heart and lungs" and then possibly fell and hit his head, passing away at age 85 years of age.
2. Rosemary Underwood, Mr. Underwood's paternal grandmother, who passed away during an unknown year after 2010 of unclear causes.
3. Donald Crawford, Mr. Underwood's maternal grandfather, who passed away in November 2020 of coronary disease complicated by myocardial infarction; he also had a history of color blindness.
4. Wanda Hopkins, Mr. Underwood's maternal grandmother, who passed away in 2021 and died of "sepsis."

b. Given this information and namely the number of siblings and the number of family members of relatively older age, it is highly unlikely that Mr. Underwood has one of the increasingly recognized familial or germline predispositions associated with an increased risk of MDS and/or AML listed in the table below from one of my recent reviews on the subject that has been favorably-reviewed and one of the most highly-cited amongst other expert colleagues (Shallis RM, et al. *Blood Rev*. 2019;36:70-87):

Germline predisposition syndromes, determinants and estimates of acute myeloid leukemia risk.

| Syndrome | Associated abnormality | Estimated AML risk |
|---|---|---|
| Germline mutations | | |
| Ataxia-pancytopenia syndrome | *SAMD9L* | Unavailable |
| Bloom Syndrome | *BLM* | Lifetime risk: 20% |
| Diamond-Blackfan anemia | *RPS19, RPL5, RPL11, RPS35A, RPS10, RPS17, RPS24, RPS26* | O/E ratio: 27.9 (95% CI, 3.4–101) |
| Dyskeratosis congenita | *DKC1, TERT, TERC* | O/E ratio: 195 (95% CI, 22–707) |
| Fanconi anemia | *FANCA, FANCC, FANCG* | 8% risk at 20 years |
| Familial AML with mutated *CEBPA* | *CEBPA* | Unavailable |
| Familial AML with mutated *DDX41* | *DDX41* | Lifetime risk: 9% |
| Familial platelet syndrome | *RUNX1* | Median risk: 35% (ranging up to 60%) |
| *GATA2* haploinsufficiency | *GATA2* | *Lifetime risk: 33%* |
| MIRAGE syndrome | *SAMD9* | Lifetime risk: at least 17% |
| Noonan syndrome | *PTPN11* | Lifetime risk: 1% |
| Severe congenital neutropenia (Kostmann syndrome) | *ELANE, HAX1, G6PC3, WASP* | Lifetime risk: 11–22% |
| Shwachman-Diamond syndrome | *SBDS* | AML/MDS risk 20-year risk: 11%<br>AML/MDS risk 20-year risk: 36% |
| Thrombocytopenia-2 | *ANKRD26* | Lifetime risk: 5%; incidence of 123 per 100,000 person-years (95% CI, 62–221) |
| Thrombocytopenia-5 | *ETV6* | Unavailable |
| Chromosomal aberrations | | |
| Down syndrome | Trisomy 21 | Lifetime risk: 1–2% |
| Familial monosomy 7 syndrome | Monosomy 7 | Unavailable |

Abbreviations: AML, acute myeloid leukemia; CI, confidence interval; MDS, myelodysplastic syndrome; O/E, observed to expected.

c. Attention to paid to the fact that myeloid next generation sequencing (50+ gene panel) of Mr. Underwood's marrow aspirate tissue performed by Sonora Quest Laboratories revealed a Tier IA frameshift insertion mutation in *CEBPA* p.(H24Afs*84) c.68_69insC at a variant allele frequency of 37.14% (the nonsense variant of unknown significance in *PHF6* p.(R274*) c.820C>T at a variant allele frequency of 85.95% is consistent with a single nucleotide polymorphism and no concern for contribution to AML).

i. Single mutations in *CEBPA* are found in half of *CEBPA*-mutated AML and bi-allelic *CEBPA* mutations are included in the WHO classification as a subtype of AML with recurrent genetic abnormalities. Furthermore, *CEBPA* is located on chromosome 19q, which was not clearly affected on conventional karyotyping of Mr. Underwood's marrow aspirate tissue; AML with homozygous *CEBPA* mutation due to loss of heterozygosity, and thus no wild-type CEBPA expressed, is unlikely. The relatively low *CEBPA* VAF of 37.14% points against Mr. Underwood's AML being related to a germline predisposition syndrome, which is typically associated with VAFs in the 40-60% range given the nature of allelic state and inheritance. Familial AML with mutated *CEBPA* is a recognized syndrome arising out of a germline predisposition syndrome, as shown in the table above. However, the strongest evidence for the lack of the detected *CEBPA* mutation being associated with an inherited syndrome or germline predisposition is the observation that these mutations are highly penetrant in affected families among which individuals with familial AML with mutated *CEBPA* develop disease at a median age of 24.5 years (range 1.75-46.0 years)(Tawana et al. *Blood*. 2015;126[10]:1214–1223). Indeed, there is no family history of AML or other hematologic/myeloid disease among the many family members appraised, including those of advanced age.

ii. The acquisition of a *CEBPA* mutation in the diseased cells in Mr. Underwood's case likely made him more susceptible to benzene-related leukemogenesis. *CEBPA* encodes for a protein known as a transcription factor critical to normal myelopoiesis and differentiation. When mutated, in addition to allowing leukemic stem cell persistence (Alberich-Jorda M, et al. *J Clin Invest.* 2012;122:4490-4505 and Zhang H, et al. *Cancer Cell*. 2013;24:575-588) and growth (Jakobsen JS, et al. *Sci Adv*. 2019;5[7]:eaaw4304), *CEPBA* promotes the transcription of myeloid growth factors (Hohaus S, et al. *Mol Cell Biol*. 1995.15;5830-5845, Smith LT, et al. *Blood.* 1996;88:1234-1247, and Ford AM, et al. *Proc Natl Acad Sci U.S.A.* 1996;93:10838-10843) that would more easily allow the necessary cell cycling among benzene-injured progenitors and thus the disease phenotype that we can eventually clinically detect. This situation would consequently make the development/detection of disease (i.e., MDS/AML) more likely among patients with relatively "low-dose" cumulative exposure to benzene.

d. Mr. Underwood never received prior chemotherapy or radiotherapy.

e. Mr. Underwood is a former smoker, but specifically reports rare and remote tobacco use, smoking only a few cigarettes in high school but none after that. Mr. Underwood reports that father smoked cigarettes, and occasionally his mother, but that this was outside of the home and he cannot recall them smoking around him (this is corroborated by the testimony of Ms. Lisa Underwood). Mr. Robert Davenport, Mr. Underwood's father, at deposition also corroborates that no one else smoked in the home while they lived together. Mr. Fisher reports at deposition that he never witnessed Mr. Underwood smoke while they worked or lived together and that he never smoked around Mr. Underwood. Ms. Angela Underwood and Ms. Lisa Underwood both report at deposition that they knew Mr. Underwood "tried" cigarettes but after that brief time period never saw Mr. Underwood smoke and both do not recall themselves or Mr. Davenport ever smoking around Mr. Underwood. However, the data regarding tobacco smoking and the risk of AML/MDS are not consistent and require a nuanced appraisal.

i. Firstly, there are many studies that have found *no* association between tobacco smoking and an increased risk of AML/MDS (e.g. Copley GB, et al. J Occup Environ Med. 2017;59[4]:349-355, Lv L, et al. *Am J Hematol.* 2011;86:163-9, Pekmezovic T, et al. *Ann Hematol.* 2006;85:514-519, Bjork J, et al. *Epidemiology.* 2000;11:285-291, Bjork J, et al. *Leuk Res.* 2009;33:788-791, Pogoda J, et al. *Am J Epidemiol.* 2002;155[6]:546-53, Speer SA, et al. *J Enrivon Health.* 2002;64[7]:9-16, Nagata C, et al. *Leuk Res.* 1999;23:57-62, Ido M, et al. *Leuk Res.* 1996;20:727-731, West RR, et al. *Leuk Res.* 1995;19:127-139, Mele , et al. *Am J Epidemiol.* 1994;139[6]:609-19, Sandler DP, et al. *J Natl Cancer Inst.* 1993;85[24]:1994-2003, and Brown LM, et al. *Am J Epidemiol.* 1992;135[7]:763-8).

ii. Other studies that have found a "positive association" between tobacco smoking and AML/MDS have been limited in their methodology or analyses:

1. The case-control study by Strom and colleagues identified "ever-smokers" as having a higher risk for all forms of MDS among both men and women (OR=1.65, 95% CI: 1.19-2.30), however when evaluating males specifically, no statistically-significant increase in the risk of MDS was noted when compared with never-smokers (OR=1.41, 95% CI: 0.93-2.12). Furthermore, this study did not account for the prior receipt of chemotherapy/radiotherapy that are known leukemogens and are frequently employed to treat prior solid tumors like lung cancers, which are coincidentally found in individuals with a smoking history, clearly invoking a relevant confounder. (Strom SS, et al. *Leukemia.* 2005;22:419-29).
2. Nisse and colleagues in their case-control study report and increased risk of MDS among smokers when compared with normal controls (OR=1.74, 95% CI: 1.1-2.7), however their multivariable analyses did not account for other variables including factors that also independently associate with a risk of AML/MDS (Nisse C, et al. *Br J Haematol.* 2001;112:927-35).
3. Ma and colleagues evaluated the association between smoking and MDS while accounting for BMI and noted that smoking still retained its impact on MDS risk, however, as the authors admit, BMI was not objectively recorded but simply calculated using heights and weights that were self-reported by included subjects and thus subject to inaccuracy. Furthermore, the analyses did not account for employment history that may have critically influenced the results of the study (e.g. can the results simply be explained by the hypothesis that individuals employed in agricultural, factory, automotive or other industries that expose workers to benzene and other leukemogens are more likely to be smokers?)(Ma X, et al. *Am J Epidemiol.* 2009;169:1492-9).
4. Jayasekara and colleagues in their recent case-control study reported an increased risk of MDS for only a subset of subjects who were actively smoking $\geq$20 cigarettes/day, but similarly to the Ma study above do not account for employment history that may have critically influenced the results of the study (Jayasekara H, et al. *Leuk Res.* 2021;109:106593).
5. Yarosh and colleagues in their recent case-control study, after accounting for classical variables including occupational history and potential exposures that the above studies did not, reported an increased risk of *de novo* MDS only among former smokers (OR=1.45, 95% CI: 1.10-1.93) but *not* active smokers (OR=1.31, 95% CI: 0.80-2.14) and strangely with *no* dose-response relationship observed

(e.g. only patients with >0-10 pack-years had a borderline positive association, whereas subjects with >10-20 and >20 pack-years had no statistically-significant increased risk of MDS) and their multivariable analyses did not account for BMI, weakening the impact of the "positive" findings (Yarosh R, et al. *Cancer Causes Control.* 2021;32[3]:241-250)

iii. Meta-analyses that have concluded an association between tobacco smoking and AML/MDS (Du et al. *Leuk Res.* 2010;34:1-5, Wang P, et al. *PLoS One.* 2015;10[9]:e0137300 and Fircanis, et al. *Am J Haemtol.* 2014;89[8]:E125-32) have included as part of their analyses the above case-control and population-based studies that did not account for relevant confounders that may have been responsible for the reported positive association or were limited by an imperfect data source.

iv. When evaluating former smokers with limited exposure to cigarettes like in Mr. Underwood's case, stronger data support *no* association between AML/MDS including AML, specifically.

1. Fircanis, et al. conducted a meta-analysis and when evaluating former smokers with <20 years of smoking history, like Mr. Underwood, there was no increased risk of AML (RR=1.07, 95% CI: 0.91-1.23; p=0.415), including after adjustment for age, sex and BMI (RR=1.06, 95% CI: 0.89-1.25) and when evaluating former smokers with <10 pack-year history, like Mr. Underwood, there was no increased risk of AML (RR=1.13, 95% CI: 0.95-1.36; p=0.175), including after adjustment for age, sex and BMI (RR=1.11, 95% CI: 0.93-1.32)(Fircanis, et al. *Am J Haemtol.* 2014;89[8]:E125-32).

2. Wang and colleagues performed a more contemporary analysis including many of the same studies used in Fircanis, et al above, and even when including AML and MDS together as the event in question, similarly found no increased risk for such among smokers with <20 years of smoking (OR=1.10 (95% CI: 0.93-1.29; p=0.25); a slight positive association with smoking >0 but <20 pack-years was reported, but this study did not account for relevant confounders such as BMI and occupational history as questioned above (Wang P, et al. *PLoS One.* 2015;10[9]:e0137300).

f. Mr. Underwood reports a history of vaping, specifically using single-use Juuls and Puff Bars with 3-5% nicotine, beginning at the age of 19 years in 2006 and continued until mid-2019. Mr. Underwood reports that a Puff Bar or a five-pack of Juuls would last a week. In my review of the literature, electronic cigarette solutions appear to contain no detectable benzene and there remains significant uncertainty regarding the composition of electronic cigarette vapors, which is also subject to varying on the specific product/device and means by which it is used; furthermore,

I can find no population-based or epidemiological study that has evaluated any influence of electronic cigarette use on the development of AML/MDS. However, it is my opinion that even if the vapors produced by the electronic cigarette products/devices specifically used by Mr. Underwood were consistently found to contain benzene, it is likely that this amount is nominal when compared with that known of the benzene-containing products to which Mr. Underwood was regularly exposed and are the chief reason for his developing AML.

g. Mr. Underwood reports experimenting with alcohol in high school at the age of 16 or 17 years old and reports no history of excessive use, only after the age of 22 years occasionally having a drink with his girlfriend, Haylee Menter. Mr. Angela Underwood reports at deposition that "he wasn't much of a drinker at all." Mr. Underwood also reports experimenting with marijuana (several times a week, mostly on the weekends, with friends) at the age of 14 or 15 until he was about 17 or 18 and then none since. Ms. Angela Underwood corroborates Mr. Underwood's testimony and states that he only "experimented" with marijuana briefly. Mr. Underwood briefly tried cocaine during high school, only trying 2-3 times, and did not like the experience so stopped using this. Mr. Underwood also tried MDMA at a festival at the age of 19 years, tried DMT once at the age of 15 years, and ayahuasca (a ceremonial Peruvian drink) twice during his teenage years. These substances have not been associated with an increased risk of AML/MDS.

h. Mr. Underwood exhibits no other relevant past medical history.

i. There is no clear personal or family history of autoimmune disease to my knowledge in reviewing the documents provided to me.

j. Mr. Underwood was not overweight/obese given a body-mass index (BMI) of 21.87 as of December 18th, 2020 and no documented history of being such previously.

11. There is little relevance for attempting to satisfy the remaining Bradford Hill criteria as the available pre-clinical evidence is not consistently contrary to that offered in the epidemiologic literature I have referenced above (Bradford Hill's "coherence" aspect). Other than entirely removing benzene from the substances it constitutes, which is an unlikely goal given benzene's ideal nature of a solvent without equal alternatives and its industrial pervasiveness, no "experiment" to prevent, reverse or abolish the effects attributed to benzene is possible, let alone likely (Bradford Hill's "experiment" aspect).

## VI. Summary of opinion

1. I have concluded to a reasonable degree of scientific and medical certainty that benzene causes AML/MDS, but also that no safe degree of exposure to benzene has been established, despite what has been offered by regulatory agencies like OSHA, NIOSH or the EPA, whose standards for allowable benzene exposure have not kept pace with the scientific research and do not eliminate the risks from chronic, low-dose benzene exposure that has been demonstrated in both the pre-clinical and epidemiologic literature. I believe asserting that a particular exposure to benzene is "trivial" ignores the totality of evidence

supporting the biological plausibility for even low doses to induce the genetic/chromosomal/epigenetic lesions necessary and in many cases sufficient to induce AML, which may take many years to eventually manifest.

2. As a clinician and researcher, I am profoundly concerned by Mr. Underwood's exposure history, which includes approximately 15 years of near daily exposure to known benzene-containing products, specifically gasoline, CRC carburetor cleaner, CRC Brakleen, PB B'laster penetrating catalyst, O'Reilly's brake cleaner, Autozone brake cleaner, Safety-Kleen parts washer, TruFuel 50:1 pre-mixed 2-cycle engine fuel, Klean Strip lacquer thinner, Klean Strip mineral spirits, and Sunnyside mineral spirits that were used to perform the tasks related to his employment for many years and for decades to dutifully service his, his family members' and friends' vehicles. Furthermore, I have reviewed the quantitative benzene exposure estimates for Mr. Underwood assessed by the Plaintiffs' industrial hygiene expert, Dr. Robert Laumbach as well as the benzene data for samples tested on April 20th, 2023 at the Tyler Underwood repair shop as performed by the Plaintiffs' forensic chemist expert Dr. Michael A. Sommer II. I compared Mr. Underwood's estimated exposures, as estimated by Drs. Laumbach and Sommer II, to the exposures of groups of benzene-exposed workers who have been found to be at increased risk for AML/MDS in various peer-reviewed, published epidemiological studies. If I had been the primary hematologist charged with establishing the diagnosis and management strategy of Mr. Underwood, his vivid descriptions offered at deposition detailing the media/vehicles by which he was chronically exposed to benzene would be sufficient for me strongly suspect these exposures were *causally* associated with the development of his AML.
3. It is my conclusion that, to a reasonable degree of scientific and medical certainty, Mr. Underwood's chronic dermal and inhalational exposure to benzene constituting the products he used on a near daily basis for years since childhood was a substantial factor in causing his AML. This professional opinion is rendered after thoroughly considering other factors that can contribute to the development of AML such as underlying genetic susceptibility/germline predispositions and/or other environmental factors.
4. It is my conclusion that Mr. Underwood died as a consequence of his AML.
5. Lastly, I have reviewed Mr. Underwood's medical and billing records provided to me related to his diagnosis, procedures and treatment for his AML. Based on my education/training and experience in the active treatment of patients with AML, it is my opinion to a reasonable degree of medical certainty that the bills provided to me pertaining to the diagnosis, procedures and medical treatments for Mr. Underwood's AML were necessary and the costs for this care were reasonable and customary.
6. All of these opinions are expressed to a reasonable degree of scientific and medical certainty. I reserve the right to amend, modify or supplement my opinions and offer additional opinions should new information become available to me about the case of Mr. Underwood.

I have included my curriculum vitae for review should it be helpful and remain available to address any questions as needed.

Respectfully,

Rory M. Shallis, M.D.