# Exhibit Q

# Dr. Robert Laumbach Rebuttal Report (May 19, 2023)

**REBUTTAL REPORT OF ROBERT LAUMBACH, M.D., M.P.H., C.I.H., D.A.B.T.**
**TYLER UNDERWOOD, MAY 19, 2023**

## 1) Dr. Pyatt on "Establishing Causation"

Dr. Pyatt demonstrates his fundamental misunderstanding of Bradford Hill "criteria" by applying Hills viewpoints specific causation. "These criteria are often used for two critical steps in conducting a causative analysis (general and specific causation analysis)." Hill's viewpoints are meant to aid in evaluating general causation, not specific causation, which requires additional analysis of the level of exposures. According to Pyatt, "Meaningfully satisfying these criteria (Bradford Hill's viewpoints) is essential to reach a scientifically and toxicologically defensible conclusion that a causal relation exists between exposure to a given chemical at a given exposure level and development of a specific disease or adverse health effect." Whether a given level of exposure was sufficient to cause a specific disease is specific causation, which requires a different methodology involving evaluation of exposure, comparison to exposure-response relationships, potential modifying factors, baseline risk, and other potential causes. General causation, to which Bradford Hill viewpoints are meant to be applied, concerns whether a chemical can cause a disease at any level of exposure.

Bradford Hill called his 9 considerations "viewpoints," not "criteria." This is an important distinction because it is misleading when Dr. Pyatt calls them criteria, and asserts that, like criteria, they must be "satisfied" or are "essential" in order to conclude that there is a general causal association between an exposure and a disease.

On strength of association, Dr. Pyatt conflates this viewpoint with statistical significance. Pyatt: "The first criterion is designed to evaluate the overall strength of a potential association, e.g. between chemical exposure and a specific disease. The purpose of this step is to statistically establish that the incidence or rate of disease is significantly higher in an exposed population when compared to a population not so exposed (the control population)."

Dr. Hill did not mention statistical significance in his discussion of strength of association, which he described in terms of relative risk ratios comparing exposed to unexposed populations. Hill: "We must not be too ready to dismiss a cause-and-effect hypothesis merely on the grounds that the observed association appears to be slight. There are many occasions in medicine when this is in truth so. Relatively few persons harbouring the meningococcus fall sick of meningococcal meningitis." Likewise, we expect that with a disease like AML, which is quite rare, and even rarer in very young adults, that few young adults exposed to benzene will get the disease. Even though there is a strong and generally accepted causal association between benzene and AML, relatively few exposed persons exposed to benzene by working with benzene-containing products will get AML.

After discussing all 9 viewpoints, Hill addressed "Tests of Significance:" "No formal tests of significance can answer those questions. Such tests can, and should, remind us of the effects that the play of chance can create, and they will instruct us in the likely magnitude of those effects. Beyond that they contribute nothing to the 'proof' of our hypothesis." (P. 299)

On “consistency,” Pyatt: “Reproducibility of findings is absolutely essential in all areas of science and epidemiology and/or toxicology is no exception. Therefore, consistent findings observed between independent studies from different investigators are necessary before one can reach a conclusion that exposure to a chemical is meaningfully related to the development of disease”

Hill proposed a decidedly less absolutist approach to consistency between results of different studies: “We have, therefore, the somewhat paradoxical position that the different results of a different inquiry certainly cannot be held to refute the original evidence; yet the same results from precisely the same form of inquiry will not invariably greatly strengthen the original evidence. I would myself put a good deal of weight upon similar results reached in quite different ways, e.g. prospectively and retrospectively.”

Dr. Hill did not consider consistent studies replicating results to be essential. Hill: “Once again looking at the obverse of the coin there will be occasions when repetition is absent or impossible and yet we should not hesitate to draw conclusions.”

Dr. Pyatt claims that “The remaining criteria as outlined by Bradford-Hill are also important in reaching a conclusion on medical causation, but cannot serve as adequate substitutions for fulfilling the first two.” Bradford Hill made no such pronouncement about the absolute importance of the first two criteria, or the need to “fulfill” any of the viewpoints. Hill: “Here then are nine different viewpoints from all of which we should study association before we cry causation.” (p. 299). Pyatt substitutes an absolutist dogma for the thoughtful consideration of evidence advocated by Dr. Hill.

Again, Pyatt asserts that the Hill methodology includes a false criterion that exposure magnitude and duration is needed to establish general causation. Pyatt: “In this regard, it is critically important to credibly establish that any hypothetical exposures have occurred at levels that have been shown in the quantitative literature to result in a meaningful increase in risk. Simply stating that exposure occurred without credible evidence of the magnitude or duration is insufficient.” Hill cites the classic examples of exposure to tar/mineral oils and scrotal cancer among chimney sweeps, and cholera caused by water contamination discovered by John Snow. In both of these cases of clear causation, the magnitude and duration of exposure were not characterized (p. 295, 296).

Additional quotations from Dr. Hill demonstrate the use of judgment and reason in considering his viewpoints, in contrast to the rigid application of “criteria” represented by Dr. Pyatt’s stated methodology.

> On significance:
> “Yet too often I suspect we waste a deal of time, we grasp the shadow and lose the substance, we weaken our capacity to interpret data and to take reasonable decisions whatever the value of P (the level of statistical significance). “And far too often we deduce 'no difference' from 'no significant difference.”
>
> On specificity:
> “In short, if specificity exists we may be able to draw conclusions without hesitation; if it is not apparent, we are not thereby necessarily left sitting irresolutely on the fence.”

On dose-response:
"Often the difficulty is to secure some satisfactory quantitative measure of the environment which will permit us to explore this dose-response. But we should invariably seek it."

On biological plausibility:
"It will be helpful if the causation we suspect is biologically plausible. But this is a feature I am convinced we cannot demand. What is biologically plausible depends upon the biological knowledge of the day."

**2) Dr. Pyatt's claim that "there has been no credible evidence presented in this case that Mr. Underwood received benzene exposures that are associated with a meaningfully increased risk of developing AML."**

Dr. Pyatt confuses the concept of dose-response relationship with threshold of response. Dose-response (Hill's "biological gradient") means higher levels of exposure are associated with higher incidence of disease. It does not follow, as a "corollary," that there is a threshold dose below which there is no increased incidence of disease.

Also, Dr. Pyatt claims that workers with exposures that he believes were similar to Mr. Underwood's ("0.04 ppm-years") were put in the unexposed control group of epidemiological studies: "There have been at least two dozen quantitative epidemiological investigations (with subsequent updates and analyses) that have determined the AML risk associated with a cumulative benzene exposure of this magnitude (0.04 ppm-years). In these studies, workers with exposures comparable to Mr. Underwood were put into the unexposed control group. These studies demonstrate that approximately 0.04 ppm-years is simply not enough benzene to be toxic or give someone AML" (p. 7). These, however, represent arbitrary cut-offs selected by the authors to perform comparison of relative risk within a single population based on that data available for that particular group. It is misleading to suggest that they someone constitute a uniform distinction between what is considered an "unexposed" versus an "exposed" worker.

Dr. Pyatt fails to recognize that risk at this level of exposure cannot be determined if workers thus exposed have been put in the control groups. Similarly, Dr. Pyatt states, that "…everyone in the US is exposed to benzene on a daily basis [12, 13]. These so-called background or ambient exposures to benzene are not a health concern as the measured air concentrations are too low to be of toxicological relevance (they are not associated with any adverse health effects)." Because everyone is exposed to benzene at these levels, it is difficult to find relatively unexposed comparison groups. Few studies or risk from ambient concentrations have therefore been performed. However, Teras (2019), using U.S. EPA National Ambient Toxics Assessment did examine the risk of MDS based on increasing ambient concentrations in certain "hot spot" areas of the United States. Ambient benzene exposure was positively associated with MDS (HR = 1.16, 95% CI: 1.01-1.33 per $\mu g/m^3$) and t-cell lymphoma (HR = 1.29, 95% CI: 1.08-1.53 per $\mu g/m^3$). This lends support to the increasing body of literature that very low level benzene exposures, even ambient concentrations, increase the risk of myeloid malignancy.

In asserting that "Using the best available data, the threshold for benzene induced AML appears to be between 40 and 500 ppm-years, with an average value of ~200 ppm-years," Pyatt relied primarily on studies of the Pliofilm cohort, ignoring more recent data of increased risk at lower doses (Kirkeleit, Stenehejm, Vlaaderan 2010, Glass 2003, Schnatter 2012). Pyatt claims that Schnatter (2012) supports this claim when Schnatter found increased risk of MDS and AML at >2.93 ppm-years of exposure.

In evaluating data from the Pliofilm cohort, EPA (1998) noted the limitations in using this data to assert a "critical" (threshold) concentration or a threshold cumulative exposure for causing AML. EPA rejected arguments for a threshold based on the studies of the Pliofilm workers (Wong 1995, Schnatter 1996, and Rinsky 1997) due to "the lack of sensitivity to detect the effects of benzene at low levels."

EPA 1998 concluded, "Even if there are threshold levels at which each individual experiences increased leukemia risk, population variability will almost certainly dictate that there is no one threshold dose that applies across the population of people exposed to benzene." It is my opinion that there has not been a demonstrated threshold of exposure at which increased risk of leukemia in an individual occurs, and even if there were such a threshold dose that applies to some people, there was no known threshold that can be applied Mr. Underwood.

**3) The defense focus on cumulative doses of exposure fails to consider the full scope of evidence.**

Peak exposures as an independent metric of benzene-induced cancer risk has been evaluated by a number of other investigators in both the epidemiology and laboratory setting. (Collins (2003) and Gray (2001)). Consistent with the findings of Schnatter (2012), Gray (2001) demonstrated a greater risk of leukemia among workers with potential for intermittent peak exposures (versus the group not expected to have peak exposures), when comparing two groups of workers with the same cumulative benzene doses.

Snyder (1988) administered a dose of benzene to one group of laboratory mice on a continuous basis, and 65% of that dose to another group of mice on an intermittent basis. The same cancer result was observed in both groups of mice, demonstrating that intermittent intense exposures are a relevant metric to the cause of benzene-induced cancers. Infante (1992) evaluated a number of experimental studies investigating mechanisms of benzene toxicity on the bone marrow. In his report, Infante (1992) concluded from these studies that peak and intermittent exposures to benzene increase the toxicity that results from cumulative doses of benzene, and actually present an independent risk metric.

By ignoring the peak benzene exposures Mr. Underwood sustained, and instead focusing on cumulative doses of exposure, the defense fails to account for and indeed masks his true risk.

**4) The defense claim that the existing scientific literature does not support the allegation that workers with occupational exposure to gasoline (e.g. mechanics, service station workers, distribution workers) are at an increased risk of developing leukemia or AML.**

Dr. Pyatt for example stated, "Consistent with data collected from experimental animal studies, existing epidemiology data does not indicate that occupational groups that work with or around gasoline are at an increased risk of developing bone marrow or hematopoietic toxicity, including an increased risk of developing AML [38, 87, 239, 242, 250, 269, 271, 272, 274, 301]." Reference #272 is Hunting (1995), who found a statistically significant increase in leukemia and aleukemia (MDS) among car and mobile equipment mechanics and concluded, "Benzene, a recognised cause of haematological cancer, is a component of petrol. Previous research indicates that garage mechanics may be at risk of leukaemia and other haematological cancers, presumably due to exposure to petrol; this study supports those findings." Dr. Pyatt also cites Schnatter (2012) who found a statistically significant excess in AML risk associated with being a tanker driver [OR = 2.02 (1.08-3.78)][55]. These are just a couple of examples of many citations that Dr. Pyatt claims support his opinions, without description or critical analysis. Upon closer examination these citations contradict Dr. Pyatt's assertions.

Benzene occurs naturally in crude oil and in petroleum products, including gasoline. It has also been added to unleaded gasoline for its octane enhancing and anti-knock properties (IARC 2018). The concentration of benzene in gasoline has varied with the refinery and time period of production. ATSDR (2007) reported that typical concentrations of benzene were 1-2%.

IARC 1989 classified gasoline as "possibly carcinogenic to humans (2B)." According to the OSHA Hazard Communication Standard (29 CFR 1910.1200), IARC 2B carcinogens are classified as presenting a cancer hazard.

All of the agencies and bodies that have determined that benzene causes MDS and leukemia also note that gasoline is a source of exposure to benzene. None of the agencies exclude benzene exposure from gasoline when concluding that benzene causes cancer, including MDS and leukemia.

IARC's 2018 Benzene Monograph which states that "[b]enzene is carcinogenic to the bone marrow causing leukemia and myelodysplastic syndromes (MDS)," notes that "[b]enzene occurs naturally in petroleum products (e.g. crude oil and gasoline) and is also added to unleaded gasoline for its octane-enhancing and anti-knock properties. Typically, the concentration of benzene in these fuels is 1–2% by volume (ATSDR, 2007)." IARC Benzene Monograph 2018. IARC goes on to note that "[w]orkers involved in the transport of crude oil and gasoline and in the dispensing of gasoline at service stations… also experience exposure to benzene." § 1.3.1.

The EPA, which recognizes benzene "as a known human carcinogen for all routes of exposure," notes that "[b]enzene is found in the air from emissions from burning coal and oil, gasoline service stations, and motor vehicle exhaust." EPA Hazard Summary on Benzene. Likewise, the ATSDR recognizes that gasoline is a main source of human exposure to benzene. ATSDR 2007 Toxicological Profile for Benzene.

In concluding that benzene is "known to be a human carcinogen," the National Toxicology Program (NTP) specifically noted that "[i]n addition [to exposure to benzene in heavy traffic and around gasoline filling stations], pumping of gasoline can be a significant source of benzene

exposure; for an individual spending 70 minutes per year pumping gasoline, daily benzene intake is estimated to be 10 ug (ATSDR 1997).” NTP RoC 15th Ed.

The EPA, in reviewing the risk of cancer from exposure to benzene emitted from gasoline for its Control of Air Pollutants from Mobile Sources rule making process, concluded that benzene emitted from gasoline and gasoline engine exhaust is responsible for almost 50% of the nationwide cancer risk from breathing outdoor toxic emissions. EPA (2006) Control of Hazardous Air Pollutants from Mobile Sources; Proposed Rule. In 2007, the EPA issued its final rule to reduce the benzene content of gasoline due to a recognition of the risk of leukemia from exposure to benzene in gasoline. The EPA’s Control of Hazardous Air Pollutants from Mobile Sources Final Rule was passed to “significantly reduce emissions of benzene” including by “limiting benzene content in gasoline,” stating that “[b]enzene is a known carcinogen, and mobile sources [hazardous air pollutants from motor vehicles and motor vehicle fuels] are responsible for the majority of benzene emissions.” EPA (2007) Control of Hazardous Air Pollutants from Mobile Sources: Final Rule, p. 1-2. The EPA concluded that merely working near major roads is likely to confer higher risks of cancer from benzene exposure. To document its position on the leukemia risk of benzene in gasoline, the EPA published an extensive review of the evidence of benzene causing leukemia at low levels of exposure. Federal Register Vol. 71, No. 60, March 29, 2006, p. 15814-15817.

The National Cancer Institute reported “strong evidence of a causal link” between leukemia, multiple myeloma and non-Hodgkin lymphoma and benzene, including benzene in gasoline. “Reducing Environmental Cancer Risk: What We Can Do Now,” 2008-2009 Annual Report, President’s Cancer Panel, National Cancer Institute, U.S. Dept. of Health and Human Services, National Institutes of Health.

In its 2018 Monograph on Benzene, IARC cites to several epidemiology studies of workers exposed to benzene from gasoline as among the “studies with quantitative data on benzene exposure [that] have shown evidence of a dose-response relationship between exposure to benzene and risk for ANLL/AML in various industries and in several countries.” IARC 2018 Monograph at p. 10.

OSHA states that gasoline is a carcinogen. See OSHA Occupational Chemical Database, Gasoline. The National Institute for Occupational Safety and Health (NIOSH) is the federal organization responsible for researching the health hazards and carcinogenicity of chemicals in the workplace. NIOSH classifies gasoline to be an occupational carcinogen.[1] NIOSH Pocket Guide to Chemical Hazards Gasoline; American Conference of Governmental Industrial Hygienists TLV Documentation for Gasoline (1991) at p. 700 (stating that NIOSH classifies gasoline as a “Carcinogen”).

---

[1] NIOSH uses the terminology “potential occupational carcinogen” synonymously with “carcinogen”. NIOSH defines “potential occupational carcinogen” as follows “Potential occupational carcinogen means any substance, or combination or mixture of substances, which causes an increased incidence of benign and/or malignant neoplasms, or a substantial decrease in the latency period between exposure and onset of neoplasms in humans or in one or more experimental mammalian species as the result of any oral, respiratory or dermal exposure, or any other exposure which results in the induction of tumors at a site other than the site of administration.” See NIOSH Appendix A - NIOSH Potential Occupational Carcinogens.

The Canadian Center for Occupational Health and Safety ("CCOHS") cited by Dr. Pyatt classifies gasoline as a "suspect cancer hazard. Suspected of causing cancer" and states the following as to gasoline's ability to cause cancer: "Carcinogenicity: Possible carcinogen. May cause cancer based on animal information. Has been associated with: cancer of the blood or blood system, kidney cancer." CCOHS Chemical Profiles for Gasoline.

The American Conference of Governmental Industrial Hygienists ("ACGIH) labels gasoline an animal carcinogen.

**Epidemiology on Gasoline Exposure**

Exposure to benzene vapors arising from gasoline was included in the land-based petroleum industry studies that found statistically significant increased risk of MDS and/or AML among workers exposed to benzene. Among epidemiological studies that specifically addressed exposure to gasoline (including "petrol," or "petrol refining products") and MDS, 7 of 8 studies found positive associations (odds ratios > 1.0) between exposure to gasoline and risk of MDS (Albin 2003, Avgerinou 2017, Ciccone 1993, Lv 2011, Nisse 2001, Poynter 2016, West 1995, Farrow 1989). One of these studies found a statistically-significant, more than 2-fold risk of MDS associated with exposure to gasoline and diesel liquid or vapors (see table below). None of these ruled out an association between gasoline and MDS, which would require the upper confidence limit (UCL) of the 95% confidence interval (95% CI) to be less than 1.0. For example, Ciccone 1993, Lv 2011, and Nisse 2001 have ORs of about 2 or greater, with UCLs greater than 7.0, indicating the most likely estimates of risk are 2-fold increase risk, but risks up to 7-fold increased risk have not been ruled out by these studies. As can be seen in the table below, none of the studies ruled out risks of less than 60% increased risk in their study populations: all UCLs are 1.6 or higher.

**Review of Literature (case control studies) on gasoline and MDS including David Pyatt Ph.D. references**

| **Reference** | **Exposure** | **OR** | **95% CI** | **Comment** |
|---|---|---|---|---|
| Albin 2003 | Gasoline | 1.0 | 0.63-1.6 | Failed to find benzene association |
| Avgerinou 2017 | Gasoline | 1.47 | 0.66-3.25 | |

| | | | | |
|---|---|---|---|---|
| Ciccone 1993 | Petrol refining products | 1.9 | 0.5-7.1 | Combined AML, CML, MDS |
| Lv 2011 | Gasoline | 2.34 | 0.70-7.77 | RCMD OR 11.44 (1.31-100.03) |
| Nisse 2001 | Petrol | 2.5 | 0.9-7.7 | |
| Poynter 2016 | Gasoline | 1.11 | 0.71-1.74 | |
| West 1995 | Petroleum products | 1.25 | 0.85-1.82 | |
| Farrow 1989 | Petrol and diesel liquid | 3.0 | P < 0.01 | Not cited by Pyatt |
| Farrow 1989 | Petrol and diesel vapors | 2.2 | P < 0.01 | Not cited by Pyatt |

Albin (2003) was a case control study of 330 MDS patients from 1976 to 1993 and matched controls in Sweden. This study did not define “exposure” to gasoline, and no details were given. Exposure periods included as little as one year in the past 20 years. Overall, about 20% of both cases and referents were found to be “exposed” to gasoline and diesel fuel, by occupation or hobby obtained by telephone interview with the person or next-of-kin, with OR 1.0 (95% CI: 0.63-1.6). It is unlikely that 20% of the population had truly significant exposure to gasoline or diesel fuel, and nondifferential exposure misclassification likely biased the study results towards the null. It should be noted that this study failed to find an association with benzene exposure, a known cause of MDS, with reported OR 0.95 (95% CI 0.54-1.7) for benzene, casting doubt on the ability of this study to find a true association between gasoline and MDS.

Avgerinou (2017) reported results of a hospital-based case control study of 126 MDS cases and 102 controls in western Greece that included an interview questionnaire about various exposures. Risk was elevated with exposure to gasoline, with OR 1.47 (95% CI 0.66-3.25).

Ciccone (1993) was a case control study of exposures among 50 AML, 17 CML, 19 MDS and 246 controls that included “petrol refining products,” which was associated with an increased risk of AML, CML, and MDS combined, with OR 1.9 (95% CI 0.5-7.1). MDS was not analyzed for exposure to petrol refining products separately.

Lv (2011) conducted a hospital-based case-control study of 403 adult MDS patients diagnosed by WHO criteria and matched to 2 controls recruited from major hospitals in Shanghai between 2003 and 2006. Gasoline was associated with “all MDS,” OR 2.34 (95% CI 0.70-7.77), with a statistically significant increased risk of RCMD, with OR 11.44 (95% CI 1.31 -100.03).

Nisse et al (2001) studied 204 Incident cases of MDS diagnosed between 1991 and 1996 at a French hospital and classified according to the FAB criteria and 204 controls randomly selected from an electoral registry. 15 cases and six controls were exposed to “petrol” yielding an odds ratio of 2.5 (95% CI 0.9-7.7) for qualitative exposure (expose/nonexposed).

Poynter (2017) conducted a case-control study of self-reported chemical exposures among AML (N = 420) and MDS (N = 265) cases identified through the Minnesota Cancer surveillance system and controls (N = 1388) from driver's license data. Occupational or recreational exposure to gasoline for greater than or equal to 5 years had an odds ratio of 1.11 (95% CI 0.71-1.74).

West (1995) studied 400 incident MDS cases and 400 controls classified in 3 broad thresholds of exposure to diesel/petrol (Low, Moderate, and High) that were based on cumulative hours of exposure (min. 20 h, 50 h, 2500 h) and low, medium, or high intensity (not defined). For exposure at or above the Low, Medium, and High thresholds to "diesels/petrols," the ORs were 1.01, 1.02, and 1.09 (no confidence interval provided). For high exposure to the broader classification of "petroleum products" the OR was 1.25 (95% CI 0.85-1.82). Effects of gasoline may have been diluted by diesel and other petroleum products and imprecise participant recall of exposure.

In addition to studies that show a positive association between gasoline exposure and MDS, there are numerous studies that report an increased risk of leukemia from exposure to gasoline. Many of these studies were not considered at the time the agencies conducted evaluations of gasoline as a carcinogen. Prior to the 1987 EPA evaluation, Brandt (1978) concluded that "occupational exposure to motor fuel is unduly common among working men who develop ANLL[2], and our results indicate that some leukaemogenic factor(s) must be considered in the exposed patients. Chronic exposure to benzene will increase the risk of ANLL, and petrol may contain 6-8% benzene."

A memo from Gary Spivey, M.D., MPH of Union Oil Company of California dated October 26, 1983, documents evidence of a more than twofold increase in the incidence of leukemia among garage and gas station attendants in Los Angeles County. A study conducted by Schwartz (1987) concluded that "the finding of a leukemia excess among automobile mechanics and workers in the gasoline service station industry is consistent with exposure to benzene, a known component of gasoline." The authors of Flodin et al. (1990) concluded that occupational exposure to gasoline appeared to be a risk factor for AML where the OR for AML was 2.7. Jakobsson et al. (1993) found that among male petrol station attendants and demonstrators, 10 cases of AML were observed versus 2.8 expected, yielding a statistically significant odds ratio of 2.6.

Infante (1990) reported 3 cases of leukemia from 1988-1990 among Washington D.C. motor pool mechanics where the mechanics were periodically siphoning gasoline by mouth.

The estimated risk based on the three cases ranged from 62 to 333 times that expected. Hunting (1995) later found a 9-fold increased risk of leukemia and aleukemia (MDS) in the Washington D.C. motor pool mechanics exposed to benzene from gasoline. Lindquist et al. (1993) conducted a case control study of 125 patients with acute leukemia and matched controls and concluded that "[t]he results indicate an etiologic relationship between the development of acute leukemia and exposure to petroleum products as fuels and exhaust." Rushton (1993) found that mortality was increased, particularly for AML in oil distribution center drivers. Schnatter et al.

[2] ANLL is another term for AML.

(1993) found that petroleum tanker truck drivers demonstrated significantly elevated mortality from leukemia (SMR 3.35).

Delzell et al. (1992) involved a case-control study of leukemia among employees of the Union Oil Company of California. Table 6 of the study reports OR of 9.3 for Myelogenous leukemia for transport operative in the refining division. Sorahan et al. (2002) involved a cohort mortality study of oil refinery and petroleum distribution workers. When adjusted for the healthy worker effect (HWE), the SMR for total leukemia and AML is statistically significant (AML, SMR = 1.61). Gun et al. (2000) reported a significant excess of leukemia (SIR of 1.82) among terminal workers. Gray et al. (2001) conducted a nested case-control study of leukemia using the same workforce as Gun et al. (2000) and demonstrated a significantly elevated risk of leukemia for those exposed to a cumulative benzene amount > 8 ppm-years. The authors noted that the significantly elevated leukemia risk among terminal workers "is probably explained by the historically higher exposures in terminals rather than any other site characteristic."

In Guenel (2002), workers who were exposed to benzene from sources that included gasoline had a statistically significant increased risk of acute leukemia with average 8 hour TWA benzene exposures of 0.16 ppm. Further, when gasoline was isolated as the source of exposure it showed an independent effect of increasing the risk of leukemia.

The Patel (2004) study followed residents of Hazleton Pennsylvania after exposure to gasoline vapors infiltrated their homes from the "Tranguch gasoline spill." Between 1990 to 2000, there were 4 cases of leukemia observed compared to 0.91 expected, for a SIR of 4.4 (95% CI 1.09-10.24). Talbott (2011)'s followup study reported a statistically significant 11-fold increased risk of AML in this cohort, this population was exposed to benzene at an average intensity of 0.04 ppm and no more than 2 ppm-years cumulative dose of benzene. Terry at al. (2005) reported significantly elevated ORs and a dose response for adult acute leukemia and AML among gasoline station attendants and a significantly elevated risk of AML and acute leukemia for those exposed to petroleum products while engaged in petroleum manufacturing.

The Lv et al. (2011) study found the overall risk of MDS was elevated for exposure to gasoline (OR = 2.34), and the overall risk for refractory cytopenia with multilineage dysphasia (RCMD) was also elevated (OR = 11.44). Strom (2012) found statistically significant increased risks of AML for gasoline/solvent/benzene exposures. The Schnatter (2012) study showed a statistically significant more than 2-fold increased risk of AML in gasoline tanker truck drivers, and an increased risk of MDS in those workers that did not reach statistical significance.

**Toxicity of Gasoline**

Dr. Pyatt claims that "[n]o long-term bioassay in any species has reported evidence of significant hematopoietic or bone marrow toxicity following even high-dose exposure to unleaded gasoline," Pyatt Aff. at ¶ 17. This is incorrect. The Poon et al. (1995) study reported hematotoxicity in female rats exposed to 3,200 ppm gasoline by inhalation for 4 weeks, which manifested as decreased hemoglobin and red blood cell counts.

Further, hematotoxicity is not a required precursor to MDS or leukemia. The EPA states that "there is no evidence that hematotoxicity is a prerequisite for leukemia induction." EPA (1998) Carcinogenic Effects of Benzene An Update, at p. 36. The IARC and EPA, among other authoritative scientific bodies, recognize that there are multiple mechanisms through which benzene causes MDS and AML, including by causing chromosomal aberrations, DNA damage such as point mutations, oxidative stress, alteration of DNA repair mechanisms, epigenetic changes, dysregulation of immune system functioning and others. See IARC (2012) at p. 282 ("While benzene and its metabolites are clearly capable of producing multiple forms of chromosomal mutation, including various translocations, deletions and aneuploidies, these are usually insufficient as a single event to explain the induction of leukaemia (Guo et al., 2008; Lobato et al., 2008). Other secondary events, such as specific gene mutations and/or other chromosome changes, are usually required (Guo et al., 2008; Lobato et al., 2008)."); IARC (2018) p. 34 ("benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.")

Accordingly, it is not necessary to have evidence of hematopoietic or bone marrow toxicity from gasoline for gasoline to be carcinogenic.

As IARC noted, "The ability of benzene and/or its metabolites to induce epigenetic changes related to the development of leukaemia, such as altered methylation status of C/EBPα, is unclear at this time. Bollati et al. (2007) reported that hypermethylation in p15 (+0.35%; P = 0.018) and hypomethylation in the MAGE-1 gene (encoding the human melanoma antigen) (-0.49%; P = 0.049) were associated with very low exposures to benzene (~22 ppb) in healthy subjects including gas-station attendants and traffic-police officers, although the corresponding effects on methylation were very low. Further study of the role epigenetics in the haematotoxicity and carcinogenicity of benzene is warranted, including studies of aberrant DNA methylation and altered microRNA expression."

In addition to animal studies, ATSDR (1995) also referenced studies in humans, and stated that "[a]n increased incidence of various blood dyscrasias (anemia, hypochromia, thrombocytopenia, and neutropenia) has been observed in Nigerian males with known exposure to gasoline in their occupations as motor mechanics and road-side vendors of heavy motor oil and/or gasoline as compared to controls with no known exposure to gasoline (Niazi et al. 1989). The authors attributed the increased incidence of these disorders to benzene that is present in gasoline (see ATSDR toxicological profile for benzene [ATSDR 1991)." (ATSDR 1995 p. 28 and 72)." The ATSDR (1995) summarized the hematotoxicity data for gasoline as follows:
Based on the findings reported above in humans, it appears that adverse hematological effects can occur following short-term, high-level exposure and longer-term, lower-level exposure to gasoline. These effects are most likely the result of exposure to benzene or lead, constituents of gasoline." (ATSDR 1995 p. 73).

Moro et al. (2013) reported that mean personal exposure to benzene of approximately 0.02 ppm showed DNA damage (indicator of genotoxicity), oxidative protein damage, and oxidative stress in peripheral (blood) leukocytes in gasoline station attendants.

In Santiago (2014), 16.6% of the studied population of gas station attendants showed elevated frequencies of chromosomal abnormalities which the authors found to be "highly likely to be correlated to their exposure to benzene during their work." In Santiago (2017), two Brazilian gas station workers chronically exposed to benzene were found to have complex chromosomal rearrangements.

In de Poca at al. (2021), the authors observed statistically significant biological effects, including elevated DNA damage (comet assay); higher frequencies of micronuclei and nuclear buds (CBMN assay); lower levels of T-helper lymphocytes and naive Th lymphocytes, lower CD4/CD8 lymphocyte ratio; and higher levels of NK cells and memory Th lymphocytes among gasoline station workers.

The Canadian Center for Occupational Health and Safety ("CCOHS"), cited by Dr. Pyatt, states with regard to the toxicity of gasoline as follows: "Effects on the blood, which have been seen in some studies, are most likely from the presence of benzene or lead in the gasoline."

**5) The defense claim that it is not possible to rule out that Mr. Underwood's AML was *de novo* and completely unrelated to any exposures he might have received."**

There is no such thing as "de novo" AML diagnosis, because these are cases without a "readily identifiable cause" (Pyatt p. 17). By Dr. Pyatt's definition, "de novo" AML cases would be a diagnosis of exclusion after other causes have been ruled out. One would not, and could not, rule out unknown causes. In medicine, we don't rule out "de novo" (or "endogenously derived" or without and external cause), instead we can only call a case "de novo," without a cause, when we have ruled out causes. In Mr. Underwood's case, it is my opinion, to a reasonable degree of medical certainty, that Mr. Underwood's exposure to benzene from Defendant's products was a cause of his AML.

Dr. Pyatt stated that the vast majority (80-90%, perhaps higher) of all AML cases are de novo. Again, by his definition, this would mean that 10-20% have a known cause. Then, Dr. Pyatt says 10-20% are secondary to chemotherapy, and that smoking has been estimated to cause 30% of AML. That leaves less than 50-60% that could be "de novo" by Dr. Pyatt's definition (p. 17). And that remainder is without subtracting the percentage of cases that are caused by exposure to benzene, or other known causes of AML such as radiation. His claim is contradicted by more recent research by Poynter (2017) which estimated that the population attributable fraction of AML caused by exposure to benzene ranges from 8 to 16%.

Research by a leading cancer hospital, M.D. Anderson Cancer Center, demonstrates the "de novo" fallacy. Strom (2012) conducted a case-control study to investigate the associations between lifestyle characteristics and the risk of AML in Texas. There were 638 cases and 636 controls. After conducting an investigation of the patients' exposure histories, the researchers determined that approximately 47% of the patients (301/638 = 47.47%) had a history of solvent exposure. This provides strong evidence in support of the conclusion that when properly investigated a large portion of AML and MDS cases are indeed causes by benzene exposure.

**6) The defense claim that toluene, xylene and mineral spirits do not cause AML or hematotoxicity.**

Dr. Pyatt, for example, states that toluene, and the other petroleum derived chemicals that he named are chemically and toxicologically distinct from benzene. The defense hypothesis is that the known cause of AML, benzene, is somehow no longer a cause of AML simply because it is present in host solvents. This is an illogical and scientifically invalid position. It suggests that only exposure to pure benzene is capable of causing AML. We know this to be false. The large majority of epidemiology studies showing increased risks of AML, MDS and leukemia involve workers exposed to benzene from hydrocarbon mixtures that include toluene, xylene and naphthas. Thus, it is not surprising that not a single regulatory or research body tasked with evaluating benzene's carcinogenicity has concluded that benzene does not cause AML (or other myeloid malignancies) where exposure results from such host solvents.

Indeed, many of the studies cited by the defense, and others omitted by them, refute their claims or fail to support the conclusions that they draw from those studies. See, Bouchardy (2002), Siemiatycki (1987). Rather than concluding that mineral spirits (Stoddard solvent) do not cause hematological damage, the ATSDR (1995) stated p. 26 "From the limited data available, it is not possible to conclude whether Stoddard solvent adversely affects the hematological system or not. A study of 45 car repair workers who were exposed to a variety of solvents showed statistically significant decreased red blood cell counts, increased mean erythrocyte volumes, and increased platelet volumes when compared to office workers who had no contact with organic solvents (Beving et al. 1991). One study of 52 house painters who were chronically exposed to solvents found statistically significant decreases in hemoglobin concentration as compared to unexposed workers from other industries (Hane et al. 1977). In Table 10 of Amuroso (2008), authored by ExxonMobil employees, the leukemia results reported include increased risks of lymphocytic leukemia of 2.8 and 2.9 in Wilcosky (1984) and an increased risk of acute leukemia 13 (2.0-554) in Lindquist. Also, Non-Hodgkin's Lymphoma risk was significant 3.1 (1.3-7.5) in Persson (1989) and multiple myeloma was significant 2.0 (1.1-3.7) in Bethwaite (1990).

In Adegoke (2003) duration of exposure to toluene was also associated with increasing risk for leukemia (p for trend 0.02) with 15 or more years of exposure. A borderline significant excess was observed among ever exposed compared with never exposed to paints for CML.

Dr. Pyatt cites animal studies purporting to show a lack of carcinogencity of mineral spirits, toluene etc. Studies in animals require high doses because they must cause a very high incidence of cancer in the relatively low number of animals in a study (in percent, or which would be equivalent to 10,000s of cases per million people) Because there are typically 60 animals in an exposure group, incidence rates are measured in percentages of animals getting cancers. (1% is 10,000 in million, so these rates are equivalent to tens of thousands in a million getting cancer). Benzene studies showing carcinogenicity in animals have typically been done with concentrations of benzene at 300 ppm for 6 hours/day and 5 days/week). Assuming 0.1% benzene in the benzene-containing solvent products, and similar density and molecular weight of the component solvent compounds, a concentration of 300 ppm/0.001 = 300,000 ppm solvent vapor would be required to achieve a benzene concentration of 300 ppm. The highest dose used in toluene animal toxicity studies, as reviewed by IARC 1998, was 1,200 ppm. At 1200 ppm toluene containing benzene at

0.1%, the concentration of benzene would be approximately 1.2 ppm, well below the 300 ppm found to cause cancer in the animal studies. Therefore, we would not expect that the carcinogenic effects of benzene in toluene, gasoline, and other benzene-containing substances would be detected in animal studies.

As another example, in the NTP study cited by Dr. Pyatt, mice were exposed to Stoddard Solvent IIC by inhalation at concentrations up to approximately 375 ppm. (NTP reported 2, 200 mg/m3; NIOSH provides an approximate molecular weight of 144) (https://www.cdc.gov/niosh/idlh/8052413.html#:~:text=%5BNote%3A%20A%20concentration%20of%205%2C000,of%20144%20for%20Stoddard%20solvent.%5D). The concentration of benzene in the air corresponding to this concentration would be approximately 0.375 ppm, well below the lowest concentration of benzene shown to cause cancer in animals.

For gasoline, at 2% benzene the 2056 ppm highest exposure in animal carcinogenicity studies of gasoline cited by IARC would be equivalent to approximately 40 ppm benzene, still well below the levels of benzene used in carcinogenicity studies of benzene. (IARC Mon 45-8).

None these studies of carcinogenicity of other chemical substances measured exposure to benzene. Therefore, Dr. Pyatt has no basis for arguing that these studies are germane to the question of whether or not benzene causes AML, which has been clearly established by studies of benzene in both animals and humans.

Numerous studies, including many cited by Dr. Pyatt, several of which were included in the Williams review that Dr. Pyatt cited, have documented exposure to benzene during use of products containing solvents that contain benzene.

The claim that concurrent benzene and toluene exposure results in competitive inhibition of benzene metabolism in exposed humans also lacks support. Dr. Pyatt cites to experimental studies of animals exposed to toluene at hundreds or thousands of parts per million, exposures not typical for a worker. At more relevant exposure levels studied by Bird (2010) and Wetmore (2008) and reviewed in my report, benzene's toxicity was found to be enhanced.

**7) The defense claim that certain occupations – gasoline station attendants, painters, printers, etc. – are not at increased risk of AML.**

It is claimed that certain occupations (gas station attendants, mechanics, painters, etc.) are not consistently at increased risks of AML. Initially, as reviewed above, the epidemiology refutes this claim as, for example, there are numerous studies of workers exposed to benzene from gasoline who are at increased risk of AML, MDS and hematotoxicity. Assessing risk by occupation is an inferior method for evaluating the scientific evidence and is fraught with error due to bias. Built into this method is the inherent assumption that all members of the occupational group sustain the same or similar exposures. In other words, occupation is used as a surrogate for actual benzene exposure. Yet, variations in environmental conditions, differences in products used and interpersonal work habits create substantial differences in exposures within the same workplace, not to mention from one site to another.

Misclassification of exposure will also bias results to null findings by including workers

not actually exposed to benzene. For example, in the case of gasoline station workers, it is not uncommon for stations to employee convenience store workers who do not fuel vehicles and who are exposed to no benzene or far less benzene then those fueling vehicles. If those workers are included within the category of "gasoline attendants", and presumed to be exposed to benzene, the true risk of benzene-related disease in the workers actually exposed to benzene is diluted. Similarly, refinery populations and terminal populations include administrative staff and other office workers who do not work with or around gasoline or other benzene-containing materials. Including such workers in the "exposed" group biases the results towards the negative, i.e. no increased risk, and masks the true risk of benzene disease in the workers who are actually exposed.

Similarly, epidemiology studies often classify workers' trades based on their occupation reported on death certificates or census surveys. It is then assumed that the worker maintained the same career for their entire work life. However, death certificates typically only report the last occupation and census surveys provide a snapshot in time, and do not support the assumption that the individual maintained that occupation as a career.

Epidemiology in general, and particularly epidemiology studies that evaluate risk by occupation, do not account for the impact of host factors on risk of disease. For these reasons, when evaluating the cause of an individual's disease, the evaluation of risk by occupation is inferior to assessing causation through a method that focuses on the individual, their particular exposures, their particular host factors (age, susceptibility to disease, etc.) and their clinical features.

**8) Dr. Boffetta (WM Barr)**

Dr. Boffetta conducted his own highly subjective and biased meta-analysis using his own arbitrary criteria such as using only the lowest benzene exposure group in his analysis, even when several exposure groups in a study may have been very low (single digit ppm-years and lower, or less than 1 ppm average intensity). Also the included studies were very heterogeneous in terms of levels of exposure, circumstances of exposure, and results, as demonstrated by the wide divergence of point estimates of relative risk. This heterogeneity would tend to bias the results towards the null. Dr. Boffetta did not include consideration of heterogeneity in his analysis. Dr. Boffetta did not conduct any sensitivity analyses, such as the effects of excluding exposure groups with low levels of exposure below the level that Dr. Boffetta asserts that there is no evidence of risk at low levels of exposure, but never clearly defines that level is. Dr. Boffetta is vague on this critical point for evaluating causation in Mr. Underwood's case, stating only, "The cutpoints of exposure categories varied among studies, but in more recent studies they were generally below 1 ppm-year, although higher cutpoints were used in older studies."

Talibov 2014 (NOCCA cohort) was a nested case control study. Dr. Boffetta failed to describe the weaknesses in this study that biased the study against finding an association between exposure to benzene and AML. The assessment of exposure to benzene in this nested case control study was based on decadal census data collected every 10 years in which only current occupation was listed. Described as a "snapshot" of a job held by the individual at the time of census, no data was collected on changes in job or tasks during the entire working career of the individual. The

authors assumed that the worker held their occupation until the mid-year between censuses. Even when this assumption happened to be correct, exposure to benzene in job classes was based on judgment – there were no actual exposure measurements. The job exposure matrix did not account for varying levels of actual exposure within a job classification – all individuals within a job class were assigned the same benzene exposure level, regardless of whether they were ever exposed to benzene, at what intensities and for what amounts of time. All of these factors increased exposure misclassification, which biases results towards the null (failure to detect an association) by assignment of inaccurate exposure estimates to the workers. Moreover, Dr. Boffetta failed to acknowledge that, despite the high degree of exposure misclassification, the study showed that risk of AML was more than two-fold among benzene-exposed individuals with more than 5 ppm-year exposure who were less than 50 years old, with HR 2.24 (95% CI 0.99-5.08). Despite the exposure misclassification, which would bias towards not being able to achieve statistical significance, the Talibov 2014 results were nearly statistically significant by the conventional standard of allowing for only a 5% or less probability that the observed increased risk was due to chance. Exposures down to 5 ppm-years is much lower than the 200 to 400 ppm "threshold" for increases AML risk that some defense experts have claimed.

The meta analysis forest plat (Figure 2) is dominated by a few larger studies, including Talibov (43.89% weighting). Dr. Boffetta used the Talibov hazard ratio (HR, a measure of relative risk) for the total population, when using the <50 age group would have been more appropriate to Mr. Underwood's case. Wong 2010 was a case control study which also used a job-exposure matrix. The results of Dr. Boffeta's meta-analysis may have been very different if these results had been included. Dr. Boffetta chose to use the environmental exposure group 1, which was reported in a separate article to correspond to less than 1 mg/m3 (0.31 ppm) (how much less was not provided) for an average of 25 hours per week, with a range of <0.01 to 84 hours per week. In addition to the wide extreme variability in duration, ppm-years of exposure was not provided. The next largest study (14.97% weighting) Blair (2001) was also a case-control study in which "high" and "low" benzene exposure were not defined. This study also relied on a job-exposure matrix. No ppm-year or other quantification of exposure was provided. The authors addressed the lack of sensitivity (ability to detect an increased risk when one is truly present): "Historically, benzene was used as a solvent and was interchangeable with several other solvents, creating uncertainty as to its presence in many industries or occupations. Dewar et al. [1991] suggested that the sensitivity for benzene is very low when a job-exposure matrix is used as a means of assigning exposure to study subjects. (p. 12)."

From Stenehejm, Dr. Boffetta also used the risk corresponding to <0.001-0.037 ppm-years exposure group (HR 1.40 (95% CI 0.18-11), neglecting the 0.124-0.948 ppm-year exposure group (HR 4.49, 95% CI 0.88-27). By selecting only the very lowest level of exposure, and ignoring results for other exposure groups with very low exposure, Dr. Boffetta biased his analysis to decrease the likelihood of observing increased risks of AML at low levels of exposure.

Boffetta's "hypothetical dose-response analysis" (figure 3) is not showing "actual results," because it fails to take into account the unreliability of the studies, as I have detailed above, which bias towards the null (failing to find increased risk) in the studies that have reported risk at relatively low doses. Dr. Boffetta based his "threshold" on flawed studies that could not detect a true increased risk of AML.

Recent analysis published in the peer reviewed literature refute Dr. Boffetta's conclusions. Scholten et al. (2021) estimated the exposure response relationship between benzene and AML by combining the results of 6 human AML epidemiological studies, 3 human leukemia studies, 10 human biomarker studies, and 4 experimental animal studies. The investigators estimated risk using the complete data set and using the AML studies only. Relative risks were comparable, but more precise, using the complete data set: at 5 ppm-years, RRs were 1.58 (95% CI, 1.01-3.22) and 1.44 (0.85-3.42), respectively.

Dr. Boffetta's opinions are also inconsistent with several scientific bodies' most recent evaluation of the levels of benzene exposure that present a risk of leukemia. The European Chemicals Agency Committee for Risk Assessment RAC Opinion on scientific evaluation of occupational exposure limits for Benzene, Adopted March 9, 2018 reviewed the literature and recommended an Occupational Exposure Limit for benzene of 0.05 ppm 8-hour TWA. The ACGIH (2022) last year published a Notice of Intended Change for the benzene TLV which proposes a reduction of the 8-hour TLV down to 0.02 ppm and the STEL down to 0.1 ppm in recognition of the growing body of data of carcinogenic effects and toxic effects on the bone marrow at these lower levels of exposure.

**9) Dr. Alexander**

Dr. Alexander states that "Benzene (discussed in a forthcoming section) is an established cause of AML (ATSDR 2007, EPA 1998, IARC 2018, NTP (National Toxicology Program) 2021) *under certain exposure conditions* (emphasis added) (p. 34). None of these agencies have declared that benzene is a cause of AML under certain exposure conditions. None of these agencies have stated that there are exposure conditions under which benzene is not a cause of AML.

In reviewing Linet 2019, Alexander fails to acknowledge that the confidence intervals around the relative risks in the low exposure group range up to 3.88, which is a four-fold risk of MDS/AML, due to the small number of cases with low cumulative exposure (>0-5 ppm-years). Thus this study does not provide evidence of no increased risk at these low exposure levels, contrary to Dr. Alexander's assertion that these levels of exposure do not increase risk (p. 38).

Dr. Alexander claims that "Based on a critical review of the study design, methodology, analytical techniques, and patterns of relative risk estimates across these studies, the epidemiologic evidence is best characterized by the presence of inconsistent associations that are widely variable and largely non-statistically significant, with incomplete control for confounding factors." However, he does not provide any of this critical review. He only shows the relative risks and confidence intervals reported by the authors in two tables on p. 42. He failed to include Hunting (1995), who found a statistically significant increase in leukemia and aleukemia (MDS) among car and mobile equipment mechanics and concluded, "Benzene, a recognised cause of haematological cancer, is a component of petrol. Previous research indicates that garage mechanics may be at risk of leukaemia and other haematological cancers, presumably due to exposure to petrol; this study supports those findings." Dr. Alexander cited a proportionate mortality ratio (PMR) analysis of the National Occupational Mortality Surveillance database. This result purportedly shows that mechanics are not at an increased risk of AML. Workers categorized as mechanics and repairers

are not associated with death due to AML compared with other occupational groups. This analysis was not published or peer-reviewed. In contrast, Dr. Alexander failed to consider the peer-reviewed PMR study by Schwartz (1987) that showed a statistically significant increased risk of leukemia (PMR 178, n = 6).

In general, Dr. Alexander failed to discuss how the studies that failed to reject the null hypothesis lumped all mechanics together in broad categories, regardless of tasks they performed or products they used, and did not measure benzene exposure, leading to large exposure misclassification errors that would bias results towards the null hypothesis.

**10) Dr. Kaden**

Dr. Kaden was asked by Defendants to evaluate the role of Mr. Tyler D. Underwood's alleged exposure to W.M. Barr, AutoZone, or O'Reilly Auto Parts products, and given the weight of evidence in the scientific literature about exposure, timing of that exposure, and other risk factors in the development of Mr. Underwood's AML.

Dr. Kaden claimed that "I have used standard and widely accepted methods for critically reviewing and synthesizing the scientific literature" (p. 6). Dr. Kaden did not name or provide any description of her methods. She failed to state that she applied Bradford Hill's viewpoints or any other specific method of causation analysis.

Dr. Kaden notes that Mr. Underwood smoked marijuana for 3 years prior to December 2019, and used electronic cigarettes, but did not smoke conventional cigarettes. Although Dr. Kaden is correct that cigarette smoking is a known risk factor for AML, no evidence is provided that smoking marijuana or vaping is a cause of AML.

Dr. Kaden pointed to articles by Tomasetti & Vogelstein, Wu 2016, and Goldstein & Patel 2019 to suggest that intrinsic mutations due to "bad luck" are the major cause of AML. Even if this controversial and unproven hypothesis were true, it applies only at the population level, not to individuals who have different risk factors and exposures. Random, intrinsic mutations contribute to the "background" risk present in everyone, including both those exposed and unexposed to a specific causative factor such as chemotherapy or benzene. We know that chemotherapy and benzene cause AML over and above this background risk, because we see the increased risk when we compare exposed to unexposed groups of people. Whether or not random mutations cause background risk in all people is immaterial to the question of whether exposure to benzene causes increased, "excess" risk of AML, and actual cases of AML that would not have occurred if not for the exposure to benzene.

Dr. Kaden relied on industrial hygienist Ms. Kathy Jones, CIH, modeling of Mr. Underwood's benzene exposure from W.M. Barr products from both inhalation and dermal pathways resulting in 18 mg benzene total, or less, during his lifetime. This value is approximately equivalent to 0.124 ppm-years benzene exposure from the inhalation route alone.

Dr. Kaden relied on industrial hygienist Dr. Sheldon Rabinowitz estimate that Mr. Underwood's inhalation exposure to benzene was up to 0.012 ppb-years benzene from AutoZone products and up to 0.020 ppm-years from O'Reilly Auto Parts products.

**11) Alison Stock PhD, MPH, MS, April 21, 2023**

Dr. Stock claims that there are only a few studies conducted outside of the petrochemical refining industry on gasoline exposures and the risk of development of MDS or AML. Several are small case control studies that have mixed results. Above I reviewed several case control studies that have evaluated associations between gasoline and MDS/AML, which has often been grouped together with AML as a form of "preleukemia."

**Automotive Mechanics and Risk of Developing Leukemias**

Dr. Stock noted that there were no studies identified that specifically evaluated the risk of AML in automotive mechanics, however, there have been several studies conducted in the United States and internationally on automotive mechanics and the risk of various forms of leukemia. Dr. Stock claimed that "The only occupational study to report a statistically significant association between auto mechanics and the risk of leukemia is a small study conducted in the Portland-Vancouver area where 1,678 cases of leukemia were identified between 1963 and 1977 (Morton and Marjanovic 1984)." Dr. Stock failed to cite Hunting (1995), who found a statistically significant increase in leukemia and aleukemia (MDS) among car and mobile equipment mechanics and concluded, "Benzene, a recognised cause of haematological cancer, is a component of petrol. Previous research indicates that garage mechanics may be at risk of leukaemia and other haematological cancers, presumably due to exposure to petrol; this study supports those findings." Dr. Stock also inaccurately stated that the study of automotive mechanics by Schwartz (1987) reported an non-statistically significant increase in mortality due to leukemia. The authors actually reported a statistically significant increased risk of leukemia (PMR 178, n = 6). Epidemiological studies of mechanics' risk of AML or MDS would tend to be biased towards the null because exposure to benzene varies between mechanics and very few studies have attempted to quantify exposure to benzene among mechanics.

Dr. Stock states that "Mr. Underwood had several underlying risk factors such as his race, his sex, and his smoking history." Race and sex are not causes of AML and these factors and epidemiological studies that show increased risk of AML from exposure to benzene control for race and sex. Mr. Underwood's age was a protective factor, the opposite of a risk factor, greatly reducing his risk of getting AML compared to older age groups. By smoking history, Dr. Stock must be referring to Mr. Underwood's history of marijuana smoking, which has not been established as a cause of AML.

Dr. Stock states that "it is not scientifically possible to rule out that Mr. Underwood's AML, like the vast majority of AML cases, was *de novo*." Indeed this is true. It is only scientifically possible to rule out causes. In my opinion, to a reasonable degree of medical certainty, exposure to benzene from Defendants' products has not been ruled out and remains the most likely cause of Mr. Underwood's AML.

**12) Michael L. Fischman MD, MPH April 18, 2023**

Dr. Fishman stated that he was tasked to assess whether his possible use of Sunnyside products would have increased his risk of developing AML.

Dr. Fischman reviewed the 2020 and 2018 IARC monographs on painting, noting that painters are exposed to a variety of solvents including benzene. He determined that painting literature was relevant to Mr. Underwood, because he engaged in brush cleaning. Regarding lympho-haematopoietic cancers, Dr. Fischman quotes the 2018 monograph as stating, "The risk for lymphatic and haematopoietic cancers among painters was evaluated in 21 case–control studies . . . Although increased risks were observed, the results were inconsistent and the data are inadequate to draw a conclusion about the association between occupation as a painter and the risk for lymphatic and haematopoietic cancers." Not all painters use solvents containing benzene, so many painters have little or no exposure to benzene. Mr. Underwood had repeated, frequent, direct and substantial contact with solvent containing benzene by inhalation and skin contact over several years while cleaning while brushes in a bucket for up to an hour for several days per week.

Dr. Fischman relies on the exposure estimates of Mr. Cohen, which grossly underestimate Mr. Underwood's exposure to benzene when using Sunnyside mineral spirits and Lacquer Thinner to clean paint brushes and equipment. I estimated that Mr. Cohen's "worst-case" calculation underestimated Mr. Underwood's exposure to benzene by perhaps 100-fold or more. Dr. Fischman's estimates of Mr. Underwood's risk of AML from using these products would then underestimate Mr. Underwood's risk by about 100-fold or more. The risk would be less than 100 in a million instead of 1 in a million. This risk added to Mr. Underwood's cumulative risk for exposures to benzene from all of Defendants' products.

**13) Joel Cohen MPH, CIH, FAIHA, April 3, 2023**

Mr. Cohen stated that he was requested to give his opinions concerning Mr. Tyler Underwood's alleged use of Sunnyside Corporation paint thinners and potential exposure to contaminant levels of benzene in those products.

Mr. Cohen modeled ½ gallon containing 10 ppm benzene (max), no ventilation, in 24 x 24 x 8 ft garage to get 0.035 ppm as what he referred to a an upper bound exposure. Mr. Cohen did not use any analysis of Sunnyside products to estimate a 10 ppm benzene content in the Sunnyside products. He used a letter to the editor of a journal by someone at ExxonMobil. He also cited another letter by Andrew Jacques to the journal JOEH with 2006 data showing mineral spirits ranged up to <50 ppm, or 5 times the level that Mr. Cohen used in his "worst case" analysis.

Mr. Cohen's overly simplified one box model relies on rapid and complete mixing of air in the garage. In reality, a near-field/far-field model is a more accurate depiction of exposure in this scenario (Nicas). An exposure concentration gradient would be expected, with higher concentration near the source, as would be experienced by Mr. Underwood as child cleaning brushes by reaching into a 5 gallon pail. In fact, the pail would further concentrate the vapors in Mr. Underwood's breathing zone. Increasing Mr. Cohen's calculated exposure by a factor of 2 for 1 gallon of mineral spirits vs. ½ gallon, a factor of 5 for 50 ppm vs. 10 ppm benzene in the liquid

product, and a factor of 10 for incomplete mixing and ratio of near-field to far-field concentration, would increase Mr. Cohen's exposure concentration by a factor of 100 from 0.035 to 3.5 ppm. This exceeds levels of short term exposure (3 ppm) found to increase risk of MDS in the study by Schnatter (2012). This level also exceeds the current ACGIH Short Term Exposure Limit (STEL) of 2.5 ppm.

**14) Kathy Jones, CIH, CAC, April 20, 2023**

Ms. Jones stated that she was requested to give her my opinions regarding the litigation associated with the allegation that Mr. Underwood developed AML due in part to his alleged exposures to benzene from the product Klean Strip Mineral Spirits and Klean Strip Lacquer Thinner.

Ms. Jones attempted to calculate Mr. Underwood's exposure to benzene by dermal absorption and inhalation from use of the Klean Strip products. Her estimates of Mr. Underwood's cumulative exposures to benzene, ranged from 0.019 ppm-year to 0.124 ppm-year. Ms. Jones refers to these cumulative ppm-year concentrations as "significantly below a 1 ppm-year value." The exposure to benzene from Klean Strip products added to Mr. Underwood's cumulative exposure and cumulative risk of AML.

At the current OSHA PEL of 1 ppm as an 8-hour time weighted average, excess AML cancer risk is 10 per 1,000. The risk at the current OSHA PEL for benzene and other carcinogens can be found in the following table from OSHA's Final Rule, Occupational Exposure to Respirable Crystalline Silica. (Federal Register / Vol. 81, No. 58 / Friday, March 25, 2016 / Rules and Regulations).

**Table VI-4: Selected OSHA Risk Estimates for Prior and Current PELs (Excess Cancers per 1,000 Workers)**

| Standard | Risk at Prior PEL | Risk at Current PEL | Federal Register Date |
|---|---|---|---|
| Ethylene Oxide | 63-109 per 1000 | 1.2-2.3 per 1000 | June 22, 1984 |
| Asbestos | 64 per 1000 | 6.7 per 1000 | June 20, 1986 |
| Benzene | 95 per 1000 | 10 per 1000 | September 11, 1987 |
| Formaldehyde | *0.43-18.9 per 1000 | *0.0056-2.64 per 1000 | December 4, 1987 |
| Methylenedianiline | **6-30 per 1000 | 0.8 per 1000 | August 10, 1992 |
| Cadmium | 58-157 per 1000 | 3-15 per 1000 | September 14, 1992 |
| 1,3-Butadiene | 11.2-59.4 per 1000 | 1.3-8.1 per 1000 | November 4, 1996 |
| Methylene Chloride | 126 per 1000 | 3.6 per 1000 | January 10, 1997 |
| Chromium VI | 101-351 per 1000 | 10-45 per 1000 | February 28, 2006 |
| Crystalline Silica | | | |
| General Industry PEL | ***11-54 per 1000 | ****5-23 per 1000 | N/A |
| Construction/Shipyard PEL | ***24-657 per 1000 | ****5-23 per 1000 | |

* range is based on maximum likelihood estimates (0.43, 0.0056) and 95% upper confidence limit estimates (18.9, 2.64).
** no prior standard; reported risk is based on estimated exposures at the time of the rulemaking.
*** estimated excess lung cancer risks at the previous PEL.
**** estimated excess lung cancer risks at the final PEL.
Source: Risk estimates from prior standards taken from 71 FR 10100, 10225 (2/28/06).

## 15) John Spencer, CIH

Mr. Spencer fails to account for many of Mr. Underwood's benzene exposures. Mr. Spencer provides no estimates of exposure from cleaning parts with gasoline despite exposure data for this and related tasks available from Runion and others. In other instances, such as when estimating Mr. Underwood's exposure to benzene from use of brake cleaners and carburetor cleaner, he fails to account for periods of time when Mr. Underwood testified that he used the products. These periods of time included when performing mechanical repairs with his biological father, working with Sonny Bowles, working for Karen Giovani, working at Rainbow Adventures and Mr. Underwood's personal use. Mr. Spencer asserts that he did not have enough information to calculate cumulative doses of exposure. He fails, though, to use available information to assess the task-based and other short-term exposures that Mr. Underwood experienced. In real world practice, an industrial hygienist should not simply ignore the exposure because the cumulative dose is not calculated.

With regards to the TruFuel products, Mr. Spencer does not account for benzene exposures caused by the small engine exhaust. Incomplete combustion of benzene in the fuel results in meaningful benzene exposures.

Mr. Spencer's modelling of Mr. Underwood's exposure to benzene from O'Reilly brake parts cleaner is flawed. While stating that the O'Reilly product contained 66 ppm benzene, the

benzene content input for his O'Reilly brake parts cleaner exposure model is only 11 ppm. The result is a 6-fold underestimation of Mr. Underwood's benzene exposure.

Mr. Spencer opines that there is 1 ppm benzene in the PB'laster product. Despite admitting that the PB'laster causes benzene exposure, Mr. Spencer constricts his estimation of Mr. Underwood's benzene exposures from the PB'laster product to his work for Bob's Forklift & Repair and Full Throttle Speed Shop. Mr. Underwood, however, used PB'laster at many other locations.

He improperly characterizes the workspaces at Full Throttle Speed Shop as being "well ventilated", when in fact the description of the spaces given by Mr. Fischer were of poorly ventilated conditions. It was common for the bay door to be closed due to concern for trespassing. Aerosol solvent products were used in an interior room with no doors or windows to the outside. Rather than objectively assessing the workplace conditions such as ventilation, which Mr. Spencer knows are important in determining exposure concentrations, Mr. Spencer instead relies on a lay person's assessment of what constitutes a "well ventilated area." The Full Throttle Speed Shop described by Mr. Fischer was not well- or sufficiently-ventilated for purposed of benzene exposure.

Mr. Spencer also underreports the products' benzene concentrations, which further reduces Mr. Underwood's benzene exposure. His opinions on the benzene content of the products relies on solvent ingredient benzene content summarized in his report's Appendix C. The data in Appendix C fails to include reports of much higher benzene concentrations in toluene and other solvents such as those cited in my report. Mr. Spencer's selection of data is biased towards of benzene in the products and lower levels of exposure to benzene when using the products

Mr. Spencer relied on the study by McDermott and Vos (1979) to estimate Mr. Underwood's exposure to benzene when fueling vehicles, fuel cans, dirt bikes, quads, and equipment. Estimates of benzene exposure while actually pumping gas or filling tanks is likely underestimated by McDermott and Vos because the exposure sampling periods included other activities. Therefore, the short-term sample benzene concentrations and total cumulative exposure calculations based on the short-term samples, underestimate Mr. Underwood's exposure to benzene from pumping gas and filling equipment with TruFuel.

The term "pumping gas," as used in the table in McDermott and Vos (1979), refers to filling cars, checking under the hood, washing windows and collecting cash or filling out charge slips. Even when filling cars, some attendants use the hold-open latch on the fill nozzle more often than others. Thus the time period exposed to gasoline vapors, as a direct result of dispensing gasoline, varies widely even for attendants spending a large part of their shift "pumping gas".

"Probably the vapor dilution caused by air movement and the time spent near the auto fill opening are the biggest factors affecting exposure. Thus local wind conditions, use of the hold-open latch, time spent washing windows and checking under the hood plus overall business activity form an inter-relationship that governs exposure but that cannot be easily defined."

Table IV. "(Sampling) Pump operated only while attendant was actually *servicing* cars for a total of 15 minutes. "Servicing" is an even broader term than "pumping gas," which they defined as including "filling cars, checking under the hood, washing windows and collecting cash or filling· out charge slips."

An industrial hygienist should know that turning a pump on and off during a single 15 minute sampling period to capture periods when only pumping was being performed would be very difficult, awkward, and highly unusual. I have never heard of such a sampling method. Two samples with "pump operated continuously for 15 minutes during rush period," but apparently not "while the attendant was actually servicing cars" were also outliers at 0.01 ppm and <0.01 ppm benzene. After eliminating these samples, the appropriate average, approximating exposure to benzene while pumping gasoline, is then 0.57 ppm.

Mr. Spencer stated, "No information was available regarding the frequency, duration, or volume of gasoline used during the cleaning of automotive parts. Consequently, it is not possible to assess Mr. Underwood's potential exposure to benzene while cleaning parts with gasoline." (p. 35). It is clear from available information that this would be a significant contributor to Tyler Underwood's exposure. Omitting this source is a serious flaw.

Asked how long it took to put gas in, Mr. Fisher said that a small can (2.5 to 5 gallon can, p. 156) would "take a few minutes, and the vehicle would take about 5 minutes to fill up, maybe more."

Spencer stated "Furthermore, based on the testimony of Mr. Fisher, I have assumed that this task (filling cans and vehicle with gasoline) took seven minutes." The number of cans fueled was not specified in any of the testimony. According to the facts from testimony, Mr. Underwood fueled his ATVs with a gallon and half to 2.5 gallons multiple times in a day (p. 340), and sometimes rode his ATV and dirt bikes several times per week (P. 205- 206). Therefore, assuming an average of 3 refills of a 2.0 gallons per day on average, he used 6.0 gallons per day, or 12 gallons every 2 days. Visiting gas station every other day would mean filling at least 2 5-gallon cans to five 2.5-gallon cans. Assuming 4 cans filled per visit and a "few (3) minutes" to fill a can, the total time would be 4 x 3 = 12 minutes to fill cans, and 5 minutes to fill the vehicle. The total time would be 17 minutes. Not 7 minutes.

Using the McDermott and Vos (1979) data and assuming that Mr. Underwood spent 17 minutes in a day at the gasoline stations fueling a vehicle and gasoline cans, his 8-hour TWA benzene exposure would have been 0.0202 ppm ((0.57 ppm x 17 minutes) / 480 minutes). Furthermore, I have assumed that he performed this task 3.5 days per week, 52 weeks per year or 182 days per year. This is equivalent to 0.728 work years (182 days per year / 250 days per work year). Mr. Underwood allegedly performed this task over a 4.5 year period (2004 until June 2008), which is equivalent to 3.28 years (0.728 x 4.5 years). Based on this task duration, Mr. Underwood's cumulative benzene exposure from fueling vehicles and gasoline containers was 0.066 ppm-years (0.0202 ppm x 3.28 years). This is approximately 3 times higher than Mr. Spencer's estimate.

When refueling his ATVs and dirt-bikes, each fueling was a separate event. Although Mr. Underwood testified that it took a minute or two to fill the tank, filling the tank was only part of

the process. It is more reasonable to assume that this total activity would be approximated by 15-minute samples.

Using the McDermott and Vos (1979) data and assuming that Mr. Underwood spent 15 minutes in a day fueling ATVs or motorcycles, his 8-hour TWA benzene exposure would have been 0.0178 ppm ((0.57 ppm x 15 minutes) / 480 minutes). Furthermore, I have assumed that he performed this task 5 days per week, 52 weeks per year or 260 days per year. This is equivalent to 1.04 work years (260 days per year / 250 days per work year). Mr. Underwood allegedly performed this task over a 4.5-year period (2004 until June 2008), which is equivalent to 4.68 years (1.04 x 4.5 years). Based on this task duration, Mr. Underwood's cumulative benzene exposure from fueling ATVs or motorcycles was 0.083 ppm-years (0.0178 ppm x 4.68 years).

Mr. Underwood's total cumulative benzene exposure associated with fueling vehicles, gasoline containers, and ATVs or motorcycles was therefore 0.066 ppm-year + 0.083 ppm-year = 0.149 ppm-years, approximately

Based on the data from McDermott and Vos, and assuming a lognormal distribution, the 95th percentile = exp (mu + 1.65*sigma), where mu is the mean of the log of the original data and sigma is the standard deviation of the log values.

| | ppm | ln |
|---|---|---|
| | 0.11 | -2.20727 |
| | 1.17 | 0.068186 |
| | 0.12 | -0.92082 |
| | 0.08 | -1.09691 |
| | 1.21 | 0.082785 |
| | 0.7 | -0.1549 |
| | mean | -0.70482 |
| | sd dev | 0.891968 |
| mu + 1.65*sigma = | | 0.766924 |
| | e^0.76692 | 2.153133 |

Assuming a log normal distribution of data from McDermott, 5% of the values would be expected to be 2.15 ppm or higher,

For filling gas cans, Mr. Underwood performed this task 182 days per year over 4.5 years or 819 times. 5% of 819 = 40.95 times.

The z score corresponding to 3 ppm would be
Z score = (ln3.0 – mu)sigma
Z score = (ln 3.0 – (-0.70482))/ 0.891968
Z score = 2.0219

According to an on-line calculator, for a one-sided assumption, a z score of 2.0219 corresponds to 2.16% of the values exceeding 3.0 ppm.

**TruFuel**

In assessing benzene exposure from TruFuel, Mr. Spencer repeats the falsehood that McDermott samples were only during gas pumping activities. He then assumes that the exposure lasted only 20 seconds, which is the time that Mr. Underwood said that it took to fill the tank on the leaf blower or weed whacker. However, the benzene in the air does not disappear immediately when the filling of the tank is completed. Also, benzene evaporating from spilled fuel, which Mr. Underwood testified would happen most of the time, would continue to evaporate. In addition, Mr. Underwood testified that he often got fuel on his hand, from which benzene would continue to evaporate or be absorbed through his skin.

Mr. Spencer also omitted estimation of Mr. Underwood's exposure to benzene emitted with the engine exhaust from the small two-stroke engines of leaf blowers and weed whackers. Due to inefficient combustion in these engines, much of the fuel is emitted unburned in the exhaust. As cited in my report, Nilsson (1987) provides the most comprehensive evidence of exposure to benzene from these engines. They measured full-shift exposures to benzene among operators of 2-stroke chain saws in forest settings in Sweden. They found 0.2 pm mean TWA exposures under most conditions, and levels as high as 0.75 ppm full-shift. Mr. Spencer ignored this source of Mr. Underwood's exposure to benzene.

**16) Sheldon Rabinowitz PhD, CIH**

In 2001, Dr. Rabinowitz apparently did his own simulation study of personal exposure to benzene and chlorinated solvents while he cleaned metal parts using "three degreasing solvent products." Results for benzene were stated to be below 0.04 ppm and 0.05 ppm. Perchloroethylene, methylene chloride, and 1,1,1 trichloroethane, all suspected human carcinogens, were found in concentrations ranging from 3.22 ppm to 21.1 ppm. These results are not germane to Mr. Underwood's case, because Mr. Underwood testified that he only used non-chlorinated cleaning solvents.

Dr. Rabinowitz subsequently used 0.5 ppm level of benzene as Mr. Underwood's exposure level during using O'Reilly brake cleaner by assuming various ratios of airborne concentration to benzene concentration in the product. "For the O'Reilly brake cleaner, I assumed a benzene airborne concentration of 0.5 ppm which is 10 times greater due to the possible higher benzene contamination level concentration in toluene than the non-aromatic ingredients in the other products." Thus, Dr. Rabinowitz provided no basis for his assumptions about the ratios or the benzene content in the products. He then assumed 100 brake jobs and 50 parts cleaning jobs, again without any basis in fact. He made similar baseless assumptions about benzene exposure levels and numbers of jobs using Autozone products.

Among other shortcomings, Dr. Rabinowitz neglected the fact that Mr. Davenport testified that Mr. Underwood used several cans of O'Reilly non-chlorinated brake cleaner to perform each task of repairing hydraulic cylinders.

After review of Defendants' expert reports, my opinions set forth in my report dated April 21, 2023, have not changed. All of my opinions in the rebuttal set forth above are stated to a reasonable degree of medical and scientific certainty.

Sincerely,

__________________________

Robert Laumbach MD, MPH, CIH, DABT
May 19, 2023